**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

L.M.-M.,
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005,

B.M.-M., a minor, by and through her Next
Friend, L.M.-M.,
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005,

V.M.-M., a minor, by and through her Next
Friend, L.M.-M.,
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005,

M.A.-H.,
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005,

I.M.-A., a minor, by and through her Next
Friend, M.A.-H.,
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005,

S.G.-C.,
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005,

B.O.-G., a minor, by and through her Next
Friend, S.G.-C.,
c/o Democracy Forward Foundation
1333 H St. NW
Washington, DC 20005, and

REFUGEE & IMMIGRANT CENTER FOR
EDUCATION & LEGAL SERVICES,
1305 N. Flores Street

Case No.

San Antonio, Texas 78212,

   *Plaintiffs*,


  vs.


KENNETH T. CUCCINELLI II, in his
  purported official capacity as acting
  Director of U.S. Citizenship and
  Immigration Services,
20 Massachusetts Ave NW,
Washington, DC 20529,


U.S. CITIZENSHIP & IMMIGRATION
  SERVICES,
20 Massachusetts Ave NW,
Washington, DC 20529,


KEVIN K. MCALEENAN, in his official
  capacity as acting Secretary of Homeland
  Security,
2707 Martin Luther King Jr Ave SE,
Washington, DC 20528,


U.S. DEPARTMENT OF HOMELAND
  SECURITY,
2707 Martin Luther King Jr Ave SE,
Washington, DC 20528, and

   *Defendants.*


## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

JURISDICTION AND VENUE ................................................................................ 4

PARTIES ............................................................................................................... 4

LEGAL BACKGROUND ....................................................................................... 5

    I.      The United States' Duty to Provide Refuge to Victims of Persecution ................. 5

    II.     The Expedited Removal System ................................................................ 7

    III.    United States Citizenship and Immigration Services ............................................ 11

    IV.   The Appointments Clause and the Federal Vacancies Reform Act ..................... 13

FACTUAL ALLEGATIONS .................................................................................. 15

    I.      The Challenges Facing Asylum Seekers at the Dilley and Karnes Detention
        Centers ........................................................................................................ 15

        A.     The Dilley and Karnes Detention Centers ................................. 15

        B.     The Difficulty of Navigating the Credible Fear Process ......................... 18

        C.     The Importance of Adequate Consultation and Legal Orientation ........... 20

    II.     The Trump Administration's Animus Toward Asylum Seekers ......................... 24

    III.    The President's Unlawful Appointment of Mr. Cuccinelli ................................... 31

    IV.   Mr. Cuccinelli's Unlawful Asylum Directives ..................................................... 38

        A.     Shortening Asylum Seekers' Time to Prepare for Interviews ................. 39

        B.     Denying Virtually All Continuances ........................................................ 41

        C.     Eliminating In-Person Orientation .......................................................... 43

    V.     Plaintiffs' Harms from the Unlawful Asylum Directives .................................... 45

        A.     Individual Plaintiffs ................................................................................. 45

             1.     L.M.-M., B.M.-M., and V.M.-M. .................................. 47

             2.     M.A.-H. and I.M.-A. ...................................................... 48

             3.     S.G.-C. and B.O.-G. ...................................................... 49

        B.     Refugee and Immigrant Center for Education and Legal Services ........... 50

CLAIMS FOR RELIEF ......................................................................................... 53

    Count One (Violation of 8 U.S.C. § 1225 and its implementing regulations,
        8 C.F.R. §§ 208.30, 235.3) ...................................................................... 53

    Count Two (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)) ...... 54

    Count Three (Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553,
        706(2)(D)) ................................................................................................. 55

    Count Four (Violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*) ..................... 56

    Count Five (Violation of the First Amendment, U.S. Const. amend. I) .......................... 58

i

Count Six (Violation of the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*) .... 59

Count Seven (Violation of the Appointments Clause of the U.S. Constitution,
U.S. Const. art. II, § 2, cl. 2) ................................................................................. 60

Count Eight (*Ultra Vires* Action) ..................................................................................... 61

REQUEST FOR RELIEF ........................................................................................................ 61

Plaintiffs L.M.-M., B.M.-M., V.M.-M, M.A.-H., I.M.-A., S.G.-C., B.O.-G., and the

Refugee & Immigrant Center for Education & Legal Services hereby sue Defendants Kenneth T.

Cuccinelli II, in his purported official capacity as Acting Director of U.S. Citizenship and

Immigration Services, Kevin K. McAleenan, in his official capacity as Acting Secretary of

Homeland Security, U.S. Citizenship and Immigration Services, and the U.S. Department of

Homeland Security, and allege as follows:

1.      Defendants recently altered long-standing procedures in ways that unlawfully

impinge on the right to seek asylum in the United States. This case challenges their new

procedures.

2.      The United States has a duty—one imposed by domestic law, international

treaties, and the nation's most fundamental commitments—to provide refuge to victims of

persecution. That obligation has no less force in the context of the expedited removal system that

Congress established in 1996 to promptly process asylum requests presented by people who have

entered the United States without inspection. While the expedited removal statute provides an

abbreviated process for assessing whether an asylum seeker's fear of persecution is credible,

Congress nevertheless specifically included critical protections as part of that assessment

process, designed to ensure that asylum seekers understand their legal rights, have an adequate

opportunity to consult with third parties, including counsel, and thus are able to meaningfully

present their asylum claims.

3.      Defendants have discarded long-standing protections in a series of recent

directives that undermine the credible fear evaluation process (the "Asylum Directives" or the

"Directives"). Until recently, asylum seekers were generally entitled to a minimum of 48 hours

from the time they received notice of their interview or from the time of arrival to consult with

third parties and to prepare for their interviews. Defendants have now reduced that time to a "full

calendar day," measured from the time an asylum seeker arrives at the ICE detention center—

which, in practice, results in asylum seekers receiving notice the night before their interview,

affording them but a few hours to prepare for an interview that could mean life or death (the

"Shortened Wait Period Directive"). Also, prior to the Asylum Directives, asylum seekers could

request continuances if they needed more time to consult with or retain counsel or other third

parties, gather evidence, organize the presentation of facts that support their claims, arrange

translation, or raise competency issues.  Now continuances are virtually forbidden (the

"Continuance Denial Directive"). Additionally, certain particularly vulnerable asylum seekers

were long provided with an in-person legal orientation to ensure that they understood their rights.

Now they are not (the "No Legal Orientation Directive").

4.       Individually and collectively, the Directives violate the Constitution and federal

law. Specifically, the Directives undermine asylum seekers' rights to consult with third parties,

to prepare for their interviews, and to participate effectively in those interviews. The Directives

are also arbitrary and capricious, because Defendants issued them without adequate

consideration of the effect on asylum seekers, and procedurally invalid, because they were

implemented without notice and comment. Moreover, by discriminating against, denying

reasonable accommodations to, and ultimately, excluding asylum seekers with trauma-related

and other mental and physical impairments, they violate the Rehabilitation Act. And, by

preventing asylum seekers from associating and communicating with third parties, and vice

versa, they violate the First Amendment.

5.       Moreover, these directives were issued by an unlawful acting official: Kenneth T.

Cuccinelli II, the purported Acting Director of U.S. Citizenship and Immigration Services

2

("USCIS"). Mr. Cuccinelli does not satisfy the legal requirements to serve as Acting USCIS Director under the Federal Vacancies Reform Act ("FVRA") and the Appointments Clause of the U.S. Constitution. He therefore lacks lawful authority to serve as the USCIS Acting Director, and any directives he issues in that capacity are therefore invalid.

6.      Through these Directives, Defendants have inflicted, and are inflicting, substantial irreparable harm to plaintiffs in this suit. Defendants, through the Directives, have harmed L.M.-M., B.M.-M., V.M.-M, M.A.-H., I.M.-A., S.G.-C., and B.O.-G. (the "Individual Plaintiffs"), who are currently detained at the South Texas Family Residential Center in Dilley, Texas (the "Dilley Detention Center," or "Dilley") by depriving them of their rights under the governing statutes and regulations and by preventing them from effectively presenting their claims during their credible fear interviews. As a result of these unfair and unlawful changes, the Individual Plaintiffs, and many others like them, now face removal to countries where they face persecution and violence.

7.      Defendants, through the Directives, have also harmed the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), which provides pro bono legal services to asylum seekers at the Karnes County Residential Center in Karnes City, Texas (the "Karnes Detention Center," or "Karnes"). Specifically, Defendants have made it even harder for RAICES to continue providing legal services to the women detained at Karnes, forcing them to divert resources in order to maintain even the limited offering of legal services that remain possible under the Directives.

8.      For these reasons, and as described more fully below, the Court should declare that the Asylum Directives are unlawful and enjoin Defendants from continuing to apply them in

processing and adjudicating asylum applications, and declare that Mr. Cuccinelli's appointment as Acting USCIS Director is unlawful.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because this action arises under federal law, and under 8 U.S.C. § 1252(e)(3).

10.    Venue is proper in this district under 28 U.S.C. § 1391(e), because Defendants are officers and agencies of the United States and are located in the District of Columbia, and under 8 U.S.C. § 1252(e)(3).

## PARTIES

11.    Plaintiffs L.M.-M. and her minor children B.M.-M. and V.M.-M. are Honduran nationals seeking asylum in the United States. They are detained at the Dilley Detention Center.

12.    Plaintiffs M.A.-H. and her minor child I.M.-A. are Honduran nationals seeking asylum in the United States. They are detained at the Dilley Detention Center.

13.    Plaintiffs S.G.-C. and her minor child B.O.-G. are Honduran nationals seeking asylum in the United States. They are detained at the Dilley Detention Center.

14.    Plaintiff Refugee and Immigrant Center for Education and Legal Services, based in San Antonio, Texas, is a nonprofit legal services organization that coordinates the Karnes Pro Bono Project. Through the Karnes Pro Bono Project, RAICES provides pro bono legal services, advocacy, and litigation on behalf of detained individuals at the Karnes Detention Center. RAICES, through its staff and Karnes Pro Bono Project volunteers, has been active at the Karnes Detention Center since it opened, in July 2014, and has provided legal services to over 20,000 non-citizens detained at the Karnes Detention Center since that time.

15.    Defendant Kenneth T. Cuccinelli II is sued in his purported official capacity as Acting Director of U.S. Citizenship and Immigration Services.

16.     Defendant USCIS is a federal agency headquartered in Washington, DC, at 20 Massachusetts Ave NW, Washington, DC 20529.

17.     Defendant Kevin K. McAleenan is sued in his official capacity as Acting Secretary of Homeland Security.

18.     Defendant U.S. Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, DC at 2707 Martin Luther King Jr Ave SE, Washington, DC 20528.

**LEGAL BACKGROUND**

I.      <u>**The United States' Duty to Provide Refuge to Victims of Persecution**</u>

19.     The United States has long pledged to provide sanctuary to those fleeing persecution and suffering abroad. Emma Lazarus's *The New Colossus*, inscribed at the base of the Statue of Liberty, describes the Statue as the "Mother of Exiles," and famously declares:

> Give me your tired, your poor,
> Your huddled masses yearning to breathe free,
> The wretched refuse of your teeming shore.
> Send these, the homeless, tempest-tost to me,
> I lift my lamp beside the golden door!

"[W]elcoming homeless refugees to our shores" is "one of the oldest themes in America's history," and part of "our national commitment to human rights and humanitarian concerns." S. Rep. No. 256, 96th Cong., 1st Sess. 1 (1979) (Senate Report on the Refugee Act of 1980).

20.     This commitment to the protection of victims of persecution is reflected in binding international treaties signed by the United States in the wake of the atrocities that refugees experienced during the World War II era. In 1968, the United States acceded to the 1967 United Nations Protocol Relating to the Status of Refugees, and thereby "agreed to comply with the substantive provisions of Articles 2 through 34 of the 1951 United Nations Convention Relating to the Status of Refugees." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987). Under

5

Article 33.1 of the Convention, the United States may not "return an alien to a country where his 'life or freedom would be threatened' on account" of a protected characteristic. *Id.* And, under Article 34, the United States "shall as far as possible facilitate the assimilation and naturalization of refugees." *Id.* at 441.

21.      To fulfill these international legal obligations, Congress enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 105. "Congress' intent in enacting the Refugee Act was to align domestic refugee law with the United States' obligations under the Protocol, to give statutory meaning to 'our national commitment to human rights and humanitarian concerns,' and 'to afford a generous standard for protection in cases of doubt.'" *Grace v. Whitaker*, 344 F. Supp. 3d 96, 106 (D.D.C. 2018) (quoting *In Re S-P-*, 21 I. & N. Dec. 486, 492 (B.I.A. 1998)).

22.      Under the Refugee Act, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Thus, Congress specifically decreed that whether a non-citizen lawfully entered the United States has no bearing on that person's ability to seek asylum.

23.      To be eligible for asylum, an asylum seeker must demonstrate "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). A grant of asylum means that "the Attorney General shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence." *Id.* § 1158(c)(1).

6

24.     If the asylum seeker does not receive a discretionary grant of asylum, the person

may nonetheless be eligible for withholding of removal or protection under the Convention

Against Torture, which is mandatory if they make the requisite showing of fear of persecution or

torture and are not subject to any bars. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 1208.16,

1208.18; *Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005).

## II.     The Expedited Removal System

25.     "Prior to 1996, every person who sought admission into the United States was

entitled to a full hearing before an immigration judge, and had a right to administrative and

judicial review." *Grace*, 344 F. Supp. 3d at 107.

26.     In 1996, Congress enacted the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546. IIRIRA

established a new system for processing certain categories of recent entrants to the United States,

commonly referred to as the "expedited removal system." IIRIRA otherwise preserved the pre-

existing removal system, including, in relevant part, its guarantees that a non-citizen has "the

privilege of being represented (at no expense to the Government) by such counsel … as he shall

choose," 8 U.S.C. § 1362, and that immigration judges must "prescribe safeguards to protect the

rights and privileges" of non-citizens who lack mental competency, *id.* § 1229a(b)(3).

27.     The expedited removal system allows DHS to remove certain non-citizens from

the United States without a removal hearing before an immigration judge. Specifically, non-

citizens who have engaged in fraud or misrepresentation to obtain admission to the United

States, *id.* § 1182(a)(6)(C), or who lack proper documentation, *id.* § 1182(a)(7), can be "removed

from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

28.     The statute requires, however, that non-citizens who seek asylum must receive

additional review before DHS may remove them. A non-citizen who indicates an intention to

apply for asylum or a fear of persecution in his or her home country must be provided with an

interview to demonstrate that their fear of persecution or torture is credible (commonly referred

to as a "credible fear interview"). *Id.* § 1225(b)(l)(A)(ii). If an asylum officer determines that it is,

the asylum seeker is placed in removal proceedings under Section 240 of the Immigration and

Nationality Act and permitted to apply for asylum.

29.     The credible fear standard is defined as "a significant possibility, taking into

account the credibility of the statements made by the alien in support of the alien's claim and

such other facts as are known to the officer, that the alien could establish eligibility for asylum."

8 U.S.C. § 1225(b)(1)(B)(v).

30.     Congress incorporated this exception and its attendant protections because it

recognized that "[e]xpediting the removal process … risks sending individuals who are

potentially eligible for asylum to their respective home countries where they face a real threat, or

have a credible fear of persecution." *Grace*, 344 F. Supp. 3d at 107; *see also Cardoza-Fonseca*,

480 U.S. at 449 ("While deportation is always a harsh measure; it is all the more replete with

danger when the alien makes a claim that he or she will be subject to death or persecution if

forced to return to his or her home country.").[1]

31.     Prior to a credible fear interview, the government "shall provide information

concerning the asylum interview," which includes a description of the process and the non-

citizen's legal rights. 8 U.S.C. § 1225(b)(1)(B)(iv).

---

[1]     *See also* 1 *Report on Asylum Seekers in Expedited Removal*, U.S. Comm'n on Int'l Religious
Freedom (Feb. 2005),
https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf
(explaining that Congress included these provisions out of concern "that *bona fide* asylum
seekers not be removed to countries where they may be persecuted").

32.     In particular, the asylum seeker is entitled to "consult with a person or persons of [their] choosing," provided that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." *Id.* The U.S. District Court for the District of Columbia has construed this statutory right of consultation to attach before a credible fear interview takes place. *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 54 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

33.     DHS has enacted regulations to implement these statutory mandates.

34.     Specifically, pursuant to these regulations, at the time the inspecting officer refers an asylum seeker for a credible fear interview, the officer must provide the asylum seeker with a written disclosure on Form M-444, Information About Credible Fear Interview, that outlines the purpose of the interview process and the procedural rights of the asylum seeker. 8 C.F.R. § 235.3(b)(4)(i).

35.     The regulations reiterate that the asylum seeker "shall be given time to contact and consult with any person or persons of his or her choosing … in accordance with the policies and procedures of the detention facility where the alien is detained," provided that contact and consultation "shall be at no expense to the government, and shall not unreasonably delay the process." *Id.* § 235.3(b)(4)(ii).

36.     Similarly, the regulations governing the interview reiterate that the asylum officer may reschedule the interview if the applicant "is unable to participate effectively in the interview because of illness, fatigue, or other impediments," that the asylum officer must verify that the asylum seeker received Form M-444 and possesses "an understanding of the credible fear determination process," that the asylum seeker may consult with persons of their choosing, who may also attend the interview, and present a statement if permitted in the asylum officer's

9

discretion, that "the asylum officer shall arrange for the assistance of an interpreter" if necessary, and that "[t]he asylum officer shall create a summary of the material facts as stated by the applicant." *Id.* § 208.30(d).

37. Under previous DHS policy at some detention centers, asylum seekers received a Form G-56, which informed them of the time of their interview, and then had a minimum of 48 hours to prepare for their credible fear interview, as well as the opportunity to request a continuance if they required additional time to prepare. At other facilities, the time began when the asylum seeker arrived at the detention center.[2]

38. Ultimately, the interview is intended to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." *Id.* § 208.30(d). The asylum officer must also consider whether the asylum seeker's "case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." *Id.* § 208.30(e)(4).

39. After the interview, the asylum officer "shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination." *Id.* § 208.30(e)(1).

40. If the asylum officer determines that the asylum seeker has a credible fear of persecution, then USCIS issues a Notice to Appear to the asylum seeker and places them in removal proceedings before an immigration judge, allowing them to apply for asylum. 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f).

---

[2]   Hamed Aleaziz, *Immigrant Asylum-Seekers May Get Less Time To Prepare Their Cases Under A New Trump Administration Rule*, BuzzFeed News (July 9, 2019), https://www.buzzfeednews.com/article/hamedaleaziz/immigrant-asylum-seekers-less-time-to-prepare [hereinafter Aleaziz, *Immigrant Asylum-Seekers*].

41.     If the asylum officer determines that the asylum seeker does not have a credible

fear of persecution, then the asylum seeker may receive only "prompt review by an immigration

judge" of that determination, which "shall include an opportunity to be heard and questioned by

the immigration judge," but "shall be concluded as expeditiously as possible, to the maximum

extent practicable within 24 hours, but in no case later than 7 days." *Id.* § 1225(b)(1)(B)(iii)(II).

In conducting that review, the immigration judge has access to "[t]he record of the negative

credible fear determination." 8 C.F.R. § 208.30(g)(2).

42.     If the immigration judge agrees with the asylum officer's negative determination,

there is no provision for further review of that decision, though USCIS, in its discretion, may

reconsider an initial negative determination. In fact, the government will generally work quickly

to remove the asylum seeker from the United States. Moreover, non-citizens who are deemed

unable to demonstrate credible fear and whom the immigration judge orders removed from the

country are subject to a five-year bar on admission to the United States unless they qualify for a

discretionary waiver. 8 U.S.C. § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2.

43.     In sum, the case of each asylum seeker in expedited removal turns on the effective

presentation of their asylum claim at the credible fear interview.

### III.     United States Citizenship and Immigration Services

44.     The expedited removal system is administered in part by Defendant U.S.

Citizenship and Immigration Services. In particular, USCIS employees conduct credible fear

interviews.

45.     Through the Homeland Security Act of 2002, Congress established USCIS as a

subagency of the Department of Homeland Security and consolidated various Executive Branch

immigration functions within DHS. *See* Pub. L. No. 107-296, Subtitle E, 116 Stat. 2195 (2002),

*codified at* 6 U.S.C. § 271 *et seq.*

46.     The Homeland Security Act established the position of Director as the head of USCIS, and provided that he or she shall be "appointed by the President, by and with the advice and consent of the Senate." 6 U.S.C. §§ 113, 271.

47.     The USCIS Director has sweeping authority to "establish the policies" underlying the adjudication of immigration petitions and refugee and asylum applications, to "oversee the administration of such policies," and to "establish national immigration services policies and priorities." 6 U.S.C. § 271(a)(3).

48.     The Homeland Security Act also transferred the authority of the Commissioner of the now-defunct Immigration and Naturalization Service ("INS") to the USCIS Director, including: (1) adjudications of immigrant visa petitions; (2) adjudications of naturalization applications; (3) adjudications of asylum and refugee applications; (4) adjudications performed at service centers; and (5) all other adjudications previously performed by the INS after USCIS was established, as well as all personnel, infrastructure, and funding provided to support these functions. *See id.* § 271(b); *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

49.     The USCIS Director oversees the work of 19,000 USCIS employees and contractors working at more than 200 offices around the world.[3] Each day, these employees and contractors within the USCIS Director's purview adjudicate more than 26,000 requests for immigration benefits and process hundreds of refugee and asylum applications.

50.     The Homeland Security Act enumerates five USCIS officers by name: the Chief of Policy and Strategy, the Legal Advisor, the Budget Officer, the Chief of the Office of Citizenship, and the Citizenship and Immigration Services Ombudsman. *See id.* §§ 271(c)-(f), 272.

---

[3]     *See, e.g.*, *About Us*, USCIS, https://www.uscis.gov/aboutus (last visited Sept. 4, 2019).

51.     USCIS's functions are further divided among four program offices: Administrative Appeals; Equal Opportunity & Inclusion; Privacy; and Investigations; and seven directorates: External Affairs; Immigration Records & Identity Services; Field Operations; Fraud Detection & National Security; Management; Refugee, Asylum & International Operations; and Service Center Operations.

52.     The chiefs of each of these program offices and directorates report to the USCIS Deputy Director and Director.[4]

## IV.   The Appointments Clause and the Federal Vacancies Reform Act

53.     The Constitution mandates a role for the United States Congress in the appointment of officers of the United States. This important role, enshrined in the Appointments Clause, "is more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125 (1976)). These "significant structural safeguards" apply to the appointment of all officers—that is, any person afforded "significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. at 126, or who has "significant discretion" in their exercise of Executive Branch authority, *Lucia v. SEC*, 138 S. Ct. 2044, 2047 (2018).

54.     Pursuant to the Appointments Clause, officers of the United States may be appointed by the President only "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. It further provides that only Congress, "by Law," may vest the appointment of inferior officers in the President, the courts, or in the heads of departments, "as they [the

---

[4]   *See USCIS*, USCIS, https://www.uscis.gov/sites/default/files/USCIS/About-Us/USCIS_OrgChart.pdf (last visited Sept. 4, 2019).

Congress] think proper." *Id.* Moreover, the Appointments Clause vests exclusive authority in Congress to "establish[] by Law" all Executive Branch offices. *Id.*

55.     Recognizing that "[t]he constitutional process of Presidential appointment and Senate confirmation … can take time," however, "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials … without first obtaining Senate approval." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017). The Federal Vacancies Reform Act "is the most recent iteration of that interbranch accommodation." *Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019).

56.     The FVRA permits an individual to serve in an acting capacity whenever "an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a).

57.     When that happens, the FVRA prescribes a default rule: "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1); *see also Guedes*, 920 F.3d at 11 ("The default is for the 'first assistant' to take the helm.").

58.     "The next two paragraphs of § 3345(a) identify alternatives." *Southwest General*, 137 S. Ct. at 936. Specifically, the President may select another individual to temporarily fill the vacancy if they "serve[] in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate," 5 U.S.C. § 3345(a)(2), or if they "served in a position in [the] agency for not less than 90 days" at the GS-15 rate of pay, *id.* § 3345(a)(3). Reflecting the FVRA's aim of providing the President with *limited* authority to

name acting officials, these provisions allow the President to deviate from the FVRA's first assistant default rule and select someone else if they have either received the Senate's approval or have met certain seniority requirements.

59.     The FVRA further provides that certain actions "taken by any person who is not acting" lawfully under the statute "shall have no force or effect." 5 U.S.C. § 3348.

## FACTUAL ALLEGATIONS

### I.     The Challenges Facing Asylum Seekers at the Dilley and Karnes Detention Centers

60.     This case principally concerns the Asylum Directives, a series of policy changes first implemented at the Dilley Detention Center, and later the Karnes Detention Center. For many of the asylum seekers detained at Dilley and Karnes, Defendants have chosen to initiate expedited removal proceedings rather than regular removal proceedings. Plaintiffs consist of several of the asylum seekers currently detained at Dilley who have been subjected to the Asylum Directives challenged in this litigation, and the Refugee and Immigrant Center for Educational and Legal Services, whose efforts to provide asylum seekers with legal assistance at the Karnes Detention Center are compromised by the Directives.

### A.     The Dilley and Karnes Detention Centers

61.     In December 2014, ICE and the Corrections Corporation of America, a for-profit corporation that operates private prisons and detention facilities and that rebranded as "CoreCivic" in October 2016, opened the Dilley Detention Center. Unlike most ICE detention facilities, Dilley was not originally constructed to serve as an adult prison or jail. Instead, Corrections Corporation of America specifically designed and constructed Dilley pursuant to ICE specifications for the sole purpose of detaining mothers and their minor children.

15

62.     In March 2012, ICE and The GEO Group, Inc., another for-profit corporation that operates private prisons and detention facilities, opened the Karnes Detention Center. Karnes was originally intended to operate as an adult detention center. However, in July 2014, the GEO Group converted Karnes into a family detention center where ICE detained families through the spring of 2019. Beginning in April 2019, Karnes began principally detaining adult women without children.

63.     At Dilley, ICE has the capacity to detain up to 2,400 mothers and children, although the actual population usually varies between 200 and 1,500, including at almost all times from 2016 through today. Most families detained at Dilley consist of a mother and one child. During 2016, ICE detained approximately 11,302 children at Dilley with a median age just under six.

64.     At Karnes, the current population is approximately 1,300 adult women. As a family detention center, Karnes had capacity for approximately 850 parents and children. The vast majority of women currently detained at Karnes are asylum seekers who have recently arrived in the United States and have been placed into the expedited removal process.

65.     Dilley and Karnes detain families and adult women, respectively, in secure facilities, behind tall fences monitored by flood lights and surveillance cameras. In 2015, a federal court concluded that the use of these facilities to detain families violated federal law.[5]

---

[5]     Franco Ordoñez, *Judge Rules Against Family Detention Policy*, McClatchy (July 25, 2015), https://www.mcclatchydc.com/news/nation-world/national/article28687876.html; *see Flores v. Johnson*, 212 F. Supp. 3d 864, 880 (C.D. Cal.), *clarified on denial of reconsideration sub nom. Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015), *aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016), *and aff'd in part, rev'd in part and remanded*, 828 F.3d 898 (9th Cir. 2016).

After visiting Dilley and Karnes, Congresswoman Judy Chu stated that they "looked so much like the Japanese-American internment camps of World War II."[6]

66.     Many of the families and women detained at Dilley and Karnes are from El Salvador, Guatemala, and Honduras, countries with some of the highest violent crime rates in the world.[7] The overwhelming majority of the families and adult women detained at Dilley and Karnes have experienced severe forms of trauma, including child abuse, rape, incest, domestic violence, and the persecution of their loved ones.

67.     As a consequence of their past trauma, journey to the United States, and detention, the women and minor children detained at Dilley and Karnes frequently suffer from post-traumatic stress disorder, anxiety, and depression. In that respect, they are emblematic of asylum seekers in general, who report higher than normal incidences of these conditions.[8] A study of Central American migrants who arrived at the U.S. border, for example, found that 32 percent of the 234 adults interviewed met diagnostic criteria for PTSD, 24 percent for depression, and 17 percent for both disorders.[9]

---

[6]     *"Deplorable": Federal Judge Condemns For-Profit Texas Detention Centers for Immigrant Families*, Democracy Now (July 29, 2015), https://www.democracynow.org/2015/7/29/deplorable_federal_judge_condemns_for_profit.

[7]     *See, e.g.*, *El Salvador*, Dep't of Justice, https://www.justice.gov/eoir/country/el-salvado-topical; *Guatemala*, U.S. Dep't of Justice, https://www.justice.gov/eoir/country/guatemala-topical; *Honduras*, U.S. Dep't of Justice, https://www.justice.gov/eoir/country/honduras-topical.

[8]     *See, e.g.*, Israel Bronstein & Paul Montgomery, *Psychological Distress in Refugee Children: A Systematic Review*, 14 Clinical Child & Fam. Psychol. Rev. 44-56 (2011); Katy Robjant et al., *Mental Health Implications of Detaining Asylum Seekers: Systematic Review,* 194 Br. J. Psychiatry 306-12 (2009); Giulia Turrini et al., *Common Mental Disorders in Asylum Seekers and Refugees: Umbrella Review of Prevalence and Intervention Studies,* 11 Int'l J. Mental Health Sys. (2017).

[9]     Allen Keller et al., *Pre-Migration Trauma Exposure and Mental Health Functioning Among Central American Migrants Arriving at the U.S. Border*, 12 PLOS ONE (2017).

**B.**     **The Difficulty of Navigating the Credible Fear Process**

68.     The families and women detained at Dilley and Karnes have just completed an immensely arduous journey to the United States. The journey itself may have meant many days or weeks of travel, in challenging conditions, subject to significant risks of violence, kidnapping, rape, and trafficking, which compound their prior trauma. Once taken into CBP custody, they are often held in a freezing room referred to as the *hielera*, or "icebox," and/or a caged area referred to as the *perrera*, or "dog pound." Most are scared and tired; some may be sick or injured. Against this backdrop, the families and women detained at Dilley and Karnes, respectively, are expected to navigate the credible fear process—a process that may well mean the difference between life and death.

69.     The credible fear process as a whole can be difficult to comprehend, especially to one who has never heard of it and who has just arrived following an arduous journey with children. Asylum seekers often report that "they were intimidated and confused by the interview process and complex immigration court asylum proceedings that they had to navigate on their own while detained and without legal assistance."[10]

70.     Most of the women and minor children detained at Dilley and Karnes communicate only in Spanish, or in an indigenous language for which there may be limited interpretation support.[11]

---

[10]     *"You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm*, Human Rights Watch (Oct. 16, 2014), https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk.

[11]     Molly Hennessy-Fiske, *Immigrant Families in Detention: a Look Inside One Holding Center*, L.A. Times (June 25, 2015), https://www.latimes.com/nation/la-na-dilley-detention-20150625-story.html.

71.     The interview itself is, by its nature, psychologically demanding and difficult. It requires the asylum seeker to describe the circumstances that gave rise to their fear of persecution to an asylum officer. In almost every case, doing so will require summarizing deeply personal, stigmatizing, and traumatizing details, details that the asylum seeker may never have relayed to another person before, and then answering complicated and nuanced follow-up questions.

72.     The fact of detention itself also makes it difficult for asylum seekers at Dilley and Karnes to prepare for their credible fear interviews. Asylum seekers generally have limited ability to communicate with third parties who can assist them in preparing for their interviews or in gathering crucial facts and evidence. At the same time, asylum seekers are in unfamiliar and often uncomfortable surroundings, and may have to devote time that they might otherwise use in preparing for their interviews to mandatory facility orientations and programs. Detention also "takes a severe psychological toll," and can exacerbate "trauma, depression, and suicidal thoughts," particularly among detained families.[12]

73.     As mothers at Dilley prepare for their credible fear interviews, they are also caring for their minor children. Those children, who possess their own rights under immigration law, must themselves be prepared to navigate the credible fear process. However, the children generally have limited education or ability to participate in formal legal proceedings. That simultaneously makes it more difficult for the mother to present her own claims and imposes additional responsibility on her to ensure that her child's rights are vindicated.

---

[12]   *US: Trauma in Family Immigration Detention*, Human Rights Watch (May 15, 2015), https://www.hrw.org/news/2015/05/15/us-trauma-family-immigration-detention-0.

**C.**      **The Importance of Adequate Consultation and Legal Orientation**

74.      Given the immense challenges facing asylum seekers at Dilley and Karnes, and in other facilities, an adequate opportunity to consult with third parties, including lawyers, and an adequate understanding of their legal rights during the credible fear process are essential.

75.      For five years prior to the No Legal Orientation Directive, USCIS officials at Dilley provided an oral, in-person legal orientation to asylum seekers upon arrival at the facility, where they would take questions from asylum seekers and confirm their preferred asylum officer gender and language for the interview. During that orientation, they would also provide the required Form M-444, which provides a written summary of the orientation information.

76.      That in-person orientation was the only time when asylum seekers were able to ask questions about the credible fear process and their legal rights. That orientation also provided the only means of transmitting information to asylum seekers, including children, who cannot read in one of the ten languages used for the Form M-444, and to confirm that asylum seekers with special needs, including physical or mental impairments or other competency issues, understand the information that they are given. Although other accommodations might be necessary in particular cases, the orientation constituted a type of reasonable accommodation for the needs of those asylum seekers.

77.      At or around the same time, USCIS provided asylum seekers at Dilley with the Form G-56, which informs them of the date and time of their credible fear interview.

78.      Before April 2019, when Karnes housed families as well, it also provided in-person orientation and the Form G-56. Since then, USCIS has only provided asylum seekers with the Form M-444, and GEO informs detained women about their scheduled interviews using a short slip of paper notifying them of their interview time. GEO also uses the slip of paper as a

method of communication to notify women about meetings with counsel, medical screenings, and other appointments.

79.    After the orientation at Dilley, asylum seekers could take any paperwork to a representative of the Dilley Pro Bono Project ("DPBP"), who could then assist the asylum seeker by explaining the credible fear process, providing legal counsel, connecting them with other professional assistance, or helping them collect necessary evidence and factual details. Similarly, asylum seekers at Karnes could take their paperwork to RAICES to receive assistance, although RAICES continues to face a backlog of asylum seekers.

80.    Prior to the Shortened Wait Period Directive, asylum seekers, under USCIS policy, were afforded a minimum of 48 hours from the time they received the Form G-56 to prepare for their credible fear interview at Dilley. Asylum seekers at Karnes were entitled to a minimum of 48 hours from the time they arrived at the facility.

81.    During that time, asylum seekers could consult with legal counsel or with other third parties, including family and medical and psychological professionals. That 48 hour consultation period also provided the first chance for many asylum seekers to begin to recuperate from their arduous journey north and their stay at the CBP facilities along the border, feel safe, help their children adjust to the facility and routine imposed by facility officials, and gather their thoughts and prepare in advance of their interviews.

82.    That 48 hour consultation period was invaluable in ensuring that asylum seekers could avail themselves of their right to consult with third parties and participate fully in their credible fear interviews.

83.    In general, the assistance of counsel greatly enhances an asylum seeker's ability to press their claims. Asylum seekers who possess representation are two to ten times more likely

21

to be granted asylum.[13] "Lack of counsel not only disadvantages detainees but also burdens the system, since unrepresented cases are more difficult and time consuming for adjudicators to decide."[14]

84.     Specifically, counsel performs several critical functions in preparing for the interview. Counsel explains a confusing and complex administrative process;[15] helps the asylum seeker articulate the facts of their situation in a clear and compelling way; gathers additional evidence and facts to support the asylum seeker's claims; connects the asylum seeker's experiences to the standards for granting asylum; assists the asylum seeker in obtaining additional time or accommodations, if necessary; and makes connections to other professionals to provide assistance. Prior to the Asylum Directives, RAICES was able to provide many of these services to individuals detained at Karnes. Its ability to do so, however, has been directly and negatively impacted by the Directives.

85.     Aside from counsel, asylum seekers may need to speak to other individuals to gather necessary facts to show that their fear is credible. For example, an asylum seeker may know that she or he was persecuted on account of a protected characteristic, but not have access to the country conditions reports that would corroborate that such persecution is widespread. An asylum seeker may have been told by a relative that they needed to leave their home country, but not the nature of the threat, its details, or the surrounding context. Or an asylum seeker may

---

[13]   *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, U.S. Comm'n on Int'l Religious Freedom 52 (2016), https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

[14]   *Id.*

[15]   Moreover, many asylum seekers come from countries where they have observed that the authorities are corrupt, cannot be trusted, or are simply ineffective, and where administrative processes lack protections for confidentiality and fairness. Counsel must often spend substantial time reassuring the asylum seeker that what they say to U.S. authorities in the credible fear process will not be relayed to their persecutors.

know all of the relevant facts, but fled their home country quickly, without time to obtain supporting documentation or other evidence. In such cases, time to consult with third parties, including relatives, friends, or previous neighbors, or with counsel, is necessary to ensure that the asylum seeker can obtain, organize, and present these details and material to the asylum officer.

86.     The 48 hour consultation period also provides an opportunity to correct errors in the screening process. Border patrol agents often submit reports that contain misstatements and omissions that asylum seekers may only be able to correct with the assistance of counsel.[16]

87.     The 48 hour consultation period is also critical to identify individuals with special needs, including physical or mental impairments. Many asylum seekers have serious trauma-related or competency issues. A minimum of 48 hours constituted a reasonable accommodation for the needs of disabled asylum seekers.

88.     Moreover, a mental health evaluation can often serve as a crucial piece of evidence for an asylum seeker, bolstering her credibility by establishing that the trauma she has suffered impedes her ability to recount the circumstances that prompted her flight to the United States. Mental health evaluations also assist attorneys in determining if clients are competent to consent to representation and participate meaningfully in their cases.

89.     Prior to the Continuance Denial Directive, USCIS also frequently granted continuances to asylum seekers who required additional time. For example, some asylum seekers may be unable to consult with counsel in the time provided to them; others may need additional time to become fully prepared for their interviews; some may have particularly complicated cases that require additional analysis; and still others may need additional time to make contact

---

[16]   *See* John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies that Can Sabotage Asylum Claims*, Intercept (Aug. 11, 2019), https://theintercept.com/2019/08/11/border-patrol-asylum-claim/.

with third parties who possess information that would support their bona fide claims. Moreover, those with special needs, including physical or mental impairments, may also need additional time to consult with counsel or prepare for their interviews. These continuances constituted reasonable accommodations for the needs of disabled asylum seekers.

90.     In sum, robust in-person legal orientation, an adequate time period within which to consult with counsel and third parties, and the availability of reasonable continuances are all essential to upholding an asylum seeker's statutory and regulatory rights in the asylum process.

## II.     The Trump Administration's Animus Toward Asylum Seekers

91.     Notwithstanding the difficulty of the long-standing, extant credible fear interview process, the Trump Administration has repeatedly attempted to curtail asylum seekers' legal rights. It has done so out of animus toward asylum seekers, particularly asylum seekers of color, from countries Administration officials have publicly derided.

92.     This effort has included, in addition to the Asylum Directives at issue in this lawsuit, the following actions:

a.      Instructing U.S. Border Patrol officials to refer for criminal prosecution, and U.S. Department of Justice lawyers to prosecute, anyone who entered the United States between ports of entry, regardless of whether such individuals did so for purposes of claiming asylum.[17] That "zero tolerance" policy has included parents traveling

---

[17]    *See Decision Memorandum for the Secretary: Increasing Prosecutions of Immigration Violations*, U.S. Dep't of Homeland Security (Apr. 23, 2018), https://www.documentcloud.org/documents/4936568-FOIA-9-23-Family-Separation-Memo.html; *Memorandum for Federal Prosecutors Along the Southwest Border: Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)*, U.S. Dep't of Justice (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download.

with their children, causing them to be placed in separate detention settings in the policy colloquially known as "family separation."[18]

b.   Limiting the number of individuals who can request asylum at a port of entry along the U.S.-Mexico border each day in a process known as "metering."[19]

c.   Implementing a "remain in Mexico" policy through the so-called "Migrant Protection Protocols" (the "MPP"),[20] under which non-Mexican asylum seekers can be sent back to Mexico during the pendency of their immigration proceedings.[21]

d.   Promulgating an interim final rule that, in combination with subsequently issued presidential proclamations, made non-citizens ineligible for asylum if they entered the United States from Mexico outside a designated port of entry.[22]

---

[18]   Camila Domonoske & Richard Gonzales, *What We Know: Family Separation and 'Zero Tolerance' at the Border*, NPR (June 19, 2018), https://www.npr.org/2018/06/19/621065383/what-we-know-family-separation-and-zero-tolerance-at-the-border.

[19]   James Fredrick, *'Metering' At the Border*, NPR (June 29, 2019), https://www.npr.org/2019/06/29/737268856/metering-at-the-border.

[20]   *See Migrant Protection Protocols*, U.S. Dep't of Homeland Security (Jan. 24, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols [hereinafter *Migrant Protection Protocols*].

[21]   *See id.*; *see also Innovation Law Lab, et al. v. Nielsen*, Case No. 19-cv-00807 (N.D. Cal. April 8, 2019), ECF No. 73 at 1.

[22]   *O.A. v. Trump*, 2019 WL 3536334 (D.D.C. 2019) (citing *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018); *Addressing Mass Migration Through the Southern Border of the United States*, 83 Fed. Reg. 57,661 (Nov. 9, 2018); *Addressing Mass Migration Through the Southern Border of the United States*, 84 Fed. Reg. 3,665 (Feb. 7, 2019); *Addressing Mass Migration Through the Southern Border of the United States*, 84 Fed. Reg. 21,229 (May 8, 2019)).

e.  Promulgating an interim final rule that bars individuals from being eligible to seek asylum unless they first sought "protection from persecution or torture while in a third country through which they transited en route to the United States."[23]

f.  Dramatically expanding the expedited removal authority through a notice published in the Federal Register on July 23, 2019 to cover eligible non-citizens deemed inadmissible and who, when encountered by a DHS official anywhere in the United States, had been physically present in the United States for less than two continuous years.[24]

g.  Proposing to categorically deny work permits to those who have applied for asylum after entering the United States outside of a port of entry, and to impose significant delays for those who remain eligible for work authorization.[25]

h.  Overall, declaring it to be "the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens."[26]

---

[23]  *Asylum Eligibility and Procedural Modification*, 84 Fed. Reg. 33,829, 33,830 (July 16, 2019).

[24]  *Practice Alert: Implementation of Expedited Removal Expansion*, Am. Immigr. Lawyers Ass'n (Aug. 30, 2019), https://www.aila.org/advo-media/aila-practice-pointers-and-alerts/trump-administration-expands-expedited-removal.

[25]  *See* Hamed Aleaziz, *The Trump Administration Plans to Deny Work Permits to Asylum-Seekers Who Cross the Border*, BuzzFeed News (Aug. 20, 2019), https://www.buzzfeednews.com/article/hamedaleaziz/asylum-work-permits-deny-trump-immigration-policy [hereinafter Aleaziz, *Trump Administration Plans to Deny Work Permits*]; Ted Hesson, *Trump Administration Advances Measures to Toughen Asylum Process*, PoliticoPro (Aug. 27, 2019), https://subscriber.politicopro.com/employment-immigration/whiteboard/2019/08/trump-administration-advances-measures-to-toughen-asylum-process-3760412.

[26]  Executive Order: Border Security and Immigration Enforcement Improvements § 11 (Jan. 25, 2017), https://www.whitehouse.gov/presidential-actions/executive-order-border-security-immigration-enforcement-improvements/; *see also Implementing the President's Border Security*

93.     The Administration's attempts to limit asylum are grounded in Administration officials' animus toward those seeking asylum, particularly asylum seekers of color.

94.     Specifically, President Trump has claimed that Haitians admitted under the temporary protected status ("TPS") program "all have AIDS," that Nigerians admitted through TPS came from "huts in Africa," and he has questioned why the United States would admit "all these people from shithole countries" through programs like TPS, instead of focusing on bringing people from countries like Norway, a majority white country.[27]

95.     President Trump has said, time and again, without evidence, that he believes the asylum process to be a "scam" and a "hoax,"[28] and that asylum seekers are fraudsters reading canned statements instead of honestly describing their fear of persecution:

a.      "We shouldn't be hiring judges by the thousands, as our ridiculous immigration laws demand, we should be changing our laws, building the Wall, hire Border Agents and Ice and not let people come into our country based on the legal phrase they are told to say as their password."[29]

b.      "We cannot allow all of these people to invade our Country. When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back

_____

*and Immigration Enforcement Improvement Policies*, U.S. Dep't of Homeland Security (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf.

[27]    *Id.*

[28]    *Trump Says Some Asylum Seekers Are Gang Members*, CBS News (Apr. 5, 2019), https://www.cbsnews.com/news/trump-says-some-asylum-seekers-are-gang-members-border-calexico-2019-04-05-today/.

[29]    Donald J. Trump (@realDonaldTrump), Twitter (June 21, 2018, 8:12 AM), https://twitter.com/realDonaldTrump/status/1009770941604298753?s=20.

from where they came. Our system is a mockery to good immigration policy and Law and Order. Most children come without parents[.]"[30]

    c.    "The biggest loophole drawing illegal aliens to our borders is the use of fraudulent or meritless asylum claims to gain entry into our great country. An alien simply crosses the border illegally, finds a Border Patrol agent, and using well-coached language—by lawyers and others that stand there trying to get fees or whatever they can get—they're given a phrase to read. They never heard of the phrase before. They don't believe in the phrase. But they're given a little legal statement to read, and they read it. And now, all of a sudden, they're supposed to qualify. But that's not the reason they're here."[31]

96.    President Trump has claimed, without basis, that asylum seekers are gang members and drug traffickers.[32]

97.    President Trump has described migrants from Central America as "[s]ome of the roughest people you have ever seen. People that look like they should be fighting for the [Ultimate Fighting Championship]." He has said they are merely following a script to establish their fear of persecution: "Asylum—oh give him asylum! He's afraid, he's afraid…. We don't

---

[30]  Donald J. Trump (@realDonaldTrump), Twitter (June 24, 2018, 11:02 AM), https://twitter.com/realDonaldTrump/status/1010900865602019329?s=20.

[31]  *Remarks by President Trump on the Illegal Immigration Crisis and Border Security*, White House (Nov. 1, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-illegal-immigration-crisis-border-security/.

[32]  The White House (@WhiteHouse), Twitter (Feb. 15, 2019, 1:07 PM), https://twitter.com/WhiteHouse/status/1096470982301224960?s=20.

love the fact that he's carrying the flag of Honduras or Guatemala or El Salvador only to say he's petrified to be in his country."[33]

98.     President Trump repeatedly referred to a slow-moving group of migrants traveling towards the United States border as "an invasion" filled with "[m]any [g]ang [m]embers and some very bad people,"[34] asserting, with no basis, that they were "not legitimate asylum seekers."[35]

99.     Similarly, Defendant Kenneth T. Cuccinelli II has a history of attacking immigrants, particularly immigrants of color, and their families. Specifically, Mr. Cuccinelli has compared immigrants to rats, raccoons, and other pests, arguing that a D.C. ordinance restricting pest control "is worse than our immigration policy" because "[y]ou can't break up rat families."[36] He has argued that states should invoke "war powers" to combat an "invasion" of immigrants by "turn[ing] people back at the border": "You just point them back across the river

---

[33]   Michelle Mark, *Trump Mocks Asylum-Seekers At the Border, Says They 'Look Like They Should Be Fighting for the UFC,'* Business Insider (Apr. 6, 2019), https://www.businessinsider.com/trump-mocks-asylum-seekers-calls-system-scam-2019-4.

[34]   Donald Trump (@realDonaldTrump), Twitter (Oct. 29, 2018, 10:41 AM), https://twitter.com/realDonaldTrump/status/1056919064906469376?s=20.

[35]   Benjamin Siegel et al., *Trump Claims Crackdown Coming on Asylum Seekers, Says Troops Could Fire on Migrants if Rocks Thrown*, ABC News (Nov. 1, 2018), https://abcnews.go.com/Politics/president-trump-address-immigration-crisis-white-house-remarks/story?id=58898094.

[36]   Nick Wing, *Ken Cuccinelli Once Compared Immigration Policy To Pest Control, Exterminating Rats*, HuffPost (July 26, 2013), https://www.huffpost.com/entry/ken-cuccinelli-immigration-rats_n_3658064.

and let them swim for it."[37] He also blamed a father who died with his daughter attempting to

cross into the United States for their deaths because "that father is responsible for his decision."[38]

100.    Like President Trump, Mr. Cuccinelli has expressed his unfounded view that the

asylum process is corrupted by fraud: "Plenty of [the asylum seekers] are lying and saying they

want asylum and trying to make up cases for asylum."[39] He has even interpreted *The New

Colossus* to mean, "[g]ive me your tired and your poor who can stand on their own two feet and

who will not become a public charge."[40] He later clarified that Emma Lazarus's poem, and the

charitable spirit embodied therein, "was referring back to people coming from Europe."[41]

101.    All told, these statements and actions illustrate the Trump Administration's

animus toward asylum seekers, particularly asylum seekers of color. Courts have found similar

statements and actions to state a plausible claim that the Administration's policies stem from

unlawful animus.[42]

---

[37]    John Binder, *Exclusive–Ken Cuccinelli: States Can Stop Migrant Caravan 'Invasion' with Constitutional 'War Powers,'* Breitbart (Oct. 23, 2018), https://www.breitbart.com/politics/2018/10/23/exclusive-ken-cuccinelli-states-can-stop-migrant-caravan-invasion-with-constitutional-war-powers/.

[38]    Philip Wegmann, *Cuccinelli, the Immigration Hawk After Trump's Own Heart*, RealClearPolitics (July 21, 2019), https://www.realclearpolitics.com/articles/2019/07/21/cuccinelli_the_immigration_hawk_after_trumps_own_heart_140831.html [hereinafter *Cuccinelli, the Immigration Hawk*].

[39]    *Sunday Morning Features Transcript*, Fox News (June 30, 2019), https://www.foxnews.com/transcript/rep-tim-ryan-calls-trumps-historic-visit-to-the-dmz-an-appeasement-tour.

[40]    Devan Cole and Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN (Aug. 13, 2019), https://www.cnn.com/2019/08/13/politics/ken-cuccinelli-statue-of-liberty/index.html.

[41]    *Id.*

[42]    *See, e.g.*, *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 518-20 (9th Cir. 2018), *aff'g* 298 F. Supp. 3d 1304, 1314-15 (N.D. Cal. 2018); *Arab Am. Civil Rights League v. Trump*, 2019 WL 3003455, at *10 (E.D. Mich. 2019); *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 678 (D. Md. 2019); *NAACP v. DHS*, 364 F. Supp. 3d 568, 578 (D. Md. 2019); *Saget v.*

102.    The Asylum Directives similarly seek to frustrate and deter those seeking asylum and therefore stem from the same underlying animus.

### III.    The President's Unlawful Appointment of Mr. Cuccinelli

103.    To implement his anti-immigration agenda, President Trump unlawfully appointed Defendant Kenneth T. Cuccinelli II to serve as Acting Director of USCIS through an end-run around the Federal Vacancies Reform Act and the Appointments Clause of the Constitution.

104.    The President has long sought to appoint Mr. Cuccinelli as an executive branch official, and initially planned to appoint Mr. Cuccinelli as a so-called "czar" with comprehensive authority over federal immigration policy.[43]

105.    On April 25, 2017, Lee Francis Cissna was nominated by President Trump to serve as USCIS Director. He was confirmed by the Senate on October 5, 2017 and took office on October 8, 2017.

106.    On May 13, 2019, Mark Koumans was named Deputy Director of USCIS. At the time, the Deputy Director was designated as the first assistant to the office of the USCIS

---

*Trump*, 375 F. Supp. 3d 280, 371-74 (E.D.N.Y. 2019); *CASA de Maryland v. Trump*, 355 F. Supp. 3d 307, 325-26 (D. Md. 2018); *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 395 (D. Md. 2018); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1108 (N.D. Cal. 2018), *appeal filed*, No. 18-16981 (9th Cir. 2018); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018); *New York v. Dep't of Commerce*, 315 F. Supp. 3d 766, 810-11 (S.D.N.Y. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276-79 (E.D.N.Y. 2018).

[43]    Maggie Haberman & Zolan Kanno-Youngs, *Trump Expected to Pick Ken Cuccinelli for Immigration Policy Role*, N.Y. Times (May 21, 2019), https://www.nytimes.com/2019/05/21/us/politics/trump-ken-cuccinelli-immigration.html.

Director. Mr. Koumans's career "spans nearly three decades of federal service … within the Department of Homeland Security … and the Department of State."[44]

107.    On May 24, 2019, Director Cissna informed his employees via email that he would be resigning from the agency effective June 1. Mr. Cissna stated that he had submitted his resignation "at the request of the president."[45] The President reportedly "forced the resignation of … Cissna" because he believed that Mr. Cissna "wasn't doing enough" to pursue the President's immigration agenda.[46] Specifically, the President's chief immigration adviser, Stephen Miller, had "been publicly agitating for weeks for Trump to fire Cissna."[47] Thus, President Trump effectively fired Mr. Cissna.

108.    Under the FVRA, Deputy Director Koumans—the first assistant to the Director—automatically became Acting Director of USCIS upon Mr. Cissna's termination.

109.    However, on June 10, 2019, DHS announced that Mr. Cuccinelli would serve as Acting Director of USCIS, effective that same day.[48]

---

[44]   *Mark Koumans, Acting Director, U.S. Citizenship and Immigration Services*, USCIS, https://www.uscis.gov/about-us/leadership/mark-koumans-acting-director-us-citizenship-and-immigration-services (last visited Sept. 4, 2019) [hereinafter *Mark Koumans*].

[45]   Dara Lind, *Trump Pushes Out Head of Largest Immigration Agency—and Wants Ken Cuccinelli Instead*, Vox (May 25, 2019), https://www.vox.com/2019/5/25/18639156/trump-cuccinelli-cissna-uscis-director [hereinafter *Trump Pushes Out Head*].

[46]   *Staunch Anti-Immigration Supporter Ken Cuccinelli Named to Top Immigration Post*, CBS News (June 10, 2019), https://www.cbsnews.com/news/staunch-anti-immigration-supporter-ken-cuccinelli-named-to-top-immigration-post/ [hereinafter *Staunch Anti-Immigration Supporter*]; *see also Cuccinelli Named Acting Head of Citizenship and Immigration Services*, PBS News Hour (June 10, 2019), https://thehill.com/homenews/administration/447724-cuccinelli-named-acting-head-of-citizenship-and-immigration-services [hereinafter *Cuccinelli Named Acting Head*].

[47]   *Trump Pushes Out Head*, *supra*.

[48]   *Cuccinelli Named Acting Director of USCIS*, USCIS (June 10, 2019), https://www.uscis.gov/news/news-releases/cuccinelli-named-acting-director-uscis.

110.    To appoint Mr. Cuccinelli as Acting Director, the Administration created a new office of "Principal Deputy Director," designated the Principal Deputy Director as the first assistant to the USCIS Director for purposes of the FVRA, and appointed Mr. Cuccinelli as the Principal Deputy Director of USCIS. The Administration did so because it believed that these steps "would allow Cuccinelli to become acting director under a provision of the [FVRA]."[49]

111.    Specifically, Acting Secretary of Homeland Security Kevin McAleenan appointed Mr. Cuccinelli as Principal Deputy Director in a memorandum dated June 10, 2019. That same day, Acting Secretary McAleenan issued an order amending the order of succession at USCIS to provide that the Principal Deputy Director would serve as first assistant to the Director of USCIS. Both documents stated that they would automatically terminate upon the appointment of a new USCIS Director.

112.    Congress has not, either in the Homeland Security Act or elsewhere, authorized the establishment "by Law" of the office of Principal Deputy Director of USCIS, or designated that office as the first assistant to the office of the Director.

113.    On information and belief, there are no publicly promulgated rules, directives, or other documents reflecting the creation of the office of Principal Deputy Director or that position's designation as first assistant to the Director.

---

[49]    Ted Hesson, *Cuccinelli Starts as Acting Immigration Official Despite GOP Opposition*, Politico (June 10, 2019), https://www.politico.com/story/2019/06/10/cuccinelli-acting-uscis-director-1520304.

114.    Mr. Koumans remains Deputy Director of USCIS, and his biography continues to reflect his designation as "Acting Director," even though it also lists Mr. Cuccinelli as "Acting Director."[50]

115.    Mr. Cuccinelli has never served in USCIS, any other component of DHS, nor any other federal agency, as either an elected or appointed official or as an employee.[51]

116.    Senators from the President's own party made clear that they would not vote to confirm Mr. Cuccinelli as USCIS Director. Senate Majority Leader Mitch McConnell expressed his "lack of enthusiasm" for Mr. Cuccinelli. Senator John Thune, the Senate Majority Whip, stated that "he would have had a hard time getting confirmed," and that appointing Mr. Cuccinelli as the Acting Director was "probably the only way they could get him in there." Senators Chuck Grassley, Marco Rubio, and Mitt Romney also voiced concern over the President's decision to appoint Mr. Cuccinelli.[52]

117.    The President and his Administration were therefore "made aware that Cuccinelli would have a difficult time winning confirmation in the Senate."[53] Indeed, it was reported at the time that "Cuccinelli stands almost no chance of being confirmed by the Senate if Trump were to nominate him to be the agency's permanent director."[54]

---

[50]   *Mark Koumans*, *supra*; *see also Leadership*, USCIS, https://www.uscis.gov/about-us/leadership (last visited Sept. 4, 2019).

[51]   *See Kenneth T. "Ken" Cuccinelli II Acting Director, USCIS*, USCIS, https://www.uscis.gov/about-us/leadership/kenneth-t-ken-cuccinelli-ii-acting-director-uscis (last visited Sept. 4, 2019).

[52]   Jordain Carney, *Republicans Warn Cuccinelli Won't Get Confirmed by GOP Senate*, The Hill (June 10, 2019), https://thehill.com/homenews/senate/447804-republicans-warn-cuccinelli-wont-get-confirmed-by-gop-senate.

[53]   *Staunch Anti-Immigration Supporter*, *supra*.

[54]   Claire Hansen, *Cuccinelli's Appointment Seen as a Further Sign of Shift in Focus at USCIS*, U.S. News (June 13, 2019), https://www.usnews.com/news/national-news/articles/2019-06-13/cuccinellis-appointment-seen-as-a-further-sign-of-shift-in-focus-at-uscis [hereinafter

118.    In response to Mr. Cuccinelli's appointment, the chairs of the House of

Representatives Committees on the Judiciary, Oversight and Government Reform, and

Homeland Security sent a letter to Acting Secretary of Homeland Security Kevin McAleenan.

The letter voiced concern that "Mr. Cuccinelli was appointed in a manner that circumvents the

Federal Vacancies Reform Act" because "Mr. Cuccinelli did not meet any of th[e] criteria" for

appointment under the FVRA.[55] The letter therefore requested several categories of documents

to illuminate the circumstances of Mr. Cuccinelli's appointment.[56]

119.    A coalition of organizations that work to protect the rights of immigrants and/or

to assist immigrants in seeking legal immigration status before the nation's immigration agencies

and the courts submitted a letter to the Attorney General and the U.S. Attorney for the District of

Columbia, asking them to institute a proceeding for writ of quo warranto to remove Mr.

Cuccinelli from office given the legal flaws in his appointment.[57] Neither official has responded

---

*Cuccinelli's Appointment*]; *see also* Geneva Sands, *Ken Cuccinelli Takes Over as Acting Director of Citizenship and Immigration Services*, CNN (June 10, 2019), https://www.cnn.com/2019/06/10/politics/cucinelli-uscis-acting-director/index.html ("Republican lawmakers have privately signaled to the White House should not nominate Cuccinelli [sic], or else he risks having another high-profile pick forced to withdraw, CNN has learned.").

[55]   Letter from Jerrold Nadler, Chairman, House Comm. on the Judiciary, et al. to Acting Sec'y of Homeland Security Kevin K. McAleenan at 1 (June 19, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/06-18-2019%20Letter%20to%20Acting%20Secretary%20McAleenan.pdf.

[56]   *Id.* at 2.

[57]   Letter from Democracy Forward et al. to Att'y Gen. William Barr & U.S. Att'y Jessie K. Liu (July 22, 2019), https://democracyforward.org/wp-content/uploads/2019/07/Cuccinelli-Letter.pdf.

to that letter. Two other organizations also submitted a letter to Mr. McAleenan and Mr. Cuccinelli, addressing the flaws in Mr. Cuccinelli's appointment.[58]

120.    The President has neither named a nominee for USCIS Director, nor announced any intent or timetable to nominate someone.

121.    On information and belief, Mr. Cuccinelli was named Principal Deputy Director and Acting Director of USCIS in significant part because the Senate would not confirm him if he were nominated to be USCIS Director.

122.    On information and belief, President Trump intends for Mr. Cuccinelli to perform the functions and duties of USCIS Director indefinitely.

123.    On information and belief, President Trump appointed Mr. Cuccinelli as Principal Deputy Director of USCIS, and as Acting Director of USCIS, for the unlawful purpose of circumventing the Senate's mandatory role in the appointment of the USCIS Director.

124.    Notwithstanding the mandate of the Appointments Clause, and in derogation of Congress's constitutional role in staffing the executive branch, the President has repeatedly chosen to fill positions with acting officials who do not require Senate confirmation.

125.    In just two and a half years, the President has named 28 acting cabinet secretaries—more than *any* of the past five presidents in their entire tenure in office.[59] They have served an average of 50 days, which is also longer than the average for any of those five

---

[58]    Letter from Protect Democracy & Constitutional Accountability Ctr. to Acting Sec'y of Homeland Sec. Kevin McAleenan & Acting Dir. of USCIS Kenneth T. Cuccinelli (July 30, 2019), https://protectdemocracy.org/resource-library/document/cuccinelli-appointment-letter/.

[59]    Anne Joseph O'Connell, *Acting Leaders: Recent Practices, Consequences, and Reforms*, Brookings Institution (July 22, 2019), https://www.brookings.edu/research/acting-leaders/ [hereinafter *Acting Leaders*].

presidents.[60] In total, the Administration has had a full cabinet of Senate-confirmed officials for only four months.[61]

126.    The President has particularly placed immigration and national security policy in the hands of acting officials. Specifically, "the Trump administration has filled many Homeland Security Department posts with acting officials installed for lengthy periods of time."[62] At present, only 41% of Senate-confirmed positions have been filled at the Department of Homeland Security.[63] Acting officials currently serve as Secretary of Homeland Security, Director of Immigration and Customs Enforcement, Director of Customs and Border Protection, and Administrator of the Federal Emergency Management Agency.

127.    The President has been transparent in explaining his reasons for using acting officials, explaining that he prefers to do so because it is easier and more expedient than seeking Senate confirmation. To wit, the President has stated,

a.    "Well, I'm in no hurry. I have 'acting.' … I sort of like 'acting.' It gives me more flexibility."[64]

---

[60]   *Id.*

[61]   Chiqui Esteban, *Who's in Charge? Many Months of Acting Cabinet Secretaries*, Wash. Post (July 24, 2019), https://www.washingtonpost.com/politics/2019/07/24/whos-charge-many-months-acting-cabinet-secretaries/.

[62]   Ted Hesson & Anita Kumar, *Stephen Miller Ally Expected to Join Ken Cuccinelli at USCIS*, Politico (June 13, 2019), https://www.politico.com/story/2019/06/13/zadrozny-cuccinelli-uscis-1529112.

[63]   Editorial Board, *An Administration of Temps*, Bloomberg Opinion (July 25, 2019), https://www.bloomberg.com/opinion/articles/2019-07-25/trump-s-washington-has-an-acting-officials-problem [hereinafter *An Administration of Temps*].

[64]   Felicia Sonmez, *Trump Says He's 'in No Hurry' to Replace Acting Cabinet Members*, Wash. Post (Jan. 6, 2019), https://www.washingtonpost.com/politics/trump-says-hes-in-no-hurry-to-replace-acting-cabinet-members/2019/01/06/afac5fea-11e4-11e9-b6ad-9cfd62dbb0a8_story.html.

b.  "It's OK. It's easier to make moves when they're acting." "I like acting because I can move so quickly. It gives me more flexibility."[65]

c.  "Acting gives you much greater flexibility. A lot easier to do things."[66]

d.   "I'm generally not going to make a lot of the appointments that would normally be—because you don't need them."[67]

128.  Purposefully staffing the executive branch with acting officials has serious repercussions for accountable governance. Acting officials bypass the Senate's constitutional advice and consent role. They are thus "spared scrutiny by the Senate, which means less transparency in policy and fewer commitments for which office-holders might be held accountable."[68] Acting officials generally garner "diminished buy-in from the workers below them, relevant congressional committees, and the wider public."[69]

## IV.  Mr. Cuccinelli's Unlawful Asylum Directives

129.  Since taking office, Mr. Cuccinelli has stated that USCIS offers "privileges, not rights," to immigrants and that USCIS is "a vetting agency, not a benefits agency."[70] His appointment signals "an agency-wide shift in focus from facilitating the lawful settlement of migrants to increasingly participating in the administration's crackdown on immigration."[71]

---

[65]  *Transcript: President Trump on "Face the Nation,"* CBS News (Feb. 3, 2019), https://www.cbsnews.com/news/transcript-president-trump-on-face-the-nation-february-3-2019/.

[66]  *An Administration of Temps.*

[67]  Randall Lane*, Inside Trump's Head: An Exclusive Interview with the President, and the Single Theory That Explains Everything*, Forbes (Oct. 10, 2017), https://www.forbes.com/donald-trump/exclusive-interview/#501570b4bdec.

[68]  *An Administration of Temps.*

[69]  *Acting Leaders.*

[70]  *Cuccinelli, the Immigration Hawk*, supra.

[71]  *Cuccinelli's Appointment*, supra.

130.    Despite having no lawful authority to do so, Mr. Cuccinelli has issued several

Directives that alter aspects of the credible fear process, as well as other aspects of the United

States' legal immigration system.

### A.    Shortening Asylum Seekers' Time to Prepare for Interviews

131.    On July 8, 2019, Mr. Cuccinelli promulgated, authorized, and/or implemented the

Shortened Wait Period Directive, which shortens the mandatory window before the credible fear

interview to one calendar day between an asylum seeker's arrival at an ICE detention center and

their credible fear interview.[72]

132.    On information and belief, the Directive was provided to USCIS staffers, and/or

contractors operating detention centers, in writing.

133.    On information and belief, the Directive was also implemented in the form of a

change to the credible fear procedures manual that asylum officers use to process asylum

seekers.

134.    USCIS also changed the "Credible Fear FAQ" on its website to note that "USCIS

requires a wait of at least one full calendar day" before the interview, rather than "a wait of at

least 48 hours," effective July 8, 2019.[73]

135.    The use of "one calendar day" rather than "24 hours" allows USCIS to permit less

than 24 hours before a credible fear interview, so long as the interview occurs on the next

calendar day. Moreover, while USCIS previously counted the 48 hours from the time that an

---

[72]    Aleaziz, *Immigrant Asylum-Seekers*.

[73]    Aline Barros, *Trump Administration Expediting Initial Screenings of Asylum-Seekers*, Voice
of America (July 9, 2019), https://www.voanews.com/usa/trump-administration-expediting-
initial-screenings-asylum-seekers; *Credible Fear FAQ*, USCIS, https://www.uscis.gov/faq-
page/credible-fear-faq#t12831n40242 (last updated July 8, 2018).

asylum seeker received the Form G-56 at Dilley, it now counts it from the time of arrival at the detention center. On information and belief, these changes have also been issued in writing.

136.    The Shortened Wait Period Directive was first implemented at the Dilley Detention Center on or after July 8, 2019. The Directive has since been implemented at the Karnes Detention Center as well.

137.    In general, and as further detailed below, the Shortened Wait Period Directive gives asylum seekers less time to prepare for their interviews, to consult with third parties or counsel, and to recover from their dangerous journeys. It also forces asylum officers to accelerate the credible fear process.[74]

138.    It also obstructs asylum seekers' statutorily mandated right to consult with persons of their choosing before their credible fear interviews. *See* 8 U.S.C. § 1225(b)(1)(B)(iv).

139.    In doing so, it violates DHS's own regulations, which reiterate that asylum seekers have the right to consult so long as it does not "unreasonably delay" the process. 8 C.F.R. § 235.3(b)(4)(ii). A meaningful amount of time to consult with third parties before a life-and-death interview patently does not constitute "unreasonable delay." The Directive also unlawfully impedes those third parties from ensuring they can be present for the interview, if requested by the asylum seeker. *Id.* § 208.30(d).

140.    Moreover, the Shortened Wait Period Directive prevents asylum seekers from participating fully in their interviews, contrary to DHS regulations. Specifically, it is harder for asylum seekers to "participate effectively," given the length and difficulty of their journeys, or "understand[] … the credible fear determination process." *Id.* It is also more difficult for asylum seekers to present "all relevant and useful information bearing on whether the applicant has a

---

[74]   Aleaziz, *Immigrant Asylum-Seekers*.

credible fear of persecution or torture" or address "novel or unique issues that merit consideration in a full hearing before an immigration judge," both of which may require the assistance of counsel or other third parties to identify. *Id.* § 208.30(d), (e).

141.    The Shortened Wait Period Directive also discriminates against individuals with physical or mental impairments, who generally need additional time to consult with third parties and to prepare for their interviews, by permitting USCIS officers to provide them with no more than a full calendar day without regard to their individual needs. The Directive also denies disabled asylum seekers a reasonable accommodation for their disabilities.

142.    USCIS did not provide any formal statement of its reasons for adopting this change or provide an opportunity for notice and comment.

### B.    Denying Virtually All Continuances

143.    On July 8, 2019, Mr. Cuccinelli also promulgated, authorized, and/or implemented the Continuance Denial Directive, providing that USCIS must deny continuances of the credible fear interview "unless there are extraordinary circumstances."[75]

144.    On information and belief, USCIS has interpreted "extraordinary circumstances" to mean three sets of circumstances: (1) where the asylum seeker's attorney of record has written proof of a simultaneous court proceeding that conflicts with the time of the scheduled interview; (2) where the asylum seeker is hospitalized in a manner that prevents them from participating in the interview (*e.g.*, the asylum seeker is unconscious); and (3) where the facility has prevented an asylum seeker from consulting with their counsel (*e.g.*, by preventing attorneys from entering the facility).

---

[75]    *Id.*

145.    USCIS does not permit continuances in any other circumstances, including if an asylum seeker has language or competency issues, is not prepared to proceed with the interview, has a physical or mental impairment that prevents them from fully and effectively participating in the interview, has an especially complicated asylum case, has not had an opportunity to consult with counsel, or needs additional time to obtain facts or evidence or consult with other third parties.

146.    On information and belief, any asylum seeker who is denied a continuance by USCIS and then fails to appear at their credible fear interview will receive an automatic negative credible fear determination, regardless of the reasons for the failure to appear.

147.    On information and belief, the Continuance Denial Directive was provided to USCIS staffers, and/or contractors operating detention centers, in writing.

148.    On information and belief, the Directive was also implemented in the form of a change to the credible fear procedures manual that asylum officers use to process asylum seekers.

149.    The Continuance Denial Directive was first implemented at the Dilley Detention Center on or after July 8, 2019. The Directive has since been implemented at the Karnes Detention Center as well.

150.    The Continuance Denial Directive violates DHS's own regulations, which expressly provide that an asylum officer may reschedule an interview if the asylum seeker "is unable to participate effectively in the interview because of illness, fatigue, or other impediments." 8 C.F.R. § 208.30(d).

151.    Further, the Continuance Denial Directive violates asylum seekers' rights to consult with third parties, including counsel. The Directive prevents asylum seekers with

language or capacity issues that make it difficult to communicate from seeking more time to consult, and precludes further consultation if it turns out to be necessary after initial discussions with third parties or counsel that reveal additional facts or legal issues that require further development.

152.    For the same reasons, the Continuance Denial Directive impedes asylum seekers' ability to participate fully in their credible fear interviews.

153.    The Continuance Denial Directive also discriminates against individuals with physical or mental impairments by preventing them from obtaining needed additional time to consult with third parties and to prepare for their interviews. The Directive also denies disabled asylum seekers a reasonable accommodation for their disabilities.

154.    USCIS did not provide any formal statement of its reasons for adopting this change or provide an opportunity for notice and comment.

### C.    Eliminating In-Person Orientation

155.    On July 8, 2019, USCIS also promulgated, authorized, and/or implemented the No Legal Orientation Directive, announcing that it would cease providing an oral, in-person legal orientation to those detained at the Dilley Detention Center, and that Customs and Border Protection would provide only the M-444 Form to inform asylum seekers of their legal rights.

156.    On information and belief, Mr. Cuccinelli promulgated, authorized, and/or implemented the No Legal Orientation Directive.

157.    On information and belief, the Directive was provided to USCIS staffers, and/or contractors operating the Dilley Detention Center, in writing.

158.    The No Legal Orientation Directive violates asylum seekers' rights to receive "information concerning the asylum interview." 8 U.S.C. § 1225(b)(1)(B)(iv). Asylum seekers at the Dilley Detention Center include minor children and others with language or competency

issues. An in-person legal orientation is necessary to convey the required "information" to those

asylum seekers, and to ensure that they fully comprehend the information they have been given.

Similarly, the No Legal Orientation Directive violates the regulatory requirement that asylum

seekers possess "an understanding of the credible fear determination process," 8 C.F.R.

§ 208.30(d).

159.    Further, the No Legal Orientation Directive impedes asylum seekers' ability to

participate fully in their credible fear interviews by limiting their understanding of what those

interviews entail and their rights within the credible fear process. In the past, legal orientation

was an important element of providing asylum seekers with information necessary to allow them

to invoke their rights and to participate effectively in the credible fear process.

160.    The No Legal Orientation Directive also discriminates against individuals with

physical or mental impairments by denying them access to information about the credible fear

process in a format they can understand. The Directive also denies disabled asylum seekers a

reasonable accommodation for their disabilities.

161.    USCIS did not provide any formal statement of its reasons for adopting this

change or provide an opportunity for notice and comment.[76]

---

[76]   While not challenged in this litigation, Mr. Cuccinelli has improperly promulgated, authorized, and/or implemented multiple other directives pertaining to the immigration system pursuant to his purported authority as Acting USCIS Director. Specifically, he has: issued a directive pressing asylum officers to be skeptical of credible fear claims; issued a directive pressing asylum officers to consider the possibility, rather than the reasonableness, of internal relocation; diverted resources from USCIS to aid immigration enforcement; cracked down on immigrant sponsors; moved to curtail work permits for asylum seekers; signaled that he will favor some H-1B applications over others; moved to end categorical parole programs, including the Haitian Family Reunification Parole program and the Filipino World War II Veterans Parole program; curtailed the EB-5 program; issued new guidance limiting discretionary employment authorization for parole recipients; moved to deny work permits to asylum-seekers; and made it harder for children of servicemembers and government officials stationed abroad to become citizens.

**V.** **Plaintiffs' Harms from the Unlawful Asylum Directives**

162.    Each of the Plaintiffs has suffered harm as a result of Mr. Cuccinelli's unlawful

Asylum Directives. Specifically, the Directives have deprived the Individual Plaintiffs of

adequate time to consult with counsel and other persons of their choosing and prevented them

from participating fully in the credible fear interview process. The Directives also disrupt

RAICES's operations at the Karnes Detention Center and force them to divert resources to

provide legal and other assistance to asylum seekers. Each of these harms is exacerbated every

day the Directives remain in effect and is irreparable.

**A.**    **Individual Plaintiffs**

163.    At Dilley, asylum seekers are able to obtain legal services from the Dilley Pro

Bono Project, which focuses on providing quick, limited-scope legal services to asylum seekers

before their credible fear interviews. Specifically, DPBP works with the asylum seeker

individually to prepare for his or her interview; connects the asylum seeker with other

professionals, including pro bono medical and psychological professionals and asylum experts,

as well as third parties that may possess critical information; analyzes the legal issues presented

by the asylum seeker's case and helps gather additional details and facts to support their claims;

assesses whether the asylum seeker may need additional time, given any language or competency

issues, or if the asylum seeker's case is especially complicated; and, at times, accompanies the

asylum seeker to their interview. If the asylum seeker receives a negative credible fear

determination, DPBP will assist the asylum seeker in obtaining immigration judge review,

prepare them for their hearing, and potentially attend the hearing with the asylum seeker.

164.    When Defendants had a policy of providing asylum seekers with 48 hours to

prepare from the time they received the Form G-56, DPBP was able to process individuals in an

orderly fashion and ensure that every individual had adequate time to receive assistance. DPBP

could expect to get dozens of G-56 forms at specific times and be able to pre-schedule meetings within the subsequent 48 hours, as well as emergency meetings when necessary.

165.    Under the Shortened Wait Period directive, that mandatory 48 hour time period has been slashed in half—at a minimum. USCIS requires only a "full calendar day," which apparently need not be 24 hours. Moreover, USCIS counts a "full calendar day" from the date of arrival at an ICE detention center, not the date the Form G-56 was provided to the asylum seeker. Thus, at the Dilley Detention Center, asylum seekers frequently receive the Form G-56 the night before their morning interview.

166.    In practice, asylum seekers have at most a few hours to prepare for the interviews, given that asylum seekers often have other orientations and tasks at the facility, may require medical care, and must sleep, eat, and care for their children. Now, asylum seekers frequently walk in to consult with DPBP staff with minutes left before their interviews, or they come in after their interviews, if at all.

167.    Moreover, when asylum seekers require additional time to consult with their attorneys or other third parties, to prepare for their interviews, or because of language or competency issues, they cannot receive a continuance under the Continuance Denial Directive.

168.    The No Legal Orientation Directive has also made it more difficult for asylum seekers to understand their legal rights, including their right to consult with third parties.

169.    The Asylum Directives have been particularly harsh on individuals with physical and psychological disabilities, including trauma-related mental disorders. Many of the asylum seekers at the Dilley Detention Center have such disorders as a consequence of their persecution, journey to the United States, and detention. These individuals need increased time and attention to ensure that they are prepared for their credible-fear interviews, including continuances if

46

necessary in order to consult with family members in their home countries, seek medical or professional assistance, receive special services from social workers or therapists, or receive other services or assistance critical to their preparation for their credible fear interview.

170.     The Individual Plaintiffs were each harmed by the Asylum Directives as they sought to press their asylum claims during the credible fear process. Each of these harms can be redressed by this Court. The Individual Plaintiffs are entitled to new credible fear interviews scheduled after they have had adequate time to comprehend their legal rights, prepare for their interviews, and consult with third parties.

171.     However, these directives threaten further irreparable harm without judicial relief. If the Defendants remove these parents and children—and hundreds like them each month—they will face significant risks of persecution, violence, and death. They may also be unable to return to the United States after removal, given the unstable situation they will be returned to in their country of origin, their existing trauma, lack of financial resources, and/or immigration laws. These consequences warrant expedited relief, including a stay of any removals ordered after processes governed by the Asylum Directives.

### 1.     *L.M.-M., B.M.-M., and V.M.-M.*

172.     L.M.-M. and her minor children B.M.-M. and V.M.-M. arrived in the United States and were first detained on August 10, 2019; they purportedly received the Form M-444 on August 12; and they arrived at Dilley on August 14. They received the Form G-56 the evening of August 14. Prior to the Shortened Wait Period Directive, their interviews would have been scheduled no earlier than the evening of August 16; however, their interviews were scheduled for 10 AM on August 15. L.M.-M. and her family were therefore denied their statutory and

regulatory rights to understand the credible fear process and consult with third parties, and were prevented from fully and effectively participating in the credible fear process.

173.     L.M.-M. and her minor children B.M.-M. and V.M.-M. have a significant possibility that they would be able to establish eligibility for asylum, withholding of removal, and/or relief under the Convention against Torture. L.M.-M., who had a severe toothache during the interview, informed the asylum officer that she feared retaliation by the Honduran government for her political beliefs. She stated that her family had difficulty obtaining jobs, education, and medical care because of their political affiliation and that her children had been physically bullied by other students at their school. However, the asylum officer issued a negative credible fear determination.

174.     While a DPBP attorney informed the immigration court that L.M.-M. had not been fully comfortable participating in the interview, and that she also feared severe violence from both a domestic partner and transnational criminal organizations that operate notoriously in Honduras, that determination was nonetheless affirmed by the immigration court. If removed from the country, L.M.-M. and her children would wish to return, if able and permitted to do so.

### 2.     *M.A.-H. and I.M.-A.*

175.     M.A.-H. and her minor child I.M.-A. arrived in the United States on August 14, 2019; were first detained on August 18; and arrived at Dilley and purportedly received the Form M-444 on August 21. They received the Form G-56 at 7 PM on August 22. Prior to the Shortened Wait Period Directive, their interviews would have been scheduled no earlier than 7 PM on August 24; however, their interviews were scheduled for 8 AM on August 23.

176.     M.A-H. and her child requested a continuance on the grounds that they had been unable to consult with counsel before their interview. Specifically, while M.A.-H. was waiting to

speak with DPBP staff, she was told to go to the medical unit for X-rays and was unable to return to the legal visitation trailer. That continuance was denied because those facts did not amount to an "exceptional circumstance." When they appeared at the interview, M.A.-H. requested a continuance so they could have more time to consult and prepare for their interviews, but were only given thirty minutes. They returned and informed the asylum officer that they needed 24 hours, but were not given additional time because they were required "to go forward right now." M.A.-H. also possesses a cognitive impairment that inhibits her understanding of the legal system and her communication with third parties. M.A.-H. and her child were therefore denied their statutory and regulatory rights to understand the credible fear process and consult with third parties, and were prevented from fully and effectively participating in the credible fear process.

177.    M.A.-H. and her minor child I.M.-A. have a significant possibility that they would be able to establish eligibility for asylum, withholding of removal, and/or relief under the Convention against Torture. M.A.-H. informed the asylum officer that members of transnational criminal organizations threw rocks at her house, but that the police were unable to respond in time to locate the perpetrators. She also stated that men would sometimes kidnap students at her daughter's school. She further stated that she had been attacked because of her race and skin color. However, the asylum officer issued a negative credible fear determination. That determination was affirmed by the immigration court. If removed from the country, M.A.-H. and I.M.-A. would wish to return, if able and permitted to do so.

### 3.    S.G.-C. and B.O.-G.

178.    S.G.-C. and her minor child B.O.-G. arrived in the United States and were first detained on August 18, 2019, and arrived at Dilley and purportedly received the Form M-444 from CBP on August 21. They received the Form G-56 the evening of August 22. Prior to the

Shortened Wait Period Directive, their interviews would have been scheduled no earlier than the evening of August 24; however, their interviews were scheduled for 12:30 PM on August 23.

179.    S.G.-C. and her family requested a continuance so they could have more time to consult and prepare for their interviews, but were denied on the grounds that consulting with an attorney was not an "exceptional circumstance," and informed that their asylum claims would be terminated if they did not proceed. S.G.-C. and her family were therefore denied their statutory and regulatory rights to understand the credible fear process and consult with third parties, and were prevented from fully and effectively participating in the credible fear process.

180.    S.G.-C. and her minor child B.O.-G. each have a significant possibility that they would be able to establish eligibility for asylum, withholding of removal, and/or relief under the Convention against Torture. S.G.-C. informed the asylum officer that she and her daughter had been threatened by a man who wanted her "to be his woman," and that she was also afraid to return to her home because of potential violence from transnational criminal organizations and drug cartels. She also stated that the government and police cannot or would not protect her from harm. However, the asylum officer issued a negative credible fear determination. S.G.-C. was unable to present to the asylum officer additional details concerning her persecution: that, among other things, she was raped by members of a gang and faced significant gender-based persecution in Honduras. If removed from the country, S.G.-C. and B.O.-G. would wish to return, if able and permitted to do so.

**B.    Refugee and Immigrant Center for Education and Legal Services.**

181.    RAICES focuses on providing quick, limited-scope legal services to asylum seekers at the Karnes Detention Center. RAICES strives to provide legal services prior to credible fear interviews, provides representation during credible fear interviews and associated immigration court hearings, and represents individuals in custody redetermination hearings and

merits hearings before the San Antonio Immigration Court. RAICES also manages a free hotline for Karnes detainees that is staffed and regularly monitored.

182.    Prior to April 2019, RAICES staff and volunteers regularly met with 100-150 individuals per day, and spent the majority of their time preparing asylum seekers for their upcoming credible fear interviews. In April 2019, when the population at Karnes changed from families to adults, Immigration and Customs Enforcement ("ICE") made significant changes to the existing visitation procedures. As a result of these changes, RAICES' access to Karnes detainees diminished significantly, and the number of detainees RAICES is able to visit on a daily basis has in turn decreased significantly. Now, RAICES staff meet with approximately 50-70 detained persons per day.

183.    These recent changes have forced RAICES to completely revise its processes in order to continue reaching as many Karnes detainees as possible. The Shortened Wait Period Directive and Continuance Denial Directive have exacerbated and solidified these revisions. As a consequence, RAICES has been forced to change the manner in which it provides legal counsel to its clients, and has diverted resources, including money and staff time, to ensure that it can continue to provide its services.

184.    Specifically, the Shortened Wait Period Directive and Continuance Denial Directive have further accelerated the pace with which asylum seekers move through the credible fear process at the Karnes Detention Center. RAICES strives to meet asylum seekers prior to their credible fear interviews; now, however, RAICES frequently is unable to make contact with asylum seekers until after their credible fear interviews, if at all.

185.    RAICES's ability to meet with asylum seekers is a direct function of the pace with which asylum seekers move through the system. In July, when the USCIS Asylum Office

was delayed for a brief period of time, RAICES was able to meet with almost all of the asylum

seekers that requested its services. More recently, however, and after Defendants implemented

the Asylum Directives at issue here, RAICES has again been unable to meet with most of the

asylum seekers that require its assistance prior to their credible fear interviews.

186.    Because the number of asylum seekers RAICES is able to meet has been greatly

curtailed, RAICES has been forced to provide much of its legal services over the phone, via its

toll free hotline. RAICES has had to divert additional resources to provide services through this

medium, including by hiring additional staff, reallocating existing staff, such as paralegals,

providing additional training to those staffers, and utilizing additional office equipment, like new

phones, to keep up with the increased demand.

187.    RAICES is also unable to obtain continuances for its clients, which it needs in

order to attempt to provide them with additional counsel. In the few cases where RAICES has

been able to make contact with an asylum seeker prior to a credible fear interview, it has

encouraged those individuals to seek a continuance to allow time for consultation with counsel.

But these efforts have generally been for naught; the asylum seeker has been forced to proceed

with the interview regardless.

188.    RAICES often serves individuals that possess trauma-related and other mental

and physical impairments. The Shortened Wait Period and Continuance Denial Directives limit

RAICES's ability to provide these individuals with effective legal representation and to ensure

that they are fully prepared for their credible fear interviews.

189.    Because RAICES often cannot make contact with an asylum seeker until after

their credible fear interview, RAICES has had to devote additional time and staff resources to

attempting to obtain reversal of negative credible fear determinations. These proceedings are

generally more complicated and time-intensive than credible fear interviews, and require substantial additional preparation.

190.    Moreover, the Directives have prevented RAICES from forming attorney-client relationships with asylum seekers. Many asylum seekers lack adequate time to engage RAICES because of the Shortened Wait Period and Continuance Denial Directives. Because RAICES is the primary pro bono legal services provider at the Karnes Detention Center, the vast majority of asylum seekers that engage counsel choose RAICES to represent them.

191.    Had the Asylum Directives been the subject of advance publication and notice-and-comment rulemaking under the Administrative Procedure Act, RAICES and/or affiliated organizations would have submitted comments opposing their adoption.

192.    RAICES has standing to assert the rights of its asylum seeking clients. RAICES also has been independently injured by the Asylum Directives; RAICES possesses a close relationship with its many clients, including prospective future clients; and those clients face hindrances in asserting their claims, given their vulnerable immigration status, language and competency issues, detention, and the complexity of the credible fear process.

193.    Each of these harms is irreparable, in that they constitute an ongoing disruption of RAICES's operations, do lasting harm to RAICES's clients, and force RAICES to spend resources, including staff time and money, that cannot be recouped. They would be redressed by an order holding unlawful and/or enjoining the Asylum Directives.

## CLAIMS FOR RELIEF

### Count One
### (Violation of 8 U.S.C. § 1225 and its implementing regulations, 8 C.F.R. §§ 208.30, 235.3)

194.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

195.    Under federal law, judicial review is available regarding whether "a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [the expedited removal system] is not consistent with applicable provisions … or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(ii). That provision extends to directives issued by USCIS. *See* 6 U.S.C. § 271(b); *Martinez*, 543 U.S. at 375 n.1.

196.    Similarly, under the Administrative Procedure Act, the court shall "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

197.    By impeding asylum seekers' ability to consult with persons of their choosing and preventing them from fully and effectively participating in the credible fear interview process, the Asylum Directives violate the Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. § 1225, and its implementing regulations, 8 C.F.R. §§ 208.30, 235.3, and must be invalidated.

### Count Two
### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

198.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

199.    Under the Administrative Procedure Act, the court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

200.    In promulgating the Asylum Directives, Defendants failed to consider or address asylum seekers' legitimate need and right to meaningfully consult with persons of their choosing, including counsel, prior to their credible fear interviews. 8 U.S.C. § 1225(b)(1)(B)(iv); *AILA*, 18 F. Supp. 2d at 54.

201.     Defendants' decision therefore "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

202.     Defendants' public explanations of the Directives, if any, are pretextual, and do not reflect Defendants' true rationales for enacting these changes.

203.     Defendants' animus toward immigrants, particularly immigrants of color, motivated their decision to promulgate the Directives. Defendants' decision therefore "relied on factors which Congress has not intended [them] to consider." *Id.*

204.     Defendants failed to provide an adequate justification for these changes in policy, especially given that these changes appear to "rest[] upon factual findings that contradict those which underlay its prior policy," and that their prior policies "engendered serious reliance interests that must be taken into account," including with respect to RAICES and other legal service providers. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

205.     For at least these reasons, the Asylum Directives are arbitrary and capricious and an abuse of discretion, and must therefore be held unlawful and set aside.

## Count Three
### (Violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2)(D))

206.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

207.     Under the Administrative Procedure Act, the court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law" 5 U.S.C. § 706(2)(D). The APA also provides that "[g]eneral notice of proposed rule making shall be

published in the Federal Register," that agencies must "give interested persons an opportunity to participate in the rule making," and that substantive rules be published 30 days before their effective date. *Id.* § 553(b), (c), (d).

208.    Defendants did not provide notice, an opportunity for comment, or advance publication before promulgating any of the Asylum Directives. The Directives are therefore unlawful and must be set aside.

### Count Four
### (Violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*)

209.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

210.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, provides in pertinent part that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or … conducted by any Executive agency." 209 U.S.C. § 794(a).

211.    DHS's implementing regulations, 6 C.F.R. § 15.1 *et seq.*, similarly mandate that Defendants not discriminate against individuals with a disability or deny equal access to their programs and benefits on that basis. The DHS regulations require that such individuals not "be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity conducted by the Department," *id.* § 15.49, and that each program or activity be operated in a manner that is "readily accessible to and usable by individuals with a disability," *id.* § 15.50.

212.    The term "disability" means any "physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9)(A); 42 U.S.C. § 12102(1)(A). Major

life activities include "learning, reading, concentrating, thinking, communicating, and working,"
as well as "the operation of a major bodily function, including … neurological, brain … [and]
endocrine … functions." 42 U.S.C. § 12102(2)(A)-(B).

213.    The trauma-related and other mental impairments exhibited by the Individual
Plaintiffs, and individuals served by RAICES, qualify as "disabilities" under the Rehabilitation
Act. *See, e.g.*, *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (holding that the Rehabilitation
Act requires reasonable accommodations be provided for mental disabilities); *Franco-Gonzales
v. Holder*, 767 F. Supp. 2d 1034, 1051 (C.D. Cal. 2010) (granting safeguards for mentally ill
immigrants in immigration court under the Rehabilitation Act). These trauma-related and other
mental impairments are also, in part, the result of Defendants' detention and processing policies.

214.    Defendants administer the credible fear interview process as part of a DHS-
conducted program or activity, which is designed to provide Plaintiffs with the opportunity to
receive asylum, withholding of removal, and/or relief under the Convention against Torture —
benefits for which they would otherwise qualify.

215.    The Asylum Directives unlawfully discriminate against these Plaintiffs by forcing
them to participate in credible fear interviews without adequate time to prepare or consult with
third parties, and without an adequate understanding of their legal rights. They also thereby fail
to provide them with a reasonable accommodation and/or exclude them from the asylum process.

216.    Moreover, Defendants' practice has a disparate impact on these Plaintiffs and
other mentally disabled individuals, who are forced to participate in credible fear interviews
without reasonable accommodations and/or receive negative credible fear determinations due to
their disabilities.

217.    Defendants would not have to fundamentally alter their programs or services to provide these Plaintiffs with a reasonable accommodation that would allow these Plaintiffs to participate fully and intelligibly in the credible fear interview process.

218.    The Asylum Directives therefore violate the Rehabilitation Act and must be invalidated.

**Count Five**
**(Violation of the First Amendment, U.S. Const. amend. I)**

219.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

220.    The First Amendment of the U.S. Constitution guarantees RAICES the right to communicate and associate with its clients and prospective clients who are seeking representation, to inform them about their legal rights, to discuss the possibility of legal representation, and to assist them with their legal claims in a confidential setting. Similarly, it guarantees the Individual Plaintiffs, and current and prospective clients of RAICES, the right to communicate and associate with their lawyers, or other third parties, for the same purposes. U.S. Const. amend. I; *see also Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ("Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

221.    The Asylum Directives unduly impede communication and association between the Individual Plaintiffs and their counsel, as well as between RAICES and its current or prospective clients. Specifically, the Shortened Wait Period Directive unduly limits the time that asylum seekers have to consult with counsel, or other third parties; the Continuance Denial Directive unduly bars asylum seekers from obtaining a continuance of their credible fear

interview if they require additional time to consult; and the No Legal Orientation Directive unduly prevents asylum seekers from being informed of their legal rights, including the right to consult.

222.    The Asylum Directives are not justified by any legitimate penological objective or any legitimate objective with respect to civil detention.

223.    The Asylum Directives therefore violate the First Amendment and must be invalidated.

**Count Six**
**(Violation of the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*)**

224.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

225.    Mr. Cuccinelli's service as Acting Director is unlawful under the Federal Vacancies Reform Act. Mr. Cuccinelli did not satisfy the statute's requirements: he was not serving as the first assistant to the office of the Director when the President terminated Mr. Cissna, nor does he currently serve in an office which was constituted as the first assistant to the office of the Director when the President terminated Mr. Cissna. *Id.* § 3345(a)(1). Nor has Mr. Cuccinelli "serve[d] in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate" or "in a position in [the] agency for not less than 90 days" at the GS-15 rate of pay. *Id.* § 3345(a)(2), (3).

226.    Moreover, the previous Senate-confirmed Director, Mr. Cissna, was forced to resign by President Trump. Mr. Cissna was therefore effectively fired, and did not "resign" in the manner contemplated by the FVRA. 5 U.S.C. § 3345. Accordingly, the FVRA provides no authority for Mr. Cuccinelli to serve as Acting USCIS Director, even assuming he met the statutory requirements.

59

227.     There is also no statute or rule, directive, or other agency action published in the Federal Register that either establishes the office of "Principal Deputy Director" or designates the Principal Deputy Director as the first assistant to the office of the Director. The Principal Deputy Director therefore cannot serve as first assistant to the office of the USCIS Director.

228.     Mr. Cuccinelli promulgated the Asylum Directives pursuant to the USCIS Director's non-delegable authority to establish policies for the United States' lawful immigration system. Those Directives therefore "shall have no force or effect." 5 U.S.C. § 3348(d)(1). Similarly, the Directives are "not in accordance with law" under the Administrative Procedure Act. *Id.* § 706(2)(A). Thus, the Directives are unlawful and must be invalidated.

**Count Seven**
**(Violation of the Appointments Clause of the U.S. Constitution,**
**U.S. Const. art. II, § 2, cl. 2)**

229.     Plaintiff repeats and incorporates by reference each of the foregoing allegations as if fully set forth herein.

230.     The Appointments Clause of the U.S. Constitution provides that officers of the United States may be appointed by the President "by and with the Advice and Consent of the Senate," unless Congress has "by Law" authorized the appointment of an inferior officer by the President, the courts, or a department head. U.S. Const. art. II, § 2, cl. 2. The Appointments Clause also provides that Congress has exclusive authority to "establish[]" offices "by Law." U.S. Const. art. II, § 2, cl. 2.

231.     As Acting USCIS Director and as the Principal Deputy Director performing the functions and duties of the USCIS Director, Mr. Cuccinelli exercises significant authority and discretion, and therefore serves as an officer for the purposes of the Appointments Clause. *See, e.g.*, *Lucia*, 138 S. Ct. at 2051-52.

232.    Although he serves as an officer, Mr. Cuccinelli has not been nominated by the President and confirmed by the Senate. Nor has Congress enacted a law authorizing Mr. Cuccinelli to perform the functions and duties of USCIS Director without Senate confirmation. Nor has Congress enacted a law authorizing the creation of the office of Principal Deputy Director.

233.    Defendants' unconstitutional actions here are part of a broader pattern by President Trump of relying on acting officials across the executive branch, in derogation of the Senate's constitutional authority and responsibility. These actions undermine one of the "significant structural safeguards of the constitutional scheme" provided by the Appointments Clause. *Edmond*, 520 U.S. at 659.

234.    Plaintiffs filed suit to challenge the Asylum Directives shortly after those Directives were promulgated and Defendants had reasonable notice of the defect in Mr. Cuccinelli's appointment. *See Andrade v. Lauer*, 729 F.2d 1475, 1500 (D.C. Cir. 1984). Thus, the Directives are unlawful and must be invalidated.

**Count Eight**
(***Ultra Vires* Action**)

235.    Courts have equitable authority to enjoin *ultra vires* agency action. *See, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

236.    Because Mr. Cuccinelli's service is not authorized by the Federal Vacancies Reform Act or the Appointments Clause of the U.S. Constitution, any actions he or USCIS may take, including establishing and implementing the Asylum Directives, are *ultra vires* and must be enjoined.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1.      declare that the Asylum Directives are unlawful, and that Mr. Cuccinelli's appointment as Acting USCIS Director is unlawful,

2.      vacate the Directives;

3.      enjoin Defendants from processing and adjudicating asylum applications under the Directives, from removing asylum seekers who have been ordered removed under the Directives, to return to the United States asylum seekers processed under the Directives and subsequently removed, and to provide new credible fear interviews for asylum seekers processed under the Directives, including, as applicable, the Individual Plaintiffs;

4.      award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

5.      grant any other relief this Court deems appropriate.

Dated: September 6, 2019                     Respectfully submitted,


_____
John T. Lewis (D.C. Bar No. 1033826)
Nitin Shah (D.C. Bar No. 156035)
Benjamin Seel (D.C. Bar No. 1035286)
Javier M. Guzman (D.C. Bar No. 462679)
DEMOCRACY FORWARD FOUNDATION
1333 H Street NW
Washington, DC 20005
(202) 448-9090
jlewis@democracyforward.org
nshah@democracyforward.org
bseel@democracyforward.org
jguzman@democracyforward.org

Samuel J. Waldon*
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 600 South
Washington, DC 20004-2533
Telephone: (202) 416-6858
Facsimile: (202) 416-6899

1.    declare that the Asylum Directives are unlawful, and that Mr. Cuccinelli's

appointment as Acting USCIS Director is unlawful,

2.    vacate the Directives;

3.    enjoin Defendants from processing and adjudicating asylum applications under

the Directives, from removing asylum seekers who have been ordered removed under the

Directives, to return to the United States asylum seekers processed under the Directives and

subsequently removed, and to provide new credible fear interviews for asylum seekers processed

under the Directives, including, as applicable, the Individual Plaintiffs;

4.    award Plaintiffs their costs, attorneys' fees, and other disbursements for this

action; and

5.    grant any other relief this Court deems appropriate.

Dated: September 6, 2019                          Respectfully submitted,

                                                 John T. Lewis (D.C. Bar No. 1033826)
                                                 Nitin Shah (D.C. Bar No. 156035)
                                                 Benjamin Seel (D.C. Bar No. 1035286)
                                                 Javier M. Guzman (D.C. Bar No. 462679)
                                                 DEMOCRACY FORWARD FOUNDATION
                                                 1333 H Street NW
                                                 Washington, DC 20005
                                                 (202) 448-9090
                                                 jlewis@democracyforward.org
                                                 nshah@democracyforward.org
                                                 bseel@democracyforward.org
                                                 jguzman@democracyforward.org

                                                 Samuel J. Waldon*
                                                 PROSKAUER ROSE LLP
                                                 1001 Pennsylvania Avenue, NW
                                                 Suite 600 South
                                                 Washington, DC 20004-2533
                                                 Telephone: (202) 416-6858
                                                 Facsimile: (202) 416-6899

swaldon@proskauer.com

Bradley Jenkins*
CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.
8757 Georgia Ave., Suite 850
Silver Spring, MD 20910
(301)565-4820
bjenkins@cliniclegal.org

Manoj Govindaiah (D.D.C. Bar ID TX0145)
REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES
802 Kentucky Ave.
San Antonio, TX 78201
(210) 787-3745
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiffs*

*\*Application for admission pro hac vice
        forthcoming*