**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L.M.-M., et al., | |
| *Plaintiffs*, | |
| vs. | Case No. 1:19-cv-2676 (RDM) |
| KENNETH T. CUCCINELLI II, in his purported official capacity as acting Director of U.S. Citizenship and Immigration Services, et al., | **ORAL ARGUMENT REQUESTED** |
| *Defendants.* | |

**MOTION FOR PRELIMINARY INJUNCTION
AND SUPPORTING MEMORANDUM**

# TABLE OF CONTENTS

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 3

      A.    Statutory and regulatory background. .......................................................... 3

      B.    Factual background. ..................................................................................... 5

      C.    Proceedings in this Court. ........................................................................... 9

Legal Standard .............................................................................................................. 10

Argument ...................................................................................................................... 11

    I.    Plaintiffs are likely to succeed on the merits. ...................................................... 11

      A.    The Asylum Directives violate the statutes and regulations that govern the credible fear process. (Count I) .................................................................. 11

          1.    The Shortened Wait Period and Continuance Denial Directives.. 11

          2.    The No Legal Orientation Directive. ............................................ 18

      B.    Mr. Cuccinelli's appointment is unlawful under the Federal Vacancies Reform Act. (Count VI) ............................................................................. 19

      C.    The Asylum Directives are arbitrary and capricious. (Count II) .............. 25

      D.    The Asylum Directives violate the Rehabilitation Act. (Count IV) ......... 28

    II.    Plaintiffs suffer irreparable injury from the Asylum Directives. ......................... 31

      A.    Five of the Individual Plaintiffs suffer irreparable injury from the Asylum Directives. ................................................................................................. 32

      B.    RAICES suffers irreparable injury .......................................................... 36

    III.    The balance of equities and the public interest favor Plaintiffs. ......................... 39

    IV.    The Court should enjoin the Asylum Directives on a nationwide basis. .............. 41

Conclusion .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AILA v. Reno*,
18 F. Supp. 2d 38 (D.D.C. 1998) ..........................................................................12

*Alexander v. Choate*,
469 U.S. 287 (1985) ...............................................................................................29

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ..............................................................................10

*Alshrafi v. Am. Airlines, Inc.*,
321 F. Supp. 2d 150 (D. Mass. 2004) ...................................................................27

*Am. Council of the Blind v. Paulson*,
525 F.3d 1256 (D.C. Cir. 2008) ............................................................................29

*Apotex, Inc. v. FDA*,
2006 WL 1030151 (D.D.C. 2006) .........................................................................35

*Arab Am. C.R. League v. Trump*,
2019 WL 3003455 (E.D. Mich. 2019) ...................................................................28

*Aracely v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018) .......................................................................41

*Arar v. Ashcroft*,
532 F.3d 157 (2d Cir. 2008) ..................................................................................12

*Baltimore v. Trump*,
2019 WL 4598011 (D. Md. 2019) .........................................................................28

*Batalla Vidal v. Nielsen*,
279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................................................................45

*Batalla Vidal v. Nielsen*,
291 F. Supp. 3d 260 (E.D.N.Y. 2018) ...................................................................28

*Beacon Assocs., Inc. v. Apprio, Inc.*,
308 F. Supp. 3d 277 (D.D.C. 2018) .......................................................................38

* *Biwot v. Gonzales*,
403 F.3d 1094 (9th Cir. 2005) ..........................................................................13, 17

*Brown v. Plata*,
   563 U.S. 493 (2011).................................................................................................41

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
   344 F. Supp. 3d 158 (D.D.C. 2018) ........................................................................39

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)................................................................................................44

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) .................................................................................44

*CASA de Maryland v. Trump*,
   355 F. Supp. 3d 307 (D. Md. 2018) .......................................................................28

* *Castaneda-Delgado v. INS*,
   525 F.2d 1295 (7th Cir. 1975) ...............................................................................13

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018) ....................................................................28

* *Chlomos v. INS*,
   516 F.2d 310 (3d Cir. 1975)...................................................................................14

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ....................................................................................10

* *Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014).................................................................12, 17, 18

*Conn v. Am. Nat'l Red Cross*,
   149 F. Supp. 3d 136 (D.D.C. 2016)........................................................................29

*ConverDyn v. Moniz*,
   68 F. Supp. 3d 34 (D.D.C. 2014) ...........................................................................41

*CREW v. DHS*,
   387 F. Supp. 3d 33 (D.D.C. 2019) .........................................................................38

*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018)........................................................................42

*Desmond v. Mukasey*,
   530 F.3d 944 (D.C. Cir. 2008)...............................................................................29

*Desta v. Ashcroft*,
   365 F.3d 741 (9th Cir. 2004) .................................................................................36

iii

*Devitri v. Cronen*,
　　289 F. Supp. 3d 287 (D. Mass. 2018) ................................................................33

*Doe 2 v. Mattis*,
　　344 F. Supp. 3d 16 (D.D.C. 2018) ....................................................................44

*Doe v. Rumsfeld*,
　　341 F. Supp. 2d 1 (D.D.C. 2004) ......................................................................43

*E. Bay Sanctuary Covenant v. Trump*,
　　349 F. Supp. 3d 838 (N.D. Cal. 2018) .............................................................33

*E. Bay Sanctuary Covenant v. Trump*,
　　932 F.3d 742 (9th Cir. 2018) .............................................................................45

*English v. Trump*,
　　279 F. Supp. 3d 307 (D.D.C. 2018) ..................................................................22

* *FCC v. Fox Television Stations, Inc.*,
　　556 U.S. 502 (2009) ...........................................................................................25

* *Franco-Gonzales v. Holder*,
　　767 F. Supp. 2d 1034 (C.D. Cal. 2010) ............................................................31

* *Grace v. Whitaker*,
　　344 F. Supp. 3d 96 (D.D.C. 2018) ............................................................ *passim*

*Guedes v. ATF*,
　　920 F.3d 1 (D.C. Cir. 2019) .........................................................................21, 22

*Guilford Coll. v. McAleenan*,
　　389 F. Supp. 3d 377 (M.D.N.C. 2019) .............................................................45

*Harris v. City of Wichita, Sedgwick Cty., Kan.*,
　　74 F.3d 1249 (10th Cir. 1996) ..........................................................................27

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
　　816 F.3d 550 (9th Cir. 2016) .......................................................................21, 22

*Hoosier Energy Rural Elec. Coop. v. John Hancock Life Ins. Co.*,
　　582 F.3d 721 (7th Cir. 2009) ............................................................................10

* *Innovation Law Lab v. Nielsen*,
　　342 F. Supp. 3d 1067 (D. Or. 2018) ............................................................12, 27

*Innovation Law Lab v. Nielsen*,
　　366 F. Supp. 3d 1110 (N.D. Cal. 2019) ...........................................................13

iv

*Int'l Refugee Assistance Project v. Trump*,
  373 F. Supp. 3d 650 (D. Md. 2019) ...................................................................28

*J.O.P. v. DHS*,
  2019 WL 3536786 (D. Md. 2019) .....................................................................26

*Jacinto-Castanon de Nolasco v. ICE*,
  319 F. Supp. 3d 491 (D.D.C. 2018) ..................................................................40

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1977) ............................................................................40

*Jubilant DraxImage Inc. v. ITC*,
  -- F. Supp. 3d ---, 2019 WL 3037536 (D.D.C. 2019) (Moss, J.) ................10, 39

*Kirwa v. DOD*,
  285 F. Supp. 3d 21 (D.D.C. 2017) ....................................................................35

*La Union del Pueblo Entero v. Ross*,
  353 F. Supp. 3d 381 (D. Md. 2018) ...................................................................28

* *League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................................ passim

* *Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) .............................................................................33

*Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015) ..........................................................................31

*Morgan Stanley DW Inc. v. Rothe*,
  150 F. Supp. 2d 67 (D.D.C. 2001) ....................................................................37

* *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................25, 27

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................................40

*NAACP v. DHS*,
  364 F. Supp. 3d 568 (D. Md. 2019) ...................................................................28

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ..................................................................26

*Nat'l Lifeline Ass'n v. FCC*,
  921 F.3d 1102 (D.C. Cir. 2019) ........................................................................26

\* *Nat'l Min. Ass'n v. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) ................................................................43, 45

*Nat'l Treasury Emps. Union v. Horner*,
  854 F.2d 490 (D.C. Cir. 1988) ................................................................28

*In re Navy Chaplaincy*,
  516 F. Supp. 2d 119 (D.D.C. 2007) ................................................................32

*New York v. Dep't of Commerce*,
  315 F. Supp. 3d 766 (S.D.N.Y. 2018) ................................................................23, 28

*Niles v. U.S. Capitol Police*,
  2019 WL 1858503 (D.D.C. 2019) ................................................................29

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................10, 40

\* *NLRB v. SW Gen., Inc.*,
  137 S. Ct. 929 (2017) ................................................................ *passim*

*Nunez v. Boldin*,
  537 F. Supp. 578 (S.D. Tex. 1982) ................................................................33

\* *O.A. v. Trump*,
  2019 WL 3536334 (D.D.C. 2019) ................................................................38, 45

\* *Open Communities All. v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................36, 39

\* *Orantes-Hernandez v. Meese*,
  685 F. Supp. 1488 (C.D. Cal. 1988) ................................................................33

*Orantes-Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) ................................................................13

*Osorio-Martinez v. Att'y Gen.*,
  893 F.3d 153 (3d Cir. 2018) ................................................................41

\* *Palamaryuk v. Duke*,
  306 F. Supp. 3d 1294 (W.D. Wash. 2018) ................................................................31

*Ramos v. Nielsen*,
  336 F. Supp. 3d 1075 (N.D. Cal. 2018) ................................................................28

*Regents of the Univ. of Cal. v. DHS*,
  908 F.3d 476 (9th Cir. 2018) ................................................................28

*\* R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................................40, 42

*Rios-Berrios v. I.N.S.*,
  776 F.2d 859 (9th Cir. 1985) ...........................................................................16

*Robertson v. Cartinhour*,
  429 F. App'x 1 (D.C. Cir. 2011) ......................................................................41

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) .........................................................28, 42

*Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) ..............................................................44

*Sean B. v. McAleenan*,
  2019 WL 4165309 (D.N.J. 2019) .....................................................................33

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) .........................................................................10

*Stellar IT Sols., Inc. v. USCIS*,
  2018 WL 6047413 (D.D.C. 2018) ....................................................................35

*SW Gen., Inc. v. NLRB*,
  796 F.3d 67 (D.C. Cir. 2015) ..........................................................................21

*Tesfamichael v. Gonzales*,
  411 F.3d 169 (5th Cir. 2005) ..........................................................................33

*Trump v. Comm. on Oversight & Reform*,
  380 F. Supp. 3d 76 (D.D.C. 2019) ...................................................................10

*U.S. Ass'n of Reptile Keepers v. Jewell*,
  106 F. Supp. 3d 125 (D.D.C. 2015) (Moss, J.) ..................................................43

*United States v. Quinteros Guzman*,
  2019 WL 3220576 (W.D. Va. 2019) .................................................................13

*Vargas v. Meese*,
  682 F. Supp. 591 (D.D.C. 1987) ......................................................................35

*Vo Van Chau v. Dep't of State*,
  891 F. Supp. 650 (D.D.C. 1995) ......................................................................32

*Walden v. Patient-Centered Outcomes Res. Inst.*,
  177 F. Supp. 3d 336 (D.D.C. 2016) ..................................................................29

\* *Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..................................................................................................10

*Yea Ji Sea v. DHS*,
  2018 WL 6177236 (C.D. Cal. 2018).....................................................................35

**Statutes, Rules, and Regulations**

5 U.S.C.
  § 706.......................................................................................................................25
  § 3345.........................................................................................................20, 21, 22
  § 3348.....................................................................................................................25

6 U.S.C. § 271.............................................................................................................25

8 U.S.C.
  § 1101.......................................................................................................................3
  § 1158.......................................................................................................................3
  § 1182....................................................................................................................3, 5
  § 1225.............................................................................................................. *passim*
  § 1231.......................................................................................................................3
  § 1252.....................................................................................................................44
  § 1362.....................................................................................................................13

29 U.S.C.
  § 705.......................................................................................................................29
  § 794.......................................................................................................................29

42 U.S.C. § 12102.......................................................................................................29

8 C.F.R.
  § 208.30........................................................................................................ *passim*
  § 212.2.......................................................................................................................5
  § 235.3..................................................................................................................4, 12
  § 1208.16..................................................................................................................3
  § 1208.18..................................................................................................................3

62 Fed. Reg. 10,312 (Mar. 6, 1997).............................................................................12

**Other Authorities**

*Designation of Acting Associate Attorney General*,
  25 Op. O.L.C. 177 (2001)......................................................................................24

*Guidance on Application of Federal Vacancies Reform Act of 1998*,
  23 Op. O.L.C. 60 (1999)........................................................................................23

Letter from Carlotta C. Joyner, GAO, to Sen. Fred Thompson, Chairman, Comm.
   on Gov't Affairs (Feb. 23, 2001), https://www.gao.gov/assets/80/75036.pdf........................24

S. Rep. 105-250 (1998)...........................................................................................................22, 24

Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*,
   2017 Cato Sup. Ct. Rev. 151...............................................................................................24

## INTRODUCTION

The United States has a duty—one imposed by domestic law, international treaties, and the nation's most fundamental commitments—to provide refuge to victims of persecution. That obligation has no less force in the context of the expedited removal system that Congress established in 1996 to promptly process those seeking admission to the United States. While the expedited removal statute provides an abbreviated process for assessing whether an asylum seeker's fear of persecution is credible, Congress nevertheless specifically included critical protections as part of that assessment process—protections designed to ensure that asylum seekers understand their legal rights, have an adequate opportunity to consult with third parties, including counsel, and thus are able to meaningfully present their asylum claims.

Defendants have contravened those long-standing protections in a series of recent directives that undermine the credible fear process (the "Asylum Directives" or the "Directives"). Until recently, asylum seekers were entitled to 48 hours from the time they received notice of their interview or from the time of their arrival at the detention center to consult with third parties and to prepare for their interviews. Defendants have now reduced that time to a "full calendar day," measured solely from the time asylum seekers arrive at the center—which, in practice, results in asylum seekers receiving notice the night before an interview that could mean life or death (the "Shortened Wait Period Directive"). Also, prior to the Asylum Directives, asylum seekers could request continuances if they needed more time to consult with counsel or other third parties, gather evidence, organize the presentation of facts that support their claims, arrange translation, or raise competency issues. Now, continuances are virtually forbidden (the "Continuance Denial Directive"). Additionally, certain particularly vulnerable asylum seekers were long provided with an in-person legal orientation to ensure that they understood their rights. Now they are not (the "No Legal Orientation Directive").

1

Seven individual asylum seekers (the "Individual Plaintiffs") and the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), filed suit to challenge those Directives. Plaintiffs now seek to preliminarily enjoin the Asylum Directives on four grounds. *First*, the Directives deprive asylum seekers of their rights under the immigration statutes and regulations. *Second*, the Directives were issued by purported Acting Director of U.S. Citizenship & Immigration Services ("USCIS") Kenneth T. Cuccinelli II, who does not meet the requirements of the Federal Vacancies Reform Act to serve in the position he now holds. *Third*, Defendants failed to consider how the Directives harm asylum seekers, and therefore acted arbitrarily and capriciously in promulgating them. And *fourth*, the Directives exclude asylum seekers with physical and mental disabilities from participating in the credible fear process, and therefore violate the Rehabilitation Act. Plaintiffs are likely to prevail on each of these claims.

Plaintiffs also meet the other factors for preliminary relief. The Individual Plaintiffs, who were ordered to be removed in proceedings under the Asylum Directives, face irreparable injury if they are deported to their home countries, where they will face persecution and violence. RAICES faces irreparable injury every day that the Directives continue to disrupt its operations. The balance of the equities and the public interest also favor Plaintiffs because the government has no legitimate interest in enforcing unlawful removal orders against asylum seekers who fear return to their home countries.

Finally, the Court should enter an injunction barring Defendants from processing asylum applications under the Directives wherever they are in effect. Such an injunction is the only way to grant complete relief to RAICES as well as other similarly situated non-parties. Nationwide relief also serves the powerful interest in a uniform national immigration system—one which does not vary based on the happenstance of where an asylum seeker happens to be detained.

For these reasons, and those set forth below, Plaintiffs respectfully request that the Court enjoin and/or stay the Asylum Directives wherever they are applied, as well as the Individual Plaintiffs' orders of removal.

## BACKGROUND

### A.     Statutory and regulatory background.

Under the Refugee Act of 1980, "[a]ny alien who is physically present in the United States or who arrives in the United States, … irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). To be eligible for asylum, an asylum seeker must demonstrate "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42). If an asylum seeker does not qualify for asylum, they may nevertheless be eligible for withholding of removal or protection under the Convention Against Torture, which is mandatory if they make the requisite showing of fear of persecution or torture and are not subject to any bars. *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 1208.16, 1208.18.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). IIRIRA established a new system for processing certain categories of individuals seeking admission to the United States, commonly referred to as the "expedited removal system." Under the expedited removal system, non-citizens who have engaged in fraud or misrepresentation to obtain admission to the United States, 8 U.S.C. § 1182(a)(6)(C), or who lack proper documentation, *id.* § 1182(a)(7), can be "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

The statute requires, however, that non-citizens who seek asylum must receive additional review before DHS may remove them. A non-citizen who indicates an intention to apply for asylum or a fear of persecution in their home country must be provided with an interview to

3

demonstrate that their fear of persecution or torture is credible (commonly referred to as a "credible fear interview"). *Id.* § 1225(b)(l)(A)(ii). An asylum seeker is deemed to have a credible fear if there is "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v).

Congress incorporated this exception because it recognized that "[e]xpediting the removal process … risks sending individuals who are potentially eligible for asylum to their respective home countries where they face a real threat, or have a credible fear of persecution." *Grace v. Whitaker*, 344 F. Supp. 3d 96, 107 (D.D.C. 2018). IIRIRA and its implementing regulations therefore provide asylum seekers with protections in the credible fear process:

- The government "shall provide information concerning the asylum interview," which includes a description of the process and the asylum seeker's legal rights. 8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. § 235.3(b)(4)(i).

- The asylum seeker is entitled to "consult with a person or persons of [their] choosing," provided that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. § 235.3(b)(4)(i). Those persons may attend the interview, and present a statement if permitted by the asylum officer. *Id.* § 208.30(d)(4).

- The asylum officer who conducts the credible fear interview may reschedule the interview if the applicant "is unable to participate effectively in the interview because of illness, fatigue, or other impediments." *Id.* § 208.30(d)(1).

Ultimately, the interview is intended to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." *Id.* § 208.30(d). After the interview, the asylum officer "shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination." *Id.* § 208.30(e)(1).

If the asylum officer determines that the asylum seeker has a credible fear of persecution, then USCIS issues a Notice to Appear to the asylum seeker and places them in removal proceedings under Section 240 of the Immigration and Nationality Act, 8 U.S.C. § 1229a, allowing them to apply for asylum. *Id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f). If the asylum officer determines that the asylum seeker does not have a credible fear of persecution, or is ineligible for asylum, then the asylum seeker may receive only "prompt review by an immigration judge" of that determination, which "shall include an opportunity to be heard and questioned by the immigration judge," but "shall be concluded as expeditiously as possible." 8 U.S.C. § 1225(b)(1)(B)(iii)(III). If the immigration judge agrees with the asylum officer's negative determination, there is no provision for further review, although USCIS, in its discretion, may reconsider an initial negative determination. Asylum seekers who DHS orders removed through the expedited removal process are usually swiftly removed from the United States, and face a five-year bar on admission to the United States unless they qualify for a discretionary waiver. *Id.* § 1182(a)(9)(A)(i); 8 C.F.R. § 212.2.

**B.     Factual background.**

This case principally involves a series of nationwide policy directives that weaken procedural safeguards for asylum seekers in the credible fear process. The Directives were first implemented at the South Texas Family Residential Center in Dilley, Texas, and the Karnes County Residential Center in Karnes City, Texas, and later at the Berks Family Residential Center in Leesport, Pennsylvania. The Dilley and Karnes Detention Centers currently house families and adult women, respectively, who are seeking asylum. Declaration of Shalyn Fluharty ¶ 3 [hereinafter Fluharty Decl.]; Declaration of Andrea Meza ¶ 5 [hereinafter Meza Decl.]. Many of the women and children detained at Dilley and Karnes are from countries in Central and South America, including Honduras, that have some of the highest violent crime rates in the world, and

speak Spanish or an indigenous language. Fluharty Decl. ¶ 4; Meza Decl. ¶¶ 8, 11. Many have

experienced severe forms of trauma, including child abuse, rape, incest, domestic violence, and

other forms of persecution. Fluharty Decl. ¶ 4; Meza Decl. ¶ 9. As a consequence of their past

trauma, journey, and detention, the women and children detained at Dilley and Karnes frequently

suffer from post-traumatic stress disorder, anxiety, and depression. *Id.*

      Against that backdrop, the women and children at Dilley and Karnes are required to

participate in credible fear interviews—interviews that may well mean the difference between

life and death. As a whole, the credible fear process is often confusing to understand. The

interviews themselves require asylum seekers to recount deeply personal, stigmatizing, and

traumatic details that they may never have recounted before. Fluharty Decl. ¶ 5; Meza Decl. ¶ 9.

Detained asylum seekers have limited ability to communicate with third parties who can assist in

preparing them for their interviews, and must devote time to mandatory facility orientations and

programs. Fluharty Decl. ¶ 5. Mothers at Dilley must also care for their children, who possess

their own legal rights, during the credible fear process. *Id*. These factors make it difficult for

asylum seekers to prepare for and participate fully and effectively in their interviews.

      However, USCIS's prior policies provided certain safeguards to asylum seekers, designed

to give effect to the protections enshrined in the statutes and regulations that govern the credible

fear process. USCIS officials used to provide asylum seekers with 48 hours, measured either

from the time an asylum seeker received notice of their interview or when they arrived at the

detention center, to prepare for their interviews. Fluharty Decl. ¶ 8; Meza Decl. ¶ 15. During that

period, asylum seekers could and often would consult with legal counsel. Attorneys perform a

number of critical functions: they can explain the complex credible fear process; help the asylum

seeker articulate the facts of their situation; gather additional evidence and facts to support the

asylum seeker's claims; connect the asylum seeker's experiences to the legal standards for granting asylum; assist the asylum seeker in obtaining additional time or accommodations; and make connections to other professionals. Fluharty Decl. ¶¶ 9-12; Meza Decl. ¶¶ 15-16, 20; Declaration of Bridget Cambria ¶ 8 [hereinafter Cambria Decl.]. Asylum seekers could also consult with third parties who may possess evidence that supports their claims or medical professionals. Fluharty Decl. ¶ 9; Meza Decl. ¶ 10. Under the Shortened Wait Period Directive, asylum seekers are now entitled only to a "full calendar day," which, in practice, often means that they receive notice the night before their morning interviews. *Id.* ¶ 13. This change is reflected on USCIS's website. Declaration of Catherine Monk, Ex. 1 [hereinafter Monk Decl.].

USCIS would also frequently grant reasonable continuances to asylum seekers who required additional time. Fluharty Decl. ¶ 17; Meza Decl. ¶ 15. For example, some asylum seekers may be unable to consult with counsel in the time provided to them; others may need additional time to become fully prepared; some may have particularly complicated cases; and still others may need additional time to make contact with third parties who possess information that would support their claims. Fluharty Decl. ¶ 17; Cambria Decl. ¶ 19. Moreover, those with special needs, including disabilities, may need additional time to communicate with counsel or organize their thoughts for their interviews. Fluharty Decl. ¶¶ 17, 21; Meza Decl. ¶¶ 9-10; Cambria Decl. ¶ 19-20. Under the Continuance Denial Directive, USCIS now only grants continuances in three "extraordinary circumstances": where (1) the asylum seeker has proof of a simultaneous court proceeding, (2) they are hospitalized in a manner than prevents them from participating in the interview, or (3) the facility has prevented the asylum seeker from consulting with their counsel. Fluharty Decl. ¶ 18; Cambria Decl. ¶¶ 11-14. Plaintiffs understand this Directive to have been issued in writing with the Shortened Wait Period Directive.

Finally, USCIS officials at Dilley used to provide an oral, in-person legal orientation, consisting of a video presentation combined with a meeting with an asylum officer, which allowed asylum seekers to ask questions about their legal rights, provided the only means of transmitting information to asylum seekers who cannot read, and facilitated understanding for asylum seekers with special needs, including disabilities or competency issues. *Id.* ¶ 6. Under the No Legal Orientation Directive, that program has been canceled, and Defendants provide, at best, only a written summary of the process, referred to as a Form M-444. *Id.* ¶ 7. Plaintiffs believe that this change was similarly implemented in writing.

The Individual Plaintiffs were processed under the Asylum Directives, and Plaintiffs L.M.-M., B.M.-M., V.M.-M., M.A.-H., and I.M.-A. are now subject to final orders of removal. As described below, these Plaintiffs fled Honduras after suffering repeated physical and sexual abuse by domestic partners; threats of being kidnapped, assaulted, or raped by members of the transnational criminal organization MS-13; and political oppression and retaliation. Declaration of L.M.-M. ¶¶ 2, 14 [hereinafter L.M.-M. Decl.]; Declaration of M.A.-H. ¶¶ 3-15, 26-29 [hereinafter M.A.-H. Decl.]. After making their arduous journey to the United States, they were eventually detained at the Dilley Detention Center, where they underwent credible fear proceedings. L.M.-M. Decl. ¶¶ 3-5; M.A.-H. Decl. ¶¶ 16-22. The Asylum Directives prevented them from understanding their legal rights and the credible fear process, having adequate time to consult with counsel, and participating fully and effectively in their interviews. L.M.-M. Decl. ¶¶ 5-13; M.A.-H. Decl. ¶¶ 22-28. As a result, each was denied asylum, withholding of removal, and protection under the Convention Against Torture, and was issued a final order of removal.[1]

---

[1]    Defendants have agreed to not remove these individuals pending the adjudication of this motion. *See* Parties' Stipulation & Joint Mot. to Set Briefing Schedule, ECF No. 8; *see also*

Plaintiff RAICES is a nonprofit legal services organization that provides legal services to asylum seekers at the Karnes Detention Center through the Karnes Pro Bono Project. Meza Decl. ¶¶ 4-6. RAICES strives to provide legal services to asylum seekers during all phases of the immigration process, including prior to and during credible fear interviews and in appeals of negative decisions to an immigration judge. *Id.* ¶ 6. RAICES also manages a free hotline for asylum seekers detained at Karnes that is staffed and regularly monitored. *Id.* ¶ 22. The Asylum Directives have limited the time that RAICES has to consult with its clients and have forced RAICES to change the manner in which it provides legal counsel and divert resources, including money and staff time, to ensure that it can continue to provide its services. *Id.* ¶¶ 14-28.

**C.      Proceedings in this Court.**

Plaintiffs filed the Complaint under pseudonym (ECF No. 1) [hereinafter Compl.] on September 6, 2019, asserting eight claims: (1) the Asylum Directives violate the statutes and regulations governing the credible fear process, Compl. ¶¶ 194-97; (2) the Directives are arbitrary and capricious, *id.* ¶¶ 198-205; (3) the Directives were unlawfully issued without notice and comment, *id.* ¶¶ 206-08; (4) the Directives violate the Rehabilitation Act, *id.* ¶¶ 209-18; (5) the Directives violate the First Amendment, *id.* ¶¶ 219-23; (6) the Directives were issued by an acting official, Mr. Cuccinelli, who does not meet the requirements of the Federal Vacancies Reform Act, *id.* ¶¶ 224-28; (7) Mr. Cuccinelli's service violates the Appointments Clause of the Constitution, *id.* ¶¶ 229-34; and (8) the Directives are *ultra vires*, *id.* ¶¶ 235-36. That same day, the Chief Judge granted Plaintiffs' motion to proceed under pseudonym. ECF No. 3. Plaintiffs

---

Minute Order of Sept. 26, 2019. After the filing of the Complaint, the reviewing immigration judge vacated the negative credible fear findings issued against Plaintiffs S.G.-C. and her child B.O.-G. Accordingly, they are no longer subject to final orders of removal at present, and their claims for asylum will be adjudicated through Section 240 removal proceedings.

have now moved for a preliminary injunction, and the Court has entered a schedule for briefing

the opposed motion, pursuant to the agreement of the parties. *See* Local Rule 7(m).

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to

succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In this Circuit,

it remains an open question whether the "sliding-scale" approach to equitable relief—where "a

strong showing on one factor could make up for a weaker showing on another"—still governs.

*Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *see also Jubilant DraxImage Inc. v. ITC*,

-- F. Supp. 3d ---, 2019 WL 3037536, at *3 (D.D.C. 2019) (Moss, J.).

Plaintiffs respectfully submit that the sliding-scale approach, retained by several circuits,

is correct. As the Second Circuit has explained, "[i]f the Supreme Court had meant for *Munaf*,

*Winter*, or *Nken* to abrogate the more flexible standard for a preliminary injunction, one would

expect some reference to the considerable history of the flexible standards applied in this circuit,

seven of our sister circuits, and in the Supreme Court itself." *Citigroup Global Mkts., Inc. v.*

*VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010); *accord, e.g.,*

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1130-35 (9th Cir. 2011); *Hoosier Energy*

*Rural Elec. Coop. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009); *cf. Trump v.*

*Comm. on Oversight & Reform*, 380 F. Supp. 3d 76, 104 (D.D.C. 2019) (applying the sliding-

scale approach in deciding whether to issue a stay pending appeal). But regardless of the

approach, Plaintiffs are entitled to a preliminary injunction.

**ARGUMENT**

**I.     <u>Plaintiffs are likely to succeed on the merits.</u>**

Plaintiffs are likely to succeed on all of their claims, but advance four in this motion.
*First*, the Asylum Directives violate the statutes and regulations that govern the credible fear
process (Count I). *Second*, the Directives were issued by an acting official, Mr. Cuccinelli, who
does not meet the requirements of the Federal Vacancies Reform Act (Count VI). *Third*, the
Directives are arbitrary and capricious (Count II). And *fourth*, the Directives violate the
Rehabilitation Act (Count IV). We address each in turn.

**A.     The Asylum Directives violate the statutes and regulations that govern the
credible fear process. (Count I)**

To start, Plaintiffs are likely to succeed on their claim that the Asylum Directives unduly
impede asylum seekers' rights under the statutes and regulations governing the credible fear
process. Congress intended that process, and its attendant protections, to provide safeguards
against removing non-citizens who credibly fear persecution in their home countries. *Grace*, 344
F. Supp. 3d at 107. The Asylum Directives undermine those safeguards in several respects.

**1.     *The Shortened Wait Period and Continuance Denial Directives.***

The Shortened Wait Period and Continuance Denial Directives violate asylum seekers'
rights to consult with persons of their choosing before their credible fear interviews and to
participate fully and effectively in those interviews. Congress mandated that asylum seekers are
entitled to "consult with a person or persons of [their] choosing prior to the [credible fear]
interview," provided that "[s]uch consultation shall be at no expense to the Government and shall
not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv). Indeed, the government has
acknowledged that this right attaches to all "those who indicate a fear of persecution … and are

thus referred for a credible fear interview." *AILA v. Reno*, 18 F. Supp. 2d 38, 54 (D.D.C. 1998). That statutory prescription overrides any contrary DHS rule, including the Directives.

DHS's implementing regulations further require that Defendants provide asylum seekers with a reasonable opportunity to consult with counsel and other third parties. *See Clean Air Project v. EPA*, 752 F.3d 999, 1011 (D.C. Cir. 2014) ("[A]n agency is not free to ignore or violate its regulations while they remain in effect.") (quotation omitted). Those regulations reiterate that the asylum seeker "*shall* be given time to contact and consult with any person or persons of his or her choosing," 8 C.F.R. § 235.3(b)(4)(ii) (emphasis added), that they "*shall*" be informed of that right, *id.* § 235.3(b)(4)(i) (emphasis added), and that the persons they consult "may be present at the interview," and may even be permitted to "present a statement at the end of the interview," *id.* § 208.30(d)(4). In promulgating these regulations, which were the product of the government's "careful[] consider[ation]" of how best to ensure that bona fide asylum seekers can assert their claims while simultaneously expediting the removal process, 62 Fed. Reg. 10,312, 10,318 (Mar. 6, 1997), the government specifically noted that it "intends that aliens will normally be given *48 hours* from the time of arrival at the detention facility, in which to contact family members, friends, attorneys, or representatives," *id.* at 10,320 (emphasis added).

These statutes and regulations therefore bind Defendants to provide sufficient time for asylum seekers to consult with third parties, including attorneys. Indeed, while the precise nomenclature is immaterial, courts have interpreted these statutory and regulatory requirements to impose a right to *counsel*. As the court explained in *Innovation Law Lab v. Nielsen*, these provisions entitle asylum seekers to "counsel of their choice at their own expense in immigration proceedings." 342 F. Supp. 3d 1067, 1080 (D. Or. 2018) (citing *Rios-Berrios v. I.N.S.*, 776 F.2d 859, 862 (9th Cir. 1985)). That procedural protection is, effectively, a "right to counsel." *Arar v.*

*Ashcroft*, 532 F.3d 157, 187 (2d Cir. 2008), *vacated and superseded on reh'g en banc*, 585 F.3d

559 (2d Cir. 2009); *see also United States v. Quinteros Guzman*, 2019 WL 3220576, at *9 (W.D.

Va. 2019) (describing the right to "counsel of the alien's choosing" available in section 240

removal proceedings as "[s]imilar[]" to the right to "consult with a person of the alien's choosing

prior to" a credible fear interview). For these reasons, "an alien processed for 'expedited'

removal under subparagraph (b)(1) still has substantial procedural safeguards against being

removed to a place where he or she may face persecution." *Innovation Law Lab v. Nielsen*, 366

F. Supp. 3d 1110, 1122 (N.D. Cal. 2019).

  If the right to consult is to be more than a promise on paper, it requires that Defendants

afford asylum seekers enough time to *meaningfully* consult with third parties. In the context of

removal proceedings under Section 240 of the INA, which afford immigrants the "privilege of

being represented" by "counsel," 8 U.S.C. § 1362, the Ninth Circuit has explained that, "[t]o

infuse the critical right to counsel with meaning, … IJs must provide aliens with reasonable time

to locate counsel and permit counsel to prepare for the hearing." *Biwot v. Gonzales*, 403 F.3d

1094, 1098-99 (9th Cir. 2005) (holding that providing a "remarkably short period" of only five

business days to obtain counsel violated right to counsel); *see also Orantes-Hernandez v.*

*Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990) (upholding an injunction in light of "numerous

obstacles," including "time restrictions" on telephone access, "the cumulative effect of which

was to prevent aliens from contacting counsel and receiving any legal advice"). Similarly, the

Third and Seventh Circuits have held that the authorities in Section 240 proceedings must give

"a reasonable … continuance to [immigrants] for the purpose of obtaining counsel," *Castaneda-*

*Delgado v. INS*, 525 F.2d 1295, 1297-1300 (7th Cir. 1975) (holding that single continuance of

less than two days violated right to counsel)—one that, as a practical matter, is adequate "to

make the services of … chosen counsel available," *Chlomos v. INS*, 516 F.2d 310, 314 (3d Cir. 1975). These decisions, which relied substantially on immigrants' *statutory* right to counsel, are applicable here, where Congress has similarly mandated that asylum seekers have the right to consult with third parties.

Defendants' curtailment of the waiting period violates asylum seekers' consultation rights. Specifically, the Shortened Wait Period Directive permits USCIS to schedule asylum interviews with as little as one calendar day's notice. By its terms, the Directive would be satisfied if an asylum seeker arrived at the detention facility at 11:58 PM, received notice of their interview at 11:59 PM, and attended their interview *two minutes later*, at 12:01 AM. That cannot possibly be consistent with the governing statutes and regulations, or, indeed, any conception of a meaningful opportunity to consult with a third party, like an attorney. In practice, the Directive means that many asylum seekers arrive at the detention center and/or receive notice the night before an early morning interview. The Continuance Denial Directive then bars asylum seekers from obtaining a continuance when that unduly short period of time proves—as is reasonably foreseeable—to be inadequate.

The Individual Plaintiffs' circumstances show in concrete detail how the Directives prevent asylum seekers from preparing for their interviews. For example, L.M.-M. arrived at Dilley on August 13 at 4 PM, and received notice at some time past 8 PM the night of August 14 that her family's interview had been scheduled for 10 AM the next morning, L.M.-M. Decl. ¶¶ 5, 9, leaving her with virtually no time to recuperate, prepare, or consult. L.M.-M. was therefore "unable to talk about [her] fear of [her] abusive partner" or fully communicate with the asylum officer. *Id.* ¶ 10. In contrast, if she "had more time to prepare for the interview," she "would have understood the process better," would have used that time "to talk to the Dilley Pro Bono

Project," and would have tried to obtain needed medical care. *Id.* ¶ 13. Similarly, M.A.-H. arrived at Dilley on August 21 at 4 PM, and received notice at 7 PM the night of August 22 that her family's interview had been scheduled for 8 AM the next morning, M.A.-H. Decl. ¶¶ 22-23. She therefore was unprepared to fully communicate the threats facing herself and her family; if she had more time, she would have spoken to family members to obtain "additional information that would have helped [her] explain the circumstances," *id.* ¶ 24, she "would have spoken with the Dilley Pro Bono Project" to "underst[and] the process better," and she would "have been in a better position to describe the threats facing [her] daughter" and to "talk about the sexual abuse [she] [has] suffered," *id.* ¶ 26. Many of the asylum seekers who pass through Dilley and Karnes now face similar challenges.

The vulnerable position of many asylum seekers, including the Individual Plaintiffs, underscores the unlawfulness of the Directives. Specifically, many asylum seekers have suffered severe trauma and exhaustion from their persecution, journey to the United States, and detention, possess trauma-related and other impairments, are intimidated and confused by the credible fear process, communicate only in Spanish or an indigenous language, have limited ability to find counsel or communicate with third parties on their own, and must care for their minor children, if any. *See* L.M.-M. Decl. ¶¶ 1, 3-4, 10, 13; M.A.-H. Decl. ¶¶ 1, 16-22, 24, 26, 28; Fluharty Decl. ¶¶ 4, 11-12; Meza Decl. ¶¶ 9-11. These challenges require more than a few hours' preparation— after a difficult journey and immediately upon arrival at an unfamiliar detention center in uncertain legal circumstances—to overcome. Indeed, in the context of Section 240 proceedings, the Ninth Circuit has held that "little more than two working days' time" was inadequate where the immigrant "was in custody, spoke only Spanish, had limited education, was unfamiliar with this country and its legal procedures, and had been removed nearly 3,000 miles from his only

friend in this country." *Rios-Berrios*, 776 F.2d at 862-63. The Directives here likewise "make[] a mockery of the clear statutory mandate." *Id.* at 863.

Moreover, the consultation right serves a number of critical functions in the credible fear process that cannot take place within the artificially narrow window provided by Defendants. Specifically, counsel can help explain a confusing and complex administrative and legal process, including the differences between asylum, withholding of removal, and protection under the Convention Against Torture, help the asylum seeker articulate their claim, assist the asylum seeker in collecting additional facts and evidence, and advocate for reasonable accommodations, if necessary. For these reasons, asylum seekers who are represented by counsel are generally much more likely to be granted asylum. More broadly, asylum seekers may need to consult with family or friends to collect additional evidence, or with medical or psychological professionals who can assess their competency, to be able to fully present their claim. Each of these functions is inhibited by the Directives. Fluharty Decl. ¶¶ 9, 12; Meza Decl. ¶¶ 14-24, Cambria Decl. ¶ 8.

In addition to working hand-in-hand with the Shortened Wait Period Directive to deprive asylum seekers of their right to consult with a third party, the Continuance Denial Directive also separately violates DHS's regulation concerning continuances. An asylum officer may reschedule an interview if the asylum seeker "is unable to participate effectively in the interview because of illness, fatigue, or other impediments," 8 C.F.R. § 208.30(d)(1)—the very conditions that asylum seekers, like the Individual Plaintiffs, tend to have upon arrival at a detention center. L.M.-M. Decl. ¶¶ 5, 10, 12; M.A.-H. Decl. ¶¶ 22, 24-28; Fluharty Decl. ¶¶ 4, 5; Meza Decl. ¶ 9; Cambria Decl. ¶ 9. By instead requiring a limited set of "extraordinary circumstances" to grant a continuance—that the asylum seeker is unavailable because of hospitalization, a conflicting court proceeding, or a facility-imposed barrier—Defendants have imposed a far higher bar than that set

by the governing regulation. Here, too, Defendants have unlawfully "ignore[d] or violate[d]" a regulation that "remain[s] in effect." *Clean Air Project*, 752 F.3d at 1011 (citation omitted).

Defendants cannot defend the Shortened Wait Period and Continuance Denial Directives on the grounds that they avoid "unreasonable delay." *Cf.* 8 U.S.C. § 1225(b)(1)(B)(iv). A short period of a few hours is inadequate for virtually any asylum seeker, as Defendants recognized in previously providing 48 hours and allowing reasonable continuances. Moreover, the Directives do not require—in fact, they effectively forbid—any case-by-case assessment of whether an individual asylum seeker requires more time. Regardless of an individual asylum seeker's needs, the Directives strip asylum officers of discretion to afford a claimant more than just a few hours to be ready for their interview in all but extraordinary circumstances. The Court "cannot allow a 'myopic insistence upon expeditiousness' to render the right to counsel 'an empty formality.'" *Biwot*, 403 F.3d at 1099 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Indeed, Congress imposed these critical protections *even though* it sought to provide a more expedited process.

Ultimately, the Directives undermine the broader purpose of the credible fear process. As the Court explained in *Grace*, Congress provided a separate process for asylum seekers because it recognized that "[e]xpediting the removal process … risks sending individuals who are potentially eligible for asylum to their respective home countries where they face a real threat, or have a credible fear of persecution." 344 F. Supp. 3d at 107. Similarly, DHS regulations mandate that the interview is intended to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture," 8 C.F.R. § 208.30(d), as well as whether the asylum seeker's "case presents novel or unique issues that merit consideration in a full hearing before an immigration judge," *id.* § 208.30(e)(4). The process cannot serve these fundamental purposes if asylum seekers have mere hours within which to consult and prepare for

the most important and challenging interviews they may ever have. Thus, the Shortened Wait Period and Continuance Denial Directives violate asylum seekers' statutory rights.

## 2. *The No Legal Orientation Directive.*

The No Legal Orientation Directive also violates the statutory and regulatory rights of asylum seekers at the Dilley Detention Center, including the Individual Plaintiffs. Defendants must provide asylum seekers with "information concerning the asylum interview." 8 U.S.C. § 1225(b)(1)(B)(iv). Defendants have implemented that mandate with regulations which further require that asylum seekers be able to "participate effectively in the interview," 8 C.F.R. § 208.30(d)(1), and possess "an understanding of the credible fear determination process," *id.* § 208.30(d)(2). These regulations, too, may not be "ignore[d] or violate[d] … while they remain in effect." *Clean Air Project*, 752 F.3d at 1011 (citation omitted).

Defendants' termination of in-person legal orientation at the Dilley Detention Center prevents asylum seekers from receiving "information concerning the asylum interview," 8 U.S.C. § 1225(b)(1)(B)(iv), in a manner that enables them to "participate effectively in the interview" and possess "an understanding of the credible fear determination process," 8 C.F.R. § 208.30(d). The in-person orientation provided the only time that asylum seekers at Dilley could ask questions about the credible fear process and their legal rights; that asylum seekers with difficulty reading, including children, could obtain information; and that asylum officers could facilitate understanding for asylum seekers with special needs, including physical or mental impairments or other competency issues. Without such an orientation, asylum seekers, including the Individual Plaintiffs, cannot fully understand the credible fear process, let alone meaningfully participate in it. L.M.-M. Decl. ¶¶ 11, 13; M.A.-H. Decl. ¶¶ 23, 26; Fluharty Decl. ¶ 6. Thus, an in-person orientation is essential to uphold Defendants' statutory and regulatory mandates.

18

These protections are especially important at the Dilley Detention Center. As explained above, Dilley is currently one of only two family detention centers in the United States, and exclusively houses women and their children.[2] Fluharty Decl. ¶ 3. The women and children detained at Dilley have high rates of trauma and trauma-related mental and physical impairments, even among asylum seekers. *See id.* ¶ 4; *see also, e.g.*, M.A.-H. Decl. ¶¶ 26, 28. Moreover, many of these women and children have difficulty reading or speak only an indigenous language for which written materials are unavailable. Fluharty Decl. ¶ 4. Thus, in-person legal orientation is essential at Dilley and other family detention centers.

**B.    Mr. Cuccinelli's appointment is unlawful under the Federal Vacancies Reform Act. (Count VI)**

Plaintiffs are also likely to prevail on their claim that, because purported USCIS Acting Director Cuccinelli does not meet any of the requirements imposed by the Federal Vacancies Reform Act ("FVRA"), his appointment is unlawful—and so any directives he issues, including the Asylum Directives, are also unlawful. The FVRA, enacted in 1998, provides the President with limited authority to appoint acting officials while preserving the Senate's advice and consent power—a power which serves as "a critical 'structural safeguard [] of the constitutional scheme.'" *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)). As the Supreme Court has recognized, "[t]he Framers envisioned" the Senate's role in the nomination process "as 'an excellent check upon a spirit of favoritism in the President' and a guard against 'the appointment of unfit characters … from family connection, from personal attachment, or from a view to popularity.'" *Id.* (quoting The Federalist No. 76 at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). Given that the confirmation

---

[2]    Defendants also provided an in-person orientation at Karnes when it detained families; if Defendants again detain families at Karnes, then this Directive may be relevant there as well.

process may take time, however, Congress has repeatedly enacted statutes permitting the President to appoint acting officials under limited and explicitly articulated circumstances. *Id.*

Specifically, the FVRA permits an individual to act as an official in an office requiring Presidential nomination and Senate confirmation (often referred to as a "PAS" office) in three ways. At the outset, the FVRA provides a default rule: "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily." 5 U.S.C. § 3345(a)(1). However, the President may select another individual to temporarily fill the vacancy if they either already serve in a PAS office, *id.* § 3345(a)(2), or if, during the year prior to the vacancy, they served as an officer or employee in the same agency for not less than 90 days and at the GS-15 rate of pay, *id.* § 3345(a)(3). Reflecting the FVRA's aim of providing the President with limited authority to name acting officials, these provisions allow the President to deviate from the FVRA's "first assistant" default rule and select someone else if that individual has either received the Senate's approval or has already been serving in a senior position at the agency for a meaningful period of time.

Mr. Cuccinelli, however, could not become the Acting Director of USCIS through any of these three paths. He had not been serving in a PAS office, *see id.* § 3345(a)(2), and had not been employed by USCIS (or, indeed, any other DHS component) in the year prior to the vacancy, *see id.* § 3345(a)(3). *See* Monk Decl., Ex. 2. Nor was Mr. Cuccinelli the first assistant. *See* 5 U.S.C. § 3345(a)(1). The Deputy Director of USCIS appears to have been designated as the first assistant to the Director since the agency's creation. At the time the last confirmed Director of USCIS, Lee Francis Cissna, was terminated, Mark Koumans served as Deputy Director, and he continues to serve in that position. *See* Monk Decl., Ex. 3. Indeed, the USCIS website reflected his service as Acting Director just days before this lawsuit was filed. *See id.*, Ex. 4.

20

To appoint Mr. Cuccinelli to serve as Acting Director, Defendants devised an end-run around the FVRA's requirements. Specifically, after forcing out the previous Director, they took the unprecedented steps of creating an entirely new position of Principal Deputy Director, designating the holder of that office as first assistant to the Director, and appointing Mr. Cuccinelli as Principal Deputy Director. The orders documenting these steps show that both Mr. Cuccinelli's appointment as Principal Deputy Director, and the designation of the Principal Deputy Director as the first assistant, took place on the same day Defendants announced Mr. Cuccinelli's appointment as Acting Director, and would lapse as soon as a new USCIS Director was confirmed. *See id.*, Ex. 5 & 6.

This extraordinary, good-for-one-ride-only attempt to manipulate the structure of USCIS just to install Mr. Cuccinelli violates the FVRA in several ways, but we emphasize only one here. An individual may only automatically ascend to fill a vacancy as the first assistant if they served as the first assistant *when that vacancy arose*. Indeed, the D.C. Circuit indicated in *Southwest General* that "subsection (a)(1) may refer to the person who is serving as first assistant *when the vacancy occurs*," although the court did not ultimately resolve the question. *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015).

The FVRA's text and structure confirm this understanding. The statute mandates that, "[i]f an officer … dies, resigns, or is otherwise unable to perform the functions and duties of the office[,] … the first assistant … *shall* perform" those duties. 5 U.S.C. § 3345(a)(1) (emphasis added). It therefore provides what the Supreme Court characterized as a "mandatory and self-executing" procedure for immediately filling a vacancy with the first assistant at the moment the office becomes vacant. *SW Gen.*, 137 S. Ct. at 940; *see also Guedes v. ATF*, 920 F.3d 1, 11 (D.C. Cir. 2019) ("default"); *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 557 (9th Cir.

21

2016) ("automatically"); *English v. Trump*, 279 F. Supp. 3d 307, 312 (D.D.C. 2018) ("default rule"). Moreover, Subsection (a)(1) refers to "*the* first assistant"—rather than "*a* person" or "*an* officer or employee," as in Subsections (a)(2) and (3)—emphasizing that it refers to a single, specific person. And Subsection (b)(1) requires that acting officials nominated to the position not only serve as first assistant, but have served as first assistant for at least 90 days, reflecting Congress's understanding that only pre-vacancy first assistants would be eligible to serve as acting officials in the first place. What matters, then, is who is serving as *the* first assistant *at the time the vacancy comes open*.

This reading also gives meaning to the FVRA's alternative appointment mechanisms. The FVRA "allows the President to choose another person instead, *as long as* that person is either a Senate-confirmed appointee ... or an employee within the same agency." *Guedes*, 920 F.3d at 11 (emphasis added). These "carefully calibrated limits," *English*, 279 F. Supp. 3d at 312, permit the President to choose another official if they have either received the Senate's approval or have sufficient experience within the agency—and are intended to be the *only* mechanisms by which the President can select an acting official. These are, again, the only "two ways the President may override the automatic operation of (a)(1)." *Kitsap*, 816 F.3d at 557.

The Senate Report concerning the FVRA emphasizes this critical point multiple times. Specifically, the Report, which was issued before the bill was amended to permit the President to designate career staffers, *see* 5 U.S.C. § 3345(a)(3), explains that "[i]f there is no first assistant, the President must designate another Senate-confirmed official." S. Rep. 105-250, at 7 (1998); *see, e.g.*, *id.* at 13 ("If the President nominates the former first assistant, ... [then] for an acting person to continue to perform those duties, the President would be required to designate as the acting officer a person who has received Senate confirmation to another post."); *id.* at 14 ("Once

22

again, that means that if there is no first assistant, and no presidential designation, no one may serve as acting officer."). Similarly, in describing Section 3346, which permits an acting official to continue to serve after a failed nomination, the Report explained that it "allows the office to be temporarily filled by 'the person' who was originally eligible to be the acting officer *at the time the vacancy arose*." *Id.* at 15 (emphasis added). Congress gave no sign that the President could circumvent the FVRA's limits by appointing a *new* first assistant to assume the acting role.

That is because conferring unconstrained power upon the President to fill vacancies with acting officials would conflict with Congress's fundamental purpose in enacting the FVRA. Congress enacted the FVRA to combat "a threat to the Senate's advice and consent power," *SW Gen.*, 137 S. Ct. at 936—not to license the same machinations that prompted the FVRA in the first place. If the President (or the head of a Department) can name a preferred first assistant after the vacancy arises, then the only limitation on the temporary appointment power is whatever conditions the agency's statute imposes for naming a first assistant. In many circumstances—like those here—the underlying statute may not require Senate confirmation, tenure in the agency, or anything at all for an individual to serve as first assistant, meaning that the power to fill the vacancy would be unbounded. That result cannot be what Congress intended.

The Executive Branch has previously endorsed this view. In guidance issued shortly after the FVRA was enacted, the Office of Legal Counsel correctly noted that "the better understanding is that you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant." *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 64 (1999).[3] And in 2001, the Government

---

[3]   Under a subsequent administration, OLC thereafter reversed its own opinion when faced with a particular designation of an acting official, concluding instead that "an individual need not be

Accountability Office—the Legislative Branch's chief watchdog agency—warned agencies that, "to show[] whether a person may serve in an acting capacity because he or she was a first assistant," any documentation "should be dated, to verify that the position (and individual) was designated as first assistant prior to the occurrence of the vacancy." Letter from Carlotta C. Joyner, GAO, to Sen. Fred Thompson, Chairman, Comm. on Gov't Affairs 2 (Feb. 23, 2001), https://www.gao.gov/assets/80/75036.pdf. These statements reflect that a rule requiring a first assistant to be appointed before the vacancy arises best accommodates both the legitimate needs of the Executive Branch and the Senate's constitutional prerogatives.

Thus, an official who assumes the acting role through service as the first assistant must have been the first assistant at the time the vacancy occurred. But even if one were to assume that an official need not have been the first assistant at the time of the vacancy, then, at the very least, the *office* in which that individual serves must have existed at the time of the vacancy. Such a reading avoids giving the Executive Branch unbounded authority to leapfrog existing first assistants through procedural gimmicks. The Principal Deputy Director position has never existed at USCIS, and will cease to exist as soon as a new USCIS Director is appointed. The creation of that position solely so that the President could select an individual with no history of

---

the first assistant when the vacancy occurs." *Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177, 181 (2001). OLC's about-face erroneously relied on the statute's use of the phrasing "first assistant to the office," which was intended to have little substantive effect. *See, e.g.*, S. Rep. No. 105-250, at 12. Moreover, OLC reasoned that Subsection (b)(1)(A)(i), which bars an individual nominated for the position from assuming the position on an acting basis unless they served as first assistant prior to the vacancy, would be superfluous if an individual was required to have served as first assistant at the time of the vacancy by Subsection (a)(1). That justification has been "entirely eliminated" by the Supreme Court's decision in *Southwest General*, 137 S. Ct. 929, which held that Subsection (b)(1)(A)(i) also applies to individuals appointed by way of Section 3345's other mechanisms. Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 171-72.

service at USCIS—and who lacked the support of the Senate—to act as its director directly contravenes the FVRA.

Because Mr. Cuccinelli's service is unlawful, his Asylum Directives are also unlawful. "An action taken by any person who is not acting" lawfully "in the performance of any function or duty of a vacant office" to which the FVRA applies "shall have no force or effect," 5 U.S.C. § 3348(d)(1), and "may not be ratified," *id.* § 3348(d)(2). Mr. Cuccinelli promulgated the Directives pursuant to the USCIS Director's authority to "establish the policies for performing [their] functions," and "establish national immigration services policies and priorities," 6 U.S.C. § 271(a)(3)(A), (D)—authority which he does not lawfully possess. Even if the FVRA's enforcement mechanism were unavailable, the Directives are "not in accordance with law" and must be set aside under the APA. 5 U.S.C. § 706(2)(A). The Directives are therefore void.

## C.    The Asylum Directives are arbitrary and capricious. (Count II)

Even assuming that the Asylum Directives do not violate the statutes and regulations governing the immigration process, and that Mr. Cuccinelli had the authority to issue them, Defendants promulgated them in an arbitrary and capricious manner. Under the Administrative Procedure Act, the Court "shall … hold unlawful and set aside agency action … found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, the agency is obligated to provide "a more detailed justification" if its change in policy disrupts "serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

One of the Directives' most egregious flaws is the extent to which they trammel the reliance interests of organizations that provide legal services. It is black-letter law that "[a]n agency cannot … ignore reliance interests." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019). Courts have repeatedly struck down changes in immigration policies where agencies failed to consider those interests. *See, e.g.*, *J.O.P. v. DHS*, 2019 WL 3536786, at *6 (D. Md. 2019) (redeterminations of "unaccompanied alien child" status); *NAACP v. Trump*, 298 F. Supp. 3d 209, 240 (D.D.C.) (rescission of Deferred Action for Childhood Arrivals, even though recipients "had structured their education, employment, and other life activities" on program's availability), *adhered to on denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018).

RAICES, which provides legal services at the Karnes Detention Center, and the legal services organizations that provide services at Dilley and Berks, relied on Defendants' prior policies in structuring their operations. Each of these organizations could rely on having at least 48 hours to make contact with asylum seekers, being able to obtain continuances in the event more time were necessary, and, at Dilley, working with asylum seekers who have a fuller understanding of their legal rights from in-person legal orientation. Fluharty Decl. ¶¶ 16, 19; Meza Decl. ¶ 15; Cambria Decl. ¶¶ 15-16. Moreover, the Directives have forced each of these organizations to adapt their programs and divert resources to continue providing the same level of services to the asylum seekers that they see. Fluharty Decl. ¶ 22; Meza Decl. ¶¶ 15-28; Cambria Decl. ¶¶ 15-16. In promulgating the Directives, Defendants made no mention of these powerful reliance interests.

Even if Defendants had written on a blank slate, their rationale would still be inadequate. In promulgating the Asylum Directives, Defendants provided virtually no public explanation, other than a statement by a spokesperson that they would "make the expedited removal process

more efficient and effective." Monk Decl., Ex. 7. That terse statement shows that Defendants "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43: the impact of the Asylum Directives on asylum seekers. As explained above, the Asylum Directives severely impede asylum seekers' rights to consult with third parties, to understand the credible fear process, and to participate fully and effectively in their credible fear interviews. Notably, the court in *Innovation Law Lab v. Nielsen* held that the government acted arbitrarily and capriciously by deviating from policies meant to protect detained immigrants' right to obtain legal representation, and entered a preliminary injunction. 342 F. Supp. 3d at 1079-83. Defendants disregarded those very same concerns here.

Moreover, Plaintiffs are also likely to prove that a motivation behind the Asylum Directives is Defendants' animus toward asylum seekers, particularly asylum seekers of color, which is manifestly a factor Congress did "not intend[] [them] to consider." *State Farm*, 463 U.S. at 43. "[G]overnmental action may be arbitrary and capricious if the government acted for an improper motive (such as out of racial animus or for partisan political or personal reasons)." *Harris v. City of Wichita, Sedgwick Cty., Kan.*, 74 F.3d 1249, at \*4 (10th Cir. 1996) (tbl.); *see also Alshrafi v. Am. Airlines, Inc.*, 321 F. Supp. 2d 150, 162 (D. Mass. 2004) ("[A]ctions motivated by racial or religious animus are necessarily arbitrary and capricious."). Apart from the Directives, the Trump Administration has repeatedly attempted to curtail asylum seekers' legal rights, particularly asylum seekers of color from Central America. *See* Monk Decl., Ex. 8-10; *see also* Compl. ¶¶ 91-92. Moreover, the President has questioned why the United States would admit "all these people from shithole countries," and asserted that the asylum process is a "scam" and a "hoax." *See* Monk Decl., Ex. 11 & 12. Similarly, Mr. Cuccinelli has argued that states should "just point [immigrants] back across the river and let them swim for it," and opined

that asylum seekers "are lying and … trying to make up cases for asylum." *Id.*, Ex. 13 & 14.
These statements reflect that Defendants' "efficiency" rationale is a smokescreen for their intent
to restrict the rights of asylum seekers.[4]

Finally, Defendants have not provided any evidence that the Asylum Directives are
needed to "prevent bottlenecking in the system." Monk Decl., Ex. 7. An agency's action is
arbitrary and capricious if it failed "to point … to any data of the sort it would have considered if
it had considered [the issue] in any meaningful way." *Nat'l Treasury Emps. Union v. Horner*,
854 F.2d 490, 499 (D.C. Cir. 1988). While the administrative record may reveal evidence of such
"bottlenecking" that Defendants have not yet provided, the lack of any evidence at this stage is
an additional reason why Plaintiffs are likely to prevail on their arbitrary-and-capricious claim.

### D.     The Asylum Directives violate the Rehabilitation Act. (Count IV)

Finally, Plaintiffs are likely to prevail on their claim that the Asylum Directives
discriminate against and exclude asylum seekers with disabilities, and therefore violate the
Rehabilitation Act. Section 504 of the Rehabilitation Act provides that no "qualified individual
with a disability in the United States … shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits of, or be subjected to discrimination

---

[4]     Courts have repeatedly found plausible allegations of racial animus behind Defendants'
immigration policies, including their policies regarding asylum seekers. *See, e.g.*, *Regents of the
Univ. of Cal. v. DHS*, 908 F.3d 476, 518-20 (9th Cir. 2018), *aff'g* 298 F. Supp. 3d 1304, 1314-15
(N.D. Cal. 2018); *Baltimore v. Trump*, 2019 WL 4598011, at *40 (D. Md. 2019); *Arab Am. C.R.
League v. Trump*, 2019 WL 3003455, at *10 (E.D. Mich. 2019); *Int'l Refugee Assistance Project
v. Trump*, 373 F. Supp. 3d 650, 678 (D. Md. 2019); *NAACP v. DHS*, 364 F. Supp. 3d 568, 578
(D. Md. 2019); *Saget v. Trump*, 375 F. Supp. 3d 280, 371-74 (E.D.N.Y. 2019); *CASA de
Maryland v. Trump*, 355 F. Supp. 3d 307, 325-26 (D. Md. 2018); *La Union del Pueblo Entero v.
Ross*, 353 F. Supp. 3d 381, 395 (D. Md. 2018); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1108
(N.D. Cal. 2018), *appeal filed*, No. 18-16981 (9th Cir. 2018); *Centro Presente v. DHS*, 332 F.
Supp. 3d 393, 415 (D. Mass. 2018); *New York v. Dep't of Commerce*, 315 F. Supp. 3d 766, 810-
11 (S.D.N.Y. 2018); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276-79 (E.D.N.Y. 2018).

under any program or activity … conducted by any Executive agency." 29 U.S.C. § 794(a).

"[T]o assure meaningful access, reasonable accommodations in the … program or benefit may

have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Ultimately, "[t]o prove a

violation of section 504, the plaintiffs must show that (1) they are disabled within the meaning of

the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the

benefit of, or subject to discrimination under a program or activity, and (4) the program or

activity is carried out by a federal executive agency or with federal funds." *Am. Council of the*

*Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).[5]

A disability is defined as "any physical or mental impairment that substantially limits one

or more major life activities." 42 U.S.C. § 12102(1)(A); *see also* 29 U.S.C. § 705(9)(B). Major

life activities include "learning, reading, concentrating, thinking, communicating, and working,"

as well as "the operation of a major bodily function, including … neurological, brain … [and]

endocrine … functions." 42 U.S.C. § 12102(2)(A)-(B). Thus, courts have held that "depression

and anxiety," *Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 147 (D.D.C. 2016), "post-

traumatic stress disorder," including PTSD that results in "sleeplessness," *Desmond v. Mukasey*,

530 F.3d 944, 954 (D.C. Cir. 2008), cognitive disorders, *Niles v. U.S. Capitol Police*, 2019 WL

1858503, at *3 (D.D.C. 2019), and disorders that cause "severe pain," *Walden v. Patient-*

*Centered Outcomes Res. Inst.*, 177 F. Supp. 3d 336, 341 (D.D.C. 2016), all qualify as disabilities.

Many of the asylum seekers that pass through the facilities where the Directives are in

effect qualify as individuals with disabilities. The majority of the families and adult women

detained at Dilley, Karnes, and Berks have experienced severe forms of trauma, including child

---

[5]   There is no reasonable dispute that the Directives are being carried out by "a federal
executive agency," *i.e.*, USCIS, and that Defendants are therefore subject to Section 504.

abuse, rape, incest, domestic violence, and persecution. As a consequence of their past trauma, journey to the United States, and detention, these women and minor children—like asylum seekers nationwide—frequently suffer from post-traumatic stress disorder, anxiety, and depression. Fluharty Decl. ¶ 4; Meza Decl. ¶ 9; Cambria Decl. ¶¶ 19-20. A study of Central American migrants who arrived at the U.S. border, for example, found that 32 percent of the 234 adults interviewed met diagnostic criteria for PTSD, 24 percent for depression, and 17 percent for both disorders. *See* Monk Decl., Ex. 15.

The Individual Plaintiffs provide examples. As a result of her trauma, M.A.-H. has difficulty sleeping, as well as difficulty concentrating, communicating, and remembering details. M.A.-H. Decl. ¶ 28; Declaration of Dr. Anita Ravi ¶¶ 11-14. Based on her clinical evaluation of M.A.-H., Dr. Anita Ravi attests that M.A.-H. "is a survivor of physical and sexual violence whose current psychological symptoms are consistent with the diagnoses of [PTSD] and will require appropriate trauma-informed accommodations to ensure her full capacity of interaction and participation." *Id.* ¶ 25. L.M.-M. also had difficulty communicating her trauma during her interview, based in part on a severe toothache. L.M.-M. Decl. ¶ 10. Such conditions often impair asylum seekers from thinking, communicating, and presenting their claims for asylum.

The Directives have denied asylum seekers with disabilities adequate time to prepare for their interviews and consult with counsel or other third parties, and, by extension, have excluded them from obtaining protections for which they would otherwise qualify. The credible fear process is already intimidating and confusing, and the interview itself is, by its nature, psychologically demanding and difficult. Fluharty Decl. ¶ 5; Meza Decl. ¶¶ 9-10, 20-21; Cambria Decl. ¶¶ 18-19. Detention can also exacerbate trauma, depression, and anxiety. In these circumstances, an in-person legal orientation is necessary to ensure that asylum seekers with

physical and mental impairments understand the information that they are given. Fluharty Decl. ¶ 6. And a 48 hour consultation period, with the ability to obtain continuances as permitted by DHS's regulations, is essential to identify individuals with such impairments, provide them with additional assistance, and identify any needed accommodations. *Id.* ¶¶ 11, 12, 21; Meza Decl. ¶¶ 9-10, 15, 21; Cambria Decl. ¶¶ 16, 18-19. By denying these safeguards, Defendants have obstructed asylum seekers with disabilities from accessing the asylum process.

Courts have held that denying immigrants with disabilities meaningful access to counsel and other safeguards violates the Rehabilitation Act in circumstances less compelling than those here. In *Franco-Gonzales v. Holder*, for example, the court held that immigrants with mental impairments that rendered them unable to "understand, formulate, and verbally express ideas" were entitled to be provided with a qualified representative to assist them in asserting their claims, and granted a preliminary injunction. 767 F. Supp. 2d 1034, 1054, 1058 (C.D. Cal. 2010). By contrast, the Directives prevent asylum seekers from obtaining a basic understanding of their legal rights and adequate time to consult with attorneys they already have, or could readily obtain at the centers where they are detained. Similarly, in *Palamaryuk v. Duke*, the court held that an asylum seeker with mental impairments had "sufficiently allege[d] that he needs an accommodation to enjoy meaningful access to benefits by alleging that his disability requires face-to-face meetings with his attorney." 306 F. Supp. 3d 1294, 1301 (W.D. Wash. 2018). The accommodations Plaintiffs seek here—adequate time—are no more onerous; they are only those afforded by Defendants' own prior policies. Thus, the Directives violate the Rehabilitation Act.

## II.   **Plaintiffs suffer irreparable injury from the Asylum Directives.**

To merit a preliminary injunction, a plaintiff must show injury that is "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins,*

*Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation omitted). There is no question that

L.M.-M. and her daughters V.M.-M. and B.M.-M. and M.A-H. and her daughter I.M.-A. face

irreparable injury: like many other asylum seekers, they were deprived of adequate time to

consult with third parties, including counsel, and to prepare for their interviews, were denied

asylum, and are now subject to removal to Honduras, where they face persecution and violence.

RAICES also faces irreparable injury because the Directives frustrate RAICES's mission of

providing legal services to asylum seekers and force RAICES to divert resources to continue to

provide those services. Plaintiffs are therefore entitled to preliminary relief.[6]

A.      **Five of the Individual Plaintiffs suffer irreparable injury from the Asylum Directives.**

It is well-established that asylum seekers suffer irreparable harm when they are forced to

return to countries where they fear persecution. As the Court concluded in *Grace*, asylum seekers

face irreparable harm where "unlawful policies were applied to [their] credible fear

determinations and thus caused plaintiffs' applications to be denied," subjecting them to removal

to countries where they "fear[] rape, pervasive domestic violence, beatings, shootings, and

death." 344 F. Supp. 3d at 146. Indeed, the D.C. Circuit has implicitly concluded that injuries

like "the ongoing threat to [the plaintiff's] health and safety" and "the ongoing threat of

repatriation" amount to "irreparable harm." *Vo Van Chau v. Dep't of State*, 891 F. Supp. 650,

656 (D.D.C. 1995) (citing *LAVAS v. Dep't State*, 1994 WL 163723, at *1 (D.C. Cir. 1994) (per

---

[6]     Because these Plaintiffs are each suffering irreparable harm, each has also suffered injury for purposes of Article III standing. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding that where the challenged action "make[s] it more difficult for the [plaintiff] to accomplish their primary mission . . . they provide injury for purposes both of standing and irreparable harm"); *In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 125 (D.D.C. 2007) ("In the bulk of cases, a finding of an irreparable injury *a fortiori* signals the existence of an injury-in-fact sufficient to confer standing."), *aff'd*, 534 F.3d 756 (D.C. Cir. 2008).

curiam)). Importantly, in the asylum context, the irreparable harm inquiry stands apart from the merits of the asylum claim. As the Ninth Circuit has explained, "the claim on the merits is that the individual is in physical danger if returned to his or her home country. Consideration of the likelihood of such treatment, *determined apart from merits issues* … , should be part of the inquiry." *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (emphasis added).[7]

These Individual Plaintiffs—and also S.G.-C. and B.O.-G.—have each presented significant evidence that they will face persecution upon their return. L.M.-M. fears political retaliation by the Honduran government because she was "targeted by the Honduran government" for her political views, including by being "fired from [her] job, prevented from securing additional employment, and denied medical care." L.M.-M. Decl. ¶ 2. Moreover, L.M.-M. was beaten and raped by her former partner. *Id.* This same abuser was also violent towards L.M.-M.'s minor children, B.M.-M. and V.M.-M., threatened to harm L.M.-M. if she ever left him, and has continued to threaten her after she left him. *Id.* Moreover, L.M.-M. recently spoke with her former partner's mother, who advised L.M.-M. "not to return to Honduras" because she

---

[7]    Other courts have repeatedly agreed. *See, e.g.*, *Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) (finding that "forced separation and likely persecution" amounted to irreparable injury"); *Sean B. v. McAleenan*, 2019 WL 4165309, at *15 (D.N.J. 2019) (explaining that "[i]rreparable injury requires little or no discussion" where asylum seeker feared removal to country that was "the very locus of the threat"); *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 864 (N.D. Cal. 2018) (finding irreparable injury because challenged policy "will result in the denial of meritorious claims for asylum that would otherwise have been granted" and force asylum seekers "to return to the site of their persecution"); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018) (finding irreparable harm existed where plaintiffs "presented a sufficient basis for fearing persecution" should they be removed to their country of origin); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504 (C.D. Cal. 1988) (holding that removal of plaintiffs from the United States "to a country overrun with civil war, violence, and government-sanctioned terrorist organizations" would result in "dire consequences" and was sufficient to establish irreparable harm); *Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex.) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury."), *dismissed*, 692 F.2d 755 (5th Cir. 1982).

knows that L.M.-M.'s former partner "is looking for [her] and will harm" L.M.-M. and her daughters. *Id.* ¶ 14.

Similarly, M.A.-H. and her minor daughter, I.M.-A., fled Honduras because of the persecution and threats of violence each faced. M.A.-H. was physically and sexually abused by each of her two husbands. M.A.-H. Decl. ¶ 5. I.M.-A. attends a school where the transnational criminal organization MS-13 targets young girls, and at least three of I.M.-A.'s classmates have been kidnapped by MS-13 members, held hostage, drugged, raped, and sexually assaulted. *Id.* ¶ 7. I.M.-A. has been stalked on numerous occasions by MS-13 members, who are recognizable by the black, unmarked cars they drive, and a similar car has repeatedly driven by M.A.-H. and I.M.-A.'s home. *Id.* ¶ 8. Moreover, M.A.-H. and I.M.-A. have clarified that they have also faced retaliation, vandalism of their property, and threats of violence from members of the Liberal Party simply because of their National Party support. *Id.* ¶¶ 9-14. Because M.A.-H. is afraid, she has refrained from voting or taking advantage of government benefit programs supported by the National Party. *Id.* ¶ 10. She believes that these threats will escalate to violence, given that her former neighbor, *id.* ¶ 13, and co-worker, *id.* ¶ 14, have been attacked for their political beliefs, and because she does not believe the police in Honduras will protect her, *id.* Thus, if these Plaintiffs are removed to Honduras, they will undoubtedly face further persecution and violence.[8]

---

[8] The "widespread and systematic" violence against women and girls in Honduras causes them to live in a "climate of fear, in both the public and private spheres," with little hope that the Honduran government will deliver "accountability for violations of human rights … despite legislative and institutional developments." Monk Decl., Ex. 16, ¶ 9. Inside the home, women and girls are subjected to high rates of domestic violence, which is both "the leading reported crime at the national level," and is among the most likely causes of femicide. *Id.* ¶¶ 13-14. Outside the home, women and girls face acute and pervasive danger from "[o]rganized criminal elements, including local and transnational gangs," which notoriously commit "acts of homicide, extortion, kidnapping, torture, human trafficking, intimidation, and other threats and violence directed against … women, and members of vulnerable populations." *Id.*, Ex. 17 at 1, 3 (noting

Moreover, these Plaintiffs have been denied their legal rights to seek asylum and other

protections, generally, and to consult with third parties in preparation for their credible fear

interviews, specifically. Non-citizens suffer irreparable harm where the government's actions

serve to "block[] access to an existing legal avenue for avoiding removal." *Kirwa v. DOD*, 285 F.

Supp. 3d 21, 43 (D.D.C. 2017); *see, e.g.*, *Yea Ji Sea v. DHS*, 2018 WL 6177236, at *8 (C.D. Cal.

2018) (finding that Plaintiff's "lack of legal status" from government's delay of naturalization

application constituted irreparable injury); *Apotex, Inc. v. FDA*, 2006 WL 1030151, at *17

(D.D.C. 2006) ("[L]os[ing] a statutory entitlement … is a harm that has been recognized as

sufficiently irreparable."), *aff'd and remanded*, 449 F.3d 1249 (D.C. Cir. 2006); *Vargas v. Meese*,

682 F. Supp. 591, 595 (D.D.C. 1987) (finding irreparable injury where plaintiffs' "statutory right

to file" for change of status under Special Agricultural Worker program "will be mooted"). Even

if legal status were later granted, the time lost by the Plaintiffs "is time [they] would never get

back, and a disruption to [their] [lives] that could never be remedied." *Stellar IT Sols., Inc. v.*

*USCIS*, 2018 WL 6047413, at *11 (D.D.C. 2018).

The Asylum Directives have each prevented Plaintiffs from exercising their legal rights

and establishing eligibility for the crucial protections of asylum, withholding of removal, and

protection under the Convention Against Torture. Specifically, the Shortened Wait Period and

Continuance Denial Directives prevented L.M.-M. and her children and M.A.-H. and her child

from having adequate time to consult with their counsel and prepare for their interviews, which,

---

the violence perpetrated by the transnational gang, MS-13, specifically). Women additionally
"suffer[] political violence, which range[s] from harassment for voting against party lines to
receiving death threats for their political participation." *Id.* at 20. The threats facing women and
girls, which are acknowledged equally by international human rights bodies, *id.*, Ex. 16, and the
United States government, *id.*, Ex. 17, are of a piece with the harms the Individual Plaintiffs will
face if they are deported.

in turn, prevented them from effectively presenting their claims for asylum. The No Legal Orientation Directive also deprived Plaintiffs from gaining a full understanding of their legal rights and the asylum process. If these Plaintiffs are removed to Honduras, they would like to again seek safety in the United States, but it will be logistically difficult for them to continue to pursue their cases for asylum and/or "to return to this country even if they are eventually successful on the merits." *Desta v. Ashcroft*, 365 F.3d 741, 748 (9th Cir. 2004); *see* L.M.-M. Decl. ¶ 15; M.A.-H. Decl. ¶ 30.

Taken together, the Directives therefore obstructed these Plaintiffs' efforts to access a legal avenue for obtaining immigration relief—leaving them faced with removal to a country that they fear. These harms warrant a stay of the Plaintiffs' removal pending final judgment.

### B. RAICES suffers irreparable injury.

RAICES is also irreparably harmed by the Shortened Wait Period and Continuance Denial Directives, which have frustrated RAICES's operations and forced it to divert resources. "An organization is harmed if the actions taken by [the defendant] have perceptibly impaired the [organization's] programs." *League of Women Voters*, 838 F.3d at 8 (quotation omitted). "If so, the organization must then also show that the defendant's actions directly conflict with the organization's mission." *Id.* If those harms are "beyond remediation," then they are irreparable. *Id.*; *see also Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 174 (D.D.C. 2017).

There is no reasonable dispute that RAICES's injuries meet this standard. The Shortened Wait Period and Continuance Denial Directives "perceptibly impair" RAICES's efforts to provide legal services to its clients by, among other things, limiting the amount of time that RAICES has to speak with them, Meza Decl. ¶¶ 16-17, 19-21, gather additional facts and evidence, *id.* ¶ 15, make connections with medical professionals and other experts, *id.* ¶ 10, assess competency issues and the need for any additional accommodations, *id.* ¶ 15, and by

preventing RAICES from obtaining continuances for clients that need additional time to receive these essential services, *id.* ¶¶ 15, 23-24. The Directives therefore undermine RAICES's "commitment to its core mission—universal representation at Karnes." *Id.* ¶ 28. These harms are quintessentially "beyond remediation": RAICES cannot turn back time and provide legal services to its actual or prospective clients who have already been processed and removed from the United States. In other words, "there can be no do over and no redress." *League of Women Voters*, 838 F.3d at 9 (citation omitted).

While these impairments alone would suffice, the Shortened Wait Period and Continuance Denial Directives, among other recent immigration policies, "have forced RAICES to restructure its resources with respect to its free hotline which detainees can access from inside Karnes." Meza Decl. ¶ 22. Because the Directives limit RAICES's time to reach individuals in person, "the volume of incoming calls on the hotline has been so high that the RAICES office often resembles something of a call center." *Id.* To facilitate this newfound reliance on telephonic counseling, RAICES has "needed to hire additional staff, reallocate existing staff, purchase additional office equipment, and review, revise, and implement new policies, procedures, and staff training." *Id.* RAICES has also had to devote additional time and resources to seeking reversal of negative credible fear determinations in proceedings before immigration judges, which are typically more complex and resource-intensive, or to seeking reconsideration by USCIS. *Id.* ¶¶ 25-27.

The Directives have also prevented RAICES from forming relationships with prospective clients. Courts have found irreparable harm in an entity's "loss of its customers and by the possibly permanently damaged relationships with its customers." *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001); *see also League of Women Voters*, 838 F.3d at 9

(impeding efforts to register voters); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) ("lost contract[ing] opportunities"). RAICES is the only pro bono legal services provider at Karnes, meaning that asylum seekers are overwhelmingly likely to seek legal services from RAICES, if at all. Meza Decl. ¶ 7. But the Asylum Directives shorten the window in which RAICES can contact and agree to represent asylum seekers at Karnes, and limit the value of RAICES's services. *Id.* ¶¶ 15-19. The Directives therefore mean that RAICES cannot reach and represent asylum seekers that it otherwise would.

The Court has not only found that these types of harm amount to injury—it has found that RAICES *in particular* suffered injury based on similar averments. In *O.A. v. Trump*, the Court concluded that the rule barring individuals from seeking asylum if they enter the United States outside ports of entry "will frustrate [RAICES's] mission and will impose substantial, tangible burdens on the organization," forcing it "to divert scarce resources" to, among other things, create new procedures, prepare asylum seekers, appeal negative determinations, and train and retrain staff. 2019 WL 3536334, at *21 (D.D.C. 2019) (Moss, J.). Ultimately, the Court noted, RAICES would "be unable to represent the same number of clients that it does currently"— which is exactly the case here. *Id.* Similarly, in *CREW v. DHS*, the Court found that the government's failure to create records regarding family separation injured RAICES because it "impair[ed] RAICES's ability to provide advice to and consult with its clients," "render[ed] removal proceedings more difficult for the organization to handle," and forced RAICES to "divert substantial resources to counteract that harm, including by increasing its staff size, creating tools … , and scaling up its litigation efforts." 387 F. Supp. 3d 33, 45 (D.D.C. 2019).

While those decisions addressed standing, RAICES's injuries are also analogous to those which the D.C. Circuit and courts in this district have repeatedly found to be irreparable. In

*League of Women Voters*, for example, the D.C. Circuit held that the Federal Election

Commission's decisions to allow states to require proof of citizenship for voter registration

created "new obstacles" which "unquestionably make it more difficult for the League to

accomplish their primary mission of registering voters." 838 F.3d at 9. It made no difference

whether the plaintiff's estimates of specific expenditures were "speculative"—which is not the

case here—because those "expenditures are merely a symptom of that programmatic injury." *Id.*

And in *Open Communities Alliance*, the Court held that a fair housing organization suffered

irreparable injury where a delayed rule "frustrate[d] [its] ability to assist voucher holders [to]

gain access to greater opportunity," and forced the organization to "divert[] scarce resources

away" from other projects. 286 F. Supp. 3d at 178. Similarly, RAICES has shown that the

Asylum Directives impose "new obstacles" that "frustrate" its mission of providing asylum

services, and force it to "divert scarce resources" from other vital immigrant assistance services.

Finally, none of these harms can be remedied through a later award of monetary

damages. Many of RAICES's injuries are non-monetary. Moreover, the Court has held that

"economic loss sustained due to a federal administrative action is typically 'uncompensable' in

the sense that federal agencies enjoy sovereign immunity, and the waiver of sovereign immunity

in the APA does not reach damages claims." *Cal. Ass'n of Private Postsecondary Schs. v.

DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (Moss, J.). To the extent they are subject to

monetary valuation at all, RAICES's harms are particularly "serious in terms of [their] effect on

[RAICES]" and its ability to provide legal services at Karnes. *Id.* Thus, RAICES's harms are

irreparable, and warrant, at a minimum, enjoining the Directives at the Karnes Detention Center.

III.   <u>**The balance of equities and the public interest favor Plaintiffs.**</u>

The balance of the equities and public interest factors "merge when the Government is

the opposing party." *Jubilant DraxImage Inc.*, 2019 WL 3037536, at *8 (quoting *Guedes*, 920

F.3d at 10). Ultimately, in considering whether to grant a preliminary injunction, the Court must "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief." *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) (quoting *Texas Child. Hosp. v. Burwell*, 76 F.Supp.3d 224, 245 (D.D.C. 2014)). That balance favors a preliminary injunction.

*First*, as described above, Defendants' Asylum Directives violate multiple federal statutes and Defendants' own regulations. The D.C. Circuit has emphasized that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (citation omitted); *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58-59 (D.C. Cir. 1977) (recognizing that "there is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate"). In particular, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). Applying these principles, the Court in *R.I.L-R v. Johnson* enjoined the government from continuing to hold Central American mothers and their children who had received positive credible fear determinations in detention as a means of deterring others who might seek asylum. 80 F. Supp. 3d 164, 172 (D.D.C. 2015). After concluding that the practice was "likely unlawful," the Court held that "[t]he Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Id.* at 191 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). The same is true here.

*Second*, there is always "a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). As explained above, the Individual Plaintiffs and many

40

asylum seekers like them risk imminent removal to countries where they fear persecution and violence. Those concerns are at their height where, as here, asylum seekers have been denied their ability to participate in the processes designed to protect them. *See Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 179 (3d Cir. 2018) ("[I]t is squarely in the public interest to enable individuals to partake of statutory and constitutional rights and meaningful judicial review where, as here, it is consistent with the process prescribed by Congress.").

*Third*, Defendants have offered scant justification for the Asylum Directives, and cannot identify any harm that would result from a preliminary injunction. Defendants may argue that the Directives are necessary to efficiently process asylum seekers, but a preliminary injunction would only reinstate the policies that existed on July 7—thereby "preserv[ing] the relative positions of the parties until a trial on the merits [can] be held." *Robertson v. Cartinhour*, 429 F. App'x 1, 3 (D.C. Cir. 2011) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 53 (D.D.C. 2014) ("[T]he balance of the equities tips in [movant's] favor because issuance of an injunction would preserve the status quo."). Moreover, an agency cannot ignore statutes and its own regulations in the pursuit of its alleged objectives. As the Court explained in *Aracely v. Nielsen*, in enjoining a policy designed to deter asylum seekers, while DHS "surely has substantial discretion in the area of immigration, … [t]he public interest surely does not cut in favor of permitting an agency to fail to comply with its own binding policies impacting the rights of individuals." 319 F. Supp. 3d 110, 157 (D.D.C. 2018). Thus, both the balance of the equities and the public interest favor injunctive relief.

## IV.    The Court should enjoin the Asylum Directives on a nationwide basis.

"[T]he scope of a district court's equitable powers ... is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. 493, 538 (2011) (quotation omitted). The Court should, at a minimum, enjoin or stay the removal of the Individual Plaintiffs,

enjoin the application of the No Legal Orientation Directive at the Dilley Detention Center, and

enjoin the application of the Shortened Wait Period and Continuance Denial Directives to the

Dilley, Karnes, and Berks Detention Centers, pending the disposition of this case.

The Court should also enjoin the Shortened Wait Period and Continuance Denial

Directives wherever else they may be applied. Specifically, the Court should either enjoin these

Directives on a nationwide basis, or issue an injunction limited to the Dilley, Karnes, and Berks

Detention Centers, but susceptible to expansion if the government is currently enforcing or

intends to enforce the Directives elsewhere. Although these Directives were first implemented at

Dilley, Karnes, and Berks, they apply by their terms to every other detention center in the United

States, and could be extended to any of those centers at a moment's notice, if they are not being

implemented already. That "systemwide impact warrant[s] a systemwide remedy." *Saget v.

Trump*, 375 F. Supp. 3d 280, 379 (E.D.N.Y. 2019).[9]

To start, a nationwide injunction is necessary to provide complete relief to RAICES.

RAICES provides in-person legal services at other detention centers on a case-by-case basis, and

RAICES's clients have sometimes been transferred to other detention centers. Meza Decl. ¶¶ 4,

12. They may therefore similarly be impacted by the Asylum Directives, if applied at those

centers. Moreover, Defendants might try to avoid the impact of a Karnes-specific preliminary

injunction by shifting asylum seekers to other detention centers where the Asylum Directives are

permitted to remain in effect, limiting the degree to which RAICES can provide its services.

---

[9]    Section 1252's limits on injunctive relief are inapplicable. Section 1252(e)(1) does not
preclude injunctive relief because "[a]n action brought pursuant to section 1252(e)(3) is an action
that is 'specifically authorized in a subsequent paragraph' of 1252(e)." *Grace*, 344 F. Supp. 3d at
143. And Section 1252(f)(1) does not require the Court to limit any relief to "individual alien[s]"
because Plaintiffs do not seek "to enjoin or restrain the operation" of the expedited removal
statute, but rather "conduct that violates the immigration laws." *Id.* at 144; s*ee, e.g.*, *Damus v.
Nielsen*, 313 F. Supp. 3d 317, 328 (D.D.C. 2018); *R.I.L-R*, 80 F. Supp. 3d at 184.

Nationwide relief is also necessary to protect non-parties who face harms identical to those suffered by the plaintiffs. As this Court has suggested, "evidence of irreparable harm to persons other than Plaintiffs" may merit extending injunctive relief. *U.S. Ass'n of Reptile Keepers v. Jewell*, 106 F. Supp. 3d 125, 129 (D.D.C. 2015) (Moss, J.). Indeed, the D.C. Circuit has specifically rejected the assertion that injunctive relief must be limited to the parties, reasoning that "a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." *Nat'l Min. Ass'n v. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17 (D.D.C. 2004) ("The Fourth, Fifth, Ninth, and D.C. Circuits have held that an injunction can benefit parties other than the parties to the litigation.").

There is significant evidence that the Directives are inflicting irreparable harm on non-parties situated identically to the Plaintiffs here. Plaintiffs have presented declarations from two other organizations providing legal services at centers where the Directives are in effect, who attest that the Directives are harming their clients and their operations. Shalyn Fluharty, the Managing Attorney of the Dilley Pro Bono Project, attests that "Defendants' directives, their new policy of interviewing families within 24 hours of arrival, and the required intake process for individuals detained in Dilley combine to make it impossible for families to consult in advance of their credible fear interview," and "have hampered the Project's efforts to provide legal services to asylum-seeking families detained in Dilley." Fluharty Decl. ¶¶ 14-19. Similarly, Bridget Cambria, the Executive Director of Aldea – The People's Justice Center, which operates at Berks, attests that "[t]he Asylum Directives have directly affected [Aldea's] ability to assist parents and children in family detention," and "[a]s a result of the Directives, many families have

now received negative credible fear determinations that are not warranted." Cambria Decl. ¶¶ 15, 18. These harms—and those that may be occurring at other centers—also warrant relief.

Denying nationwide relief would instead give the government untrammeled authority to continue enforcing systemwide rules even in the face of a meritorious "challenge[] on [the] validity of the system." 8 U.S.C. § 1252(e)(3). Because Defendants promulgated the Directives on July 8, 2019, the sixty-day statute of limitations under Section 1252(e)(3)(B) likely lapsed on September 6, 2019. As a consequence, if the Court were to grant relief to the Plaintiffs alone, other injured parties would be unable to receive any relief at all—even if their claims for relief were *identical* to the Plaintiffs. In other words, if a court may only enter preliminary injunctive relief—or permanent injunctive relief—as to the named plaintiffs in a Section 1252(e)(3) challenge, the *only* parties that can obtain such relief are parties to whom the challenged rules were applied in the first sixty days. That bizarre and unjust result weighs in favor of nationwide relief, and suggests that Congress intended systemic challenges under Section 1252(e)(3) to be remedied on a nationwide basis. Moreover, because any future challenges to the Directives are likely time-barred, a nationwide injunction here does not risk conflicting injunctions, or threaten "detrimental consequences to the development of law and deprive appellate courts of a wider range of perspectives." *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018).

The nature of Plaintiffs' claims also favors nationwide relief. "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Because Plaintiffs "are clearly making a facial challenge" to the Directives—one that argues that the Directives are "infirm regardless of how [they are] applied"—nationwide relief is appropriate. *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 25 (D.D.C. 2018); *see also Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D.

Cal. 2017) ("[W]here a law is unconstitutional on its face, … a nationwide injunction is appropriate."). Plaintiffs are also likely to obtain vacatur at final judgment. In *National Mining Association*, the D.C. Circuit explained that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that the application to the individual petitioners is proscribed." 145 F.3d at 1409. This Court has similarly noted that vacatur is, by its nature, nationwide. *See O.A.*, 2019 WL 3536334, at *29. Because Plaintiffs are likely to obtain vacatur, nationwide preliminary relief is similarly warranted. *See Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377 (M.D.N.C. 2019) (granting a preliminary injunction).

Finally, enjoining the Directives as to some detention centers, but not others, frustrates the constitutional interest in a uniform federal immigration policy. "In immigration matters," courts "have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018). "Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress." *Id.* (quoting *Regents of the Univ. of Cal.*, 908 F.3d at 512); *see also Guilford Coll.*, 389 F. Supp. 3d 377, at 397 ("[L]imiting the geographic scope of an injunction on an immigration enforcement policy would run afoul of the constitutional and statutory requirements for uniform immigration law and policy.") (quotation omitted); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018) ("[T]here is a strong federal interest in the uniformity of federal immigration law."). There is no reason why an immigrant's ability to access asylum should depend on which center they happen to be detained in—nor why the Court's order should be so circumscribed.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Dated: September 27, 2019

Respectfully submitted,

*/s/ John T. Lewis*
John Lewis (D.C. Bar No. 1033826)
Nitin Shah (D.C. Bar No. 156035)
Benjamin Seel (D.C. Bar No. 1035286)
Javier M. Guzman (D.C. Bar No. 462679)
DEMOCRACY FORWARD FOUNDATION
1333 H Street NW
Washington, DC 20005
(202) 448-9090
jlewis@democracyforward.org
nshah@democracyforward.org
bseel@democracyforward.org
jguzman@democracyforward.org

Bradley Jenkins*
CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.
8757 Georgia Ave., Suite 850
Silver Spring, MD 20910
(301) 565-4820
bjenkins@cliniclegal.org

Manoj Govindaiah (D.D.C. Bar ID TX0145)
REFUGEE AND IMMIGRANT CENTER FOR
EDUCATION AND LEGAL SERVICES
802 Kentucky Ave.
San Antonio, TX 78201
(210) 787-3745
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiffs*

*\*Application for admission pro hac vice
pending*