# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

L.M.-M., *et al.*,

      *Plaintiffs*,

  v.

KENNETH T. CUCCINELLI II,
in his purported official capacity as acting
Director of U.S. Citizenship and Immigration
Services, *et al.*,

      *Defendants.*

Case No. 1:19-cv-2676 (RDM)

## BRIEF OF AMICUS CURIAE MORTON ROSENBERG
## IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................ ii

Interest of Amicus Curiae ....................................................................................................... 1

Background .............................................................................................................................. 2

    A.  After Watergate, the President installed indefinitely "acting" appointees to evade the Senate's more rigorous confirmation process. ................................................................. 2

    B.  The Act reasserts congressional authority and limits presidential flexibility. ................... 4

    C.  The appointment of Ken Cuccinelli to be Acting Director of USCIS ............................... 5

Summary of Argument ............................................................................................................ 6

I.  The FVRA prohibits the Executive from filling an existing vacancy by designating a new first assistant. ............................................................................................................................ 8

    A.  Post-vacancy "first assistants" are forbidden by the Act's text. ....................................... 8

    B.  Post-vacancy "first assistants" are also inconsistent with the Act's history, structure, and purpose. ...................................................................................................................... 9

    C.  OLC's contrary opinion misreads and misapplies the Act. .............................................. 12

II.  The Act prohibits the Executive from stripping a first assistant of the duties and responsibilities that accompany assuming an acting agency position. ................................... 14

III.  The manner in which this transfer of first assistant authority took place also violates the Act. .. ........................................................................................................................................ 16

IV.  Vacatur of USCIS's directives and an injunction prohibiting future actions are the appropriate remedies for these numerous and serious legal infirmities. ............................... 18

Conclusion ............................................................................................................................... 21

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Buckley v. Valeo,*
424 U.S. 1 (1976) ............................................................................................ 10

*Doolin v. Office of Thrift Supervision,*
139 F.3d 203 (D.C. Cir. 1998) ..................................................................... 10, 19

*Landry* v. *FDIC,*
204 F.3d 1125 (D.C. Cir. 2000) .......................................................................... 21

*NLRB v. Southwest General, Inc.,*
137 S. Ct. 929 (2017) ........................................................................... 2, 3, 9, 13

*Olympic Federal Savings & Loan Ass'n v. Director, Office of Thrift Supervision,*
732 F. Supp. 1183, 1202 (D.D.C.), *appeal dismissed and remanded,*
903 F.2d 837 (D.C. Cir. 1990) ........................................................................... 19

*Shoemaker v. United States,*
147 U.S. 282, 301 (1893) ................................................................................... 15

*Southwest General, Inc.* v. *NLRB,*
796 F.3d 67, 60 (D.C. Cir. 2015), *aff'd,* 137 S. Ct. 929 (2017) ...................... 2, 7, 20

*Springer v. Gov't of Philippine Islands,*
277 U.S. 189 (1928) .......................................................................................... 10

*Weiss v. United States,*
510 U.S. 163 (1994) .......................................................................................... 15

*Williams* v. *Phillips,*
360 F. Supp. 1363 (D.D.C. 1973) ....................................................................... 18

**Statutes**

5 U.S.C.

§§ 301, 302 ................................................................................................ 6, 16, 18

§ 3345(a) ................................................................................................... 4, 9, 15, 16

---

[*] Authorities upon which this brief chiefly relies are marked with asterisks.

§ 3345(b) ................................................................................................ 13

§ 3347(a) ................................................................................................ 4

§ 3347(b) ........................................................................................ 4, 8, 16

§ 3348 .................................................................................................... 20

§ 3348(d) ............................................................................................... 19

§§ 3345–3349d ....................................................................................... 7

6 U.S.C.

§ 112 ................................................................................................. 6, 16

§ 271(a) ................................................................................................. 20

§ 271(b) ................................................................................................. 20

28 U.S.C. §§ 509–10 ................................................................................... 3

**Legislative and Administrative Materials**

144 Cong. Rec. S12,822 (daily ed. Oct. 21, 1998) (statement of Senator Thompson) ................ 14

19 Op. Att'y Gen. 503 (1890) ..................................................................... 10

2 Op. O.L.C. 113 (1978) .............................................................................. 10

*23 Op. O.L.C. 60 (1999) ...................................................................... 11, 12

25 Op. O.L.C. 177 (2001) ...................................................................... 12, 13

28 Op. Att'y Gen. 95 (1909) ....................................................................... 10

*S. Rep. No. 105-250, at 13 (1998) ........................................ 4, 11, 12, 14, 19

**Other Authorities**

John M. Broder, *Clinton, Softening Slap at Senate, Names "Acting" Civil Rights Chief*, N.Y. Times, Dec. 16, 1997, at A1, https://tinyurl.com/yyssl4g3 ......................................... 17

Jordain Carney, *GOP Senator: Cuccinelli Couldn't Win Senate Confirmation*, The Hill (June 10, 2019), https://tinyurl.com/y2djseg9 ......................................................... 5

Brannon P. Denning, *Article II, the Vacancies Act and the Appointment of "Acting" Executive Branch Officials*, 76 Wash. U. L.Q. 1039 (1998) .................................................... 2, 3

*The Federalist No. 76* (Alexander Hamilton) ............................................................ 7

Steven A. Holmes, *G.O.P Leader Says Nominee Will Be Halted*, N.Y. Times, Nov. 10, 1997, at A22, https://tinyurl.com/yyxtzmt2 .................................................................... 17

Letter from Carlotta C. Joyner, Dir., Strategic Issues, to Fred Thompson, Chairman, U.S. Senate Comm. on Governmental Affairs, Eligibility Criteria for Individuals to Temporarily Fill Vacant Positions Under the Federal Vacancies Reform Act of 1998, GAO-01-468R, at 2 (Feb. 23, 2001), https://tinyurl.com/y66vju63 .................................... 11

\*Stephen Migala, *The Vacancies Act and a Post-Vacancy First Assistant of USCIS*, (Sept. 9, 2019), https://ssrn.com/abstract=3450843 ........................................... 6, 13, 15, 19

Nick Miroff et al., *Trump to Place Ken Cuccinelli at the Head of the Country's Legal Immigration System*, Wash. Post (May 24, 2019), https://tinyurl.com/yx9vdpnx ..................................... 5

*Oversight of the Implementation of the Vacancies Act: Hearings on S. 1764 Before the Senate Committee on Governmental Affairs*, 105th Cong. (Mar. 18, 1998) (S. Hrg. 105-495) ........ 1, 18

Petitioner's Brief, *NLRB v. Sw. Gen., Inc.*, No. 15-1251, 2016 WL 4363344 ............................. 12

Stewart M. Powell, *Lee Wins Civil Rights Job Despite GOP Block: President Dodges Senate Opposition and Names L.A. Lawyer to Post on an Acting Basis*, S.F. Examiner, Dec. 15, 1997, at A1 .................................................................................. 17

Morton Rosenberg, Cong. Research Serv., *Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights* (Jan. 1998) .............................................. 1

\*Morton Rosenberg, Cong. Research Serv., No. 98-892, Report for Congress, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* (Nov. 1998) .................................................................................................. 1, 3

Joshua L. Stayn, *Vacant Reform: Why the Federal Vacancies Reform Act of 1998 is Unconstitutional*, 50 Duke L.J. 1511 (2001) .......................................................................... 2

## Constitutional Provisions

U.S. Const. art. II., § 2 ................................................................................. 6

**INTEREST OF AMICUS CURIAE**

Morton Rosenberg is a leading authority on the Federal Vacancies Reform Act of 1998 (Act or FVRA). The Act is central to Plaintiffs' challenges in this case, but they have not yet been fully able to explore its history and context in their briefs.

Before retiring in 2008, Mr. Rosenberg spent over three decades as an analyst in the American Law Division of the Congressional Research Service (CRS or Service). There, he advised Congress on many issues of constitutional law, administrative law, and congressional practice and procedure, with a special emphasis on Executive appointments.

In particular, Mr. Rosenberg was intimately involved in the enactment of the Act. He testified before Congress during the legislative debate over the legislation. *See Oversight of the Implementation of the Vacancies Act: Hearings on S. 1764 Before the Senate Committee on Governmental Affairs*, 105th Cong., at 40, 170 (Mar. 18, 1998) (S. Hrg. 105-495) (*FVRA Hearings*) (Statement of Morton Rosenberg, Specialist in American Public Law, Congressional Research Service). He wrote the report for Congress detailing the problems with previous appointments laws that lead directly to the Act's enactment. *See* Morton Rosenberg, Cong. Research Serv., *Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights* (Jan. 1998) (*Rosenberg Memo I*), *reprinted in FVRA Hearings*, *supra*, at 62–131.  And after Congress passed the Act, he wrote another report informing Congress how it was being implemented. *See* Morton Rosenberg, Cong. Research Serv., No. 98-892, Report for Congress, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* (Nov. 1998) (*Rosenberg Memo II*).

His experience and expertise have been recognized by courts and commentators. His writings have been cited by the Supreme Court, *see NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 935

(2017); the D.C. Circuit, *see Sw. Gen., Inc.* v. *NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137

S. Ct. 929 (2017); and in academic articles, *see* Joshua L. Stayn, *Vacant Reform: Why the Federal*

*Vacancies Reform Act of 1998 is Unconstitutional*, 50 Duke L.J. 1511, 1513 n.8 (2001); Brannon P.

Denning, *Article II, the Vacancies Act and the Appointment of "Acting" Executive Branch Officials*,

76 Wash. U. L.Q. 1039, 1050 n.60 (1998). All have treated his views on the Act's legislative

background as authoritative.

Mr. Rosenberg writes to provide the Court with his unique experience with and expertise

on the Act, and to detail why the appointment of Ken Cuccinelli to serve as Acting Director of

the U.S. Citizenship and Immigration Services (USCIS) violates the restrictions of the Act.[1]

## BACKGROUND

The legality or illegality of Cuccinelli's appointment to Acting Director depends on

whether the Executive complied with the Federal Vacancies Reform Act (FVRA or Act).

Congress passed the Act to limit the Executive's ability to evade Senate confirmation, following

post-Watergate appointment abuses. Because Congress sought to prevent evasion of

constitutional advice-and-consent requirements, the Act's requirements are strict.

**A. After Watergate, the President installed indefinitely "acting" appointees to evade the Senate's more rigorous confirmation process.**

The Federal Vacancies Reform Act emerged from Watergate's fires, which smoldered for

decades. President Nixon's Saturday Night Massacre decimated the Justice Department's senior

ranks and reminded voters and leaders that principal officers must answer to the people and not

---

[1]  No party or their counsel authored this brief in whole or in part or contributed money intended
to fund preparing or submitting this brief.

just the President. Brannon P. Denning, *Article II, the Vacancies Act and the Appointment of "Acting" Executive Branch Officials*, 76 Wash. U. L.Q. 1039, 1061 (1998). That made confirmations more politicized, which in turn made the "vetting process for potential officeholders . . . more complex, difficult and protracted." *Rosenberg Memo II*, *supra*, at 8. It also left the federal government with far more Senate-confirmed offices than acceptable candidates to fill them.

To alleviate this shortage of Senate-confirmable nominees, the Office of Legal Counsel sought ways to stretch temporary acting appointments past the Vacancies Act's strict time limits. OLC claimed to find an option in agencies' "housekeeping" statutes (such as those of the Justice Department, *see* 28 U.S.C. §§ 509–10), which empower agency heads to delegate functions to subordinates. *Rosenberg Memo II*, *supra*, at 1. OLC argued that these delegating provisions gave executive-agency heads "independent authority"—"apart from the Vacancies Act"—to fill vacant offices. *Sw. Gen.*, 137 S. Ct. at 935.

This caused scandal. With "options" to bypass the Vacancies Act's mandatory scheme for temporary appointments, Presidents could routinely evade the specific conditions that Congress had placed on those appointments. And things got worse over time: By 1998, twenty percent of the 320 positions requiring Senate-confirmed appointees (and a full fourth of those positions within the Justice Department) were staffed by temporary appointees; and most of these temporary appointees had served far more than the 120 days allowed under the then-applicable Vacancies Act. *Rosenberg Memo II*, *supra*, at 1.

**B.  The Act reasserts congressional authority and limits presidential flexibility.**

Congress responded to these Executive encroachments with the Act, which returned control over temporary appointments to Congress. The Act provides the "exclusive means" for temporarily authorizing acting officials to perform the functions of virtually all Senate-confirmed executive offices—"unless" Congress has provided a succession scheme specific to the agency. 5 U.S.C. § 3347(a). USCIS has no such scheme.

Under the Act, the Executive gets only "limited flexibility in appointing temporary officers." S. Rep. No. 105-250, at 13 (1998). If a Senate-confirmed officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office . . . [those] functions and duties of the office" are automatically assumed by "the first assistant to the office of such officer." 5 U.S.C. § 3345(a) & (a)(1). That "first assistant to the office" is usually a clearly pre-identified top deputy of a presidentially appointed, Senate-confirmed officer—and that pre-identified person automatically slots into the role. *Id.*

If the President prefers someone else, the Act allows him some choice—within strict limits. One option is a designee who already serves in a presidentially appointed, Senate confirmed office in some agency, *see id.* § 3345(a)(2)), assuring that the Senate has vetted the candidate at least in part. Another option is a designee who has previously served in the relevant agency for more than 90 days within the year preceding the vacancy, *see id.* § 3345(a)(3), ensuring a level of experience that would enable the candidate to understand the office's functions and responsibilities. Those are the only options.

The FVRA then specifies that these designation options belong to the President "and only the President"—even department heads may not exercise them. *See id.* § 3345(a)(1) & (2).

And they are not expandable—the President may not escape the Act's exclusive scheme in any

other way, for instance by invoking an agency's vesting and delegation or "housekeeping"

statutes. *Id*. § 3347(b). Congress locked down the acting-appointment scheme so tightly to

address the Executive abuses that motivated the FVRA's overhaul of the law on acting

appointments.

### C.  Ken Cuccinelli is appointed to be Acting Director of USCIS.

The Act is still the law, and it was the law in June 2019, when President Trump decided

that he wanted Ken Cuccinelli to serve as the Director of USCIS. Yet the President knew that the

controversial Cuccinelli could not be put in place through the standard procedure of nomination

and Senate confirmation. Indeed, Cuccinelli's immigration views were deemed so extreme that

even Republicans opposed him, leaving slim chance that he could be confirmed to fill the role

permanently, even in a Senate controlled by the President's party. *See, e.g.*, Jordain Carney, *GOP*

*Senator: Cuccinelli Couldn't Win Senate Confirmation*, The Hill (June 10, 2019),

https://tinyurl.com/y2djseg9 (Senator John Cornyn, the second-ranking Senate Republican,

states that Cuccinelli likely could not be confirmed to be permanent director of USCIS). Nor did

Cuccinelli meet the FVRA's requirements for leading USCIS in an acting capacity. He had never

worked for USCIS, and the Senate had never confirmed him to any federal position. Thus, the

Act's designation and succession scheme would not allow Cuccinelli to replace the then-Acting

Director, Mark Koumans.[2]

---

[2]  Koumans had been the agency's then-designated first assistant, who became Acting Director
after the Senate-confirmed Director, Francis Cissna, resigned effective June 1, 2019. Nick Miroff
et al., *Trump to Place Ken Cuccinelli at the Head of the Country's Legal Immigration System*, Wash.
Post (May 24, 2019), https://tinyurl.com/yx9vdpnx.

Undeterred, the administration tried to install Cuccinelli anyway. The Acting Secretary of Homeland Security, Kevin McAleenan, invented a new USCIS position: Principal Deputy Director of USCIS. Dkt. 12-6, Exhibit 6 to Declaration of Catherine Monk (Monk. Decl.). He then amended the internal USCIS Order of Succession to transfer the Act's "first assistant" function from Koumans (the previous USCIS Acting Director) to this newly created office (Principal Deputy Director). *Id.* Finally, on June 10, 2019, Acting Secretary McAleenan appointed Cuccinelli to be the inaugural Principal Deputy Director, and thus to be Acting Director of USCIS. Dkt. 12-6, Monk Decl., Ex. 5.[3]

On what authority did Acting Secretary McAleenan rely to accomplish this administrative reshuffling of USCIS? He invoked "general authority" statutes that allowed agency functions to be distributed throughout the agency. *See* 5 U.S.C. §§ 301, 302. And he invoked DHS's housekeeping statute. *See* 6 U.S.C. § 112. In other words, he relied on the same types of statutes that earlier administrations had used to evade vacancy-filling laws, and whose abuse Congress stopped with the Act.

## SUMMARY OF ARGUMENT

Under the Appointments Clause, "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2. This authority allows Congress to determine the structure of Executive Branch agencies, block patronage appointments, and ensure that the

---

[3] The events leading up to Cuccinelli's appointment are further detailed in Plaintiffs' Motion for Preliminary Injunction, Dkt. 12, at 20–21; *see also* Stephen Migala, *The Vacancies Act and a Post-Vacancy First Assistant of USCIS*, at 11–14 (Sept. 9, 2019), https://ssrn.com/abstract=3450843.

President is choosing qualified professionals instead of "unfit characters." *The Federalist No. 76* (Alexander Hamilton). Since 1792, Congress has also used this power to enact statutes allowing agencies to continue running even if their Senate-confirmed leaders resign and create vacancies. These laws ensure that the agencies do not freeze in place while a permanent replacement is found.

Even while providing some authority to appoint acting agency heads during temporary vacancies, Congress has jealously guarded its absolute prerogative to determine whether, when, and how these officers may wield power without Senate confirmation. Indeed, the FVRA, 5 U.S.C. §§ 3345–3349d, was conceived after Congress had to "reclaim[]" its "Appointments Clause power" and reassert its authority over temporary appointments. *See Sw. Gen.*, *Inc.* v. *NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017). The Act provides for two—and only two—ways of filling vacancies outside of a recess appointment: (1) Nominate a replacement, and persuade the Senate to confirm that nominee, or (2) follow the Act's specific rules and procedures, which identify who may be named an acting official and under what circumstances.

But the administration followed neither of these paths, instead executing a complex series of administrative maneuvers that moved the appointment further and further away from meeting the Act's strict requirements and Congress's mandated design. In creating a new "first assistant" position *after* the vacancy arose—for the sole purpose of enabling its new occupant to become the acting agency head—the administration violated the Act's plain terms. These maneuvers also subverted the Act's purpose of ensuring that only qualified, competent individuals serve—even temporarily—as stewards of our nation's highest offices. The Acting

DHS Secretary then further insulted the Act's design, and disrespected Congress's coequal role in agency appointments, by divesting the lawfully appointed first assistant and Acting USCIS Director of his congressionally vested responsibilities—all to create room for the newly minted, pseudo-first assistant. Even worse, the appointment was performed by the Acting DHS Secretary and not by the President, who is the only person that the Act authorizes to make any acting appointments at all. Finally, the Acting DHS Secretary wielded generic agency statutes to appoint Cuccinelli, in violation of the prohibition in 5 U.S.C. § 3347(b), and eerily echoing the abusive tactics that motivated Congress to pass the Act in the first place.

In short, the appointment of Ken Cuccinelli to serve as Acting Director of USCIS is miles outside the limited and specific space provided by Congress for officials to act in a Senate-confirmed office. Cuccinelli's appointment is unlawful and invalid, and it voids the directives at issue in this case under both the Administrative Procedure Act and the FVRA itself.

## ARGUMENT

I. **The FVRA prohibits the Executive from filling an existing vacancy by designating a new first assistant.**

In defending Cuccinelli's appointment, the government insists that the Act allows the Executive to create a new "first assistant" *after* an office becomes vacant—thereby replacing one "first assistant" with another to enable the latter to become the acting head of a Senate-confirmed office. But the Act cannot be evaded so easily.

### A. Post-vacancy "first assistants" are forbidden by the Act's text.

Although Congress permits some agencies, including USCIS, to designate the office that will serve as "first assistant" under the Act's succession scheme, this designation must take

place before the office becomes vacant. Once the office is vacant, the first assistant "automatically" slots into the role and becomes the "acting officer" under subsection (a)(1). *Sw. Gen., Inc.*, 137 S. Ct. at 935. The Act allows only one mechanism to displace that person: designate another person from among the options provided under subsections (a)(2) and (a)(3). That narrow set of options does not include designating a new "first assistant" to replace the one who has already assumed the role of acting officer. So the only first assistant who may become the acting head of a Senate-confirmed office is the first assistant at the time the office became vacant. Because Cuccinelli was not that person, he may not act as head of USCIS.

That alone dooms the government's defense of Cuccinelli's title. But a textual clue in section 3345 further undermines the government's theory of appointment by do-over. Subsection (a)(1)—which makes the first assistant the default acting agency head—reinforces the President's lack of post-vacancy options; it does so by using a definite article: "*the* first assistant." The President may not designate "a" first assistant and fill the slot with any person of his choosing—there may be only one. By contrast, when giving the President multiple options (like the designation options in subsections (a)(2) and (a)(3)), Congress used an indefinite article: "*a* person" and "*an* officer or employee."

When the USCIS directorship became vacant, somebody other than Cuccinelli was "the" first assistant. That person may become the acting director. Cuccinelli may not.

**B. Post-vacancy "first assistants" also defy the Act's history, structure, and purpose.**

This restriction—against designation of first assistants after a vacancy opens—is ultimately rooted in history. Through much of history, first assistants could be designated only by

statute. *See Doolin v. Office of Thrift Supervision*, 139 F.3d 203, 209 n.3 (D.C. Cir. 1998) ("If the position of 'first assistant' is not created by statute, one line of authority indicates that § 3345 and § 3346 of the Vacancies Act do not apply.").[4] Even Congress, then, could not enact a specific law after a vacancy to appoint persons or fill specific vacancies. *See Buckley v. Valeo*, 424 U.S. 1, 139–40 (1976); *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928). Both *Buckley* and *Springer*, moreover, noted the difference between (1) Congress allowing the duties of a vacant office to devolve to an existing officer before a vacancy occurred, and (2) Congress appointing someone to an existing vacancy, outside the specific bounds of the Appointments Clause. Because the latter practice simply did not exist, Congress saw no need to expressly bar it.

Prohibiting the government from designating post-vacancy first assistants is necessary not only to respect historical practice. It also is essential to prevent the Act's restrictions on the President's temporary appointment powers from becoming illusory. After all, what good is the temporal requirement in subsection (a)(3)—requiring an employee promoted from within the agency to have served at least 90 days within the year before the vacancy—when the President could at any time evade that requirement by hiring someone new and designating his office the operative "first assistant"? Remarkably, the government's reading would mean that the

---

[4] *See also, e.g.*, 2 Op. O.L.C. 113, 115 n.5 (1978) ("Moreover, the Attorney General has interpreted the term 'first assistant' as applying only to officials whose appointment has been specifically provided for by statute"); 19 Op. Att'y Gen. 503, 504 (1890) (opinion of then-Solicitor General, later President, and later Chief Justice W.H. Taft) ("I think that section 178, in the expression 'the assistant or deputy of such chief or of such officer,' can only refer to assistants or deputies whose appointment is specifically provided for by statute"); 28 Op. Att'y Gen. 95 (1909) (concluding the same).

President's designee need not have any experience in an agency before assuming temporary leadership positions within it, or have assumed any Senate-confirmed office.

With the wave of a pen, the government thus virtually erases these qualifications, meant to ensure the competence and loyalty of those who would safeguard nation's highest offices, and removes essential conditions that Congress demanded before it would accept designees even temporarily in those offices. But the Government may not accomplish implicitly through one subsection what another forbids explicitly. That would enable the very manipulation that Congress sought to prevent by enacting the Act.

For these reasons, the Act's legislative history repeatedly warns that if no first assistant exists when the vacancy occurs, the Executive may not appoint a new one; the Executive's only option is to exercise the designation options in subsections (a)(2) or (a)(3). *See* S. Rep. No. 105-250, at 13 ("If there is no first assistant, no one is permitted by law to become an acting officer until the President designates . . . ."); *id.* at 7 ("If there is no first assistant, the President must designate another . . . official."); *id.* at 14 ("[I]f there is no first assistant, and no presidential designation, no one may serve as acting officer . . . the original vacancy, not the subsequent departure of the acting officer, is the measuring event."); 23 Op. O.L.C. 60, 63, 70 (1999) (effectively stating same in Questions 12 & 39).

Until very recently, the Executive has respected the wishes of the Congress that drafted the Act, recognizing that its authority to name first assistants ceases the moment a vacancy occurs. For instance, the GAO warned candidates aspiring to hold acting offices that they should have documentation "verify[ing] that the position (and the individual) was designated as first assistant prior to the occurrence of the vacancy"—even if that required production of the

"statute, regulation, or other documentation that designates the individual's position as first assistant." Letter from Carlotta C. Joyner, Dir., Strategic Issues, to Fred Thompson, Chairman, U.S. Senate Comm. on Governmental Affairs, Eligibility Criteria for Individuals to Temporarily Fill Vacant Positions Under the Federal Vacancies Reform Act of 1998, GAO-01-468R, at 2 (Feb. 23, 2001), https://tinyurl.com/y66vju63. OLC reached a similar conclusion shortly after Congress passed the Act: "The better understanding," it opined, "is that you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant." Guidance on Application of Federal Vacancies Reform Act of 1998, 23 Op. O.L.C. 60, 63–64 (1999).

### C.  OLC's contrary opinion misreads and misapplies the Act.

OLC has since changed that initial interpretation, in a 2001 opinion concluding that section (a)(1) allows the designation of a "first assistant after the vacancy occurred," and dismissing its prior opinion as "erroneous." 25 Op. O.L.C. 177, 179 (2001), https://tinyurl.com/y4jelqmr. But the government's commitment to this new position has wavered. Just three years ago, the government appeared to reverse itself yet again, insisting that "[FVRA] curtails Presidents' ability to elevate their chosen nominees to [presidentially appointed, Senate-confirmed positions] on an acting basis through designations as first assistants occurring only after (or soon before) [that] vacancy arose—thereby cutting off an avenue for 'manipulat[ing]' the FVRA's restrictions on categories of individuals qualified to serve.'" Pet'r Br. 38, *NLRB v. Sw. Gen., Inc.*, No. 15-1251, 2016 WL 4363344, at *38 (quoting S. Rep. No. 105-250, at 13).

12

The circumstances underlying that 2001 OLC memo also diverge sharply from those at issue here. For the vacancy addressed by the OLC memo, the designated first assistant assumed an office that (1) was entirely unoccupied and (2) already existed. As is customary when a new president takes office, the prior first assistant had resigned, along with the Attorney General and all other cabinet officials. Those circumstances make the OLC opinion virtually irrelevant to the current ones. It is one thing to read the Act to allow the Executive to fill a predetermined first-assistant position when it is already vacant. Quite another to allow the Executive to designate an entirely new first assistant position and to oust another first assistant already on the job.

In any event, the reasoning of OLC's 2001-era opinion is unpersuasive. It hinges almost entirely on section 3345(b)(1), which bars many people from serving as an acting officer if they have been nominated to the office and have not previously served in the position of first assistant to the office. The government reasoned this provision would become superfluous "if an individual who was not the first assistant when the vacancy occurred is already flatly prohibited from serving in an acting capacity"—presumably because the Government assumed that section 3345(b)(1)(A) applied only to those who would be coming into the office as the first assistant under section (a)(1). 25 Op. O.L.C. at 179. But the Supreme Court rejected that assumption in *Southwest General*, concluding "that the prohibition in subsection (b)(1) applies to anyone performing acting service under the FVRA" not only to "first assistants performing acting service under subsection (a)(1)." 137 S. Ct. at 938. The passage of time has thus diminished OLC's argument  considerably. *See also* Stephen Migala, *The Vacancies Act and a Post-Vacancy First Assistant of USCIS*, at 19–23 (Sept. 9, 2019), https://ssrn.com/abstract=3450843 (highlighting problems with the OLC opinion).

13

The 2001 OLC opinion also dwells on a minor change, to a single line in section 3345,

made when the Vacancies Act was recodified as the FVRA in 1998. In particular, the phrase "the

first assistant of the *officer*" was changed to "the first assistant to the *office* [of such officer]." 25

Op. O.L.C. at 179. OLC insists that this change freed Executive officials to designate first

assistants whenever they liked, because (claimed OLC) an "officer" referred to a definite person

with a definite assistant who could exist only on the date that the vacancy arose, while an

"office" is more generic. But this reed is far too thin. As the Act's legislative history makes clear,

this change was technical, not substantive. *See* S. Rep. No. 105-250, at 12 ("As under current

law, the term 'first assistant' is used to refer to the first assistant to the 'officer.' However, the

practice under current law, which would be continued by this bill, is that the first assistant is

actually the first assistant to the vacant office."); 144 Cong. Rec. S12,822 (daily ed. Oct. 21,

1998) (statement of Senator Thompson) ("[T]he change in wording is not intended to alter case

law on the meaning of the term 'first assistant."). And as OLC's 2001 interpretation has been

undermined by intervening events, as well as by its own incomplete and incorrect reasoning, it

may not allow the Executive to contravene the Act's plain language, history, and purpose.

Ultimately, then, Cuccinelli cannot serve as the first assistant to the Director of USCIS

after the director position became vacant.

## II.    The Act prohibits the Executive from stripping a first assistant of the duties and responsibilities that accompany an acting agency position.

The statutory problem created by assigning Cuccinelli the role of first assistant is only one

side of the legally fraught equation in this case. The Executive's decision to divest Koumans of

his position as first assistant and acting director of USCIS—solely to give that role to

14

Cuccinelli—presents an entirely separate problem, and a serious breach of the boundaries between the Executive and Legislative Branches in the area of temporary appointments.

That is because Congress has conveyed, through the FVRA, powers that attach to whichever office assumes the role of first assistant to a Senate-confirmed position—even in agencies, like USCIS, for which Congress has not specified the particular office to serve as first assistant. Those powers are triggered when a vacancy in the Senate-confirmed office occurs, making that office the one that "shall perform the functions and duties of the office temporarily," and vesting those functions and duties in a particular officer until the vacancy is filled (or the President properly delegates someone else to fulfill the role). 5 U.S.C. § 3345(a)(1). That is a proper exercise of Congress's Appointment authority, because Congress may act by devolving upon a certain office particular powers and duties, including those to temporarily perform the duties of another, higher office. *See* Migala, *supra*, at 32 & n.118 (citing *Shoemaker v. United States*, 147 U.S. 282, 301 (1893); *Weiss v. United States*, 510 U.S. 163, 176 (1994)).

As a result, the full weight of Congress's appointment powers lies behind the conveyance of power to temporarily assume higher office that accompanies the role of first assistant. That power is absolute, and the Executive branch must yield to it. Thus, when the designated first assistant assumes an agency's powers as its acting head, neither the President nor anyone else within the Executive may strip those powers away—except through means that Congress itself has provided. Accordingly, after the office designated as first assistant has ripened into Acting Director of USCIS, the administration may no more transfer that designation from one office to another than the Senate-confirmed Director of USCIS could sluff off all of the office's power and responsibility onto anyone he or she chooses. This means that while it may arguably be a matter

of administrative reshuffling to change the designation of a first assistant *before* there is a vacancy—when there is no one occupying the office of acting head of USCIS and assuming the powers of the office—the situation changes after a vacancy has triggered the transfer of power to the first assistant. Once that occurs, the choice to divest an office of the first assistant role lies beyond the power of the Secretary and the Executive.

III.   **The manner in which this transfer of first assistant authority took place also violates the Act.**

The constitutional and statutory problems with the Cuccinelli appointment are not isolated to the transfer of first assistant authority that made it happen. The manner in which the appointment was undertaken likewise creates a series of problems under the FVRA.

The first problem is the identity of the person doing the replacing. It was not the President who hired Cuccinelli as Principal Deputy Director or transferred to that newly created office the role of first assistant to the Director. It was Kevin McAleenan, the Acting Secretary of Homeland Security. But the constitutional appointments authority may be specifically vested by statute alone. And the FVRA, the only applicable appointments statute, is blunt: The authority to designate officials to serve as acting heads of Senate-confirmed offices belongs to "the President (and only the President)." 5 U.S.C. § 3345(a)(2) & (3). There is no authority—none—that allows the President's appointment authority to be wielded by others within in the Executive Branch.

The second problem is the statutory authority that McAleenan relied upon to justify it. In his memorandum announcing Cuccinelli's appointment, McAleenan nowhere cited the FVRA or purported to rely on its provisions allowing for the designation of acting officials. Instead, he

cited DHS's enabling statute, and generic delegation statutes providing authority to agency heads to delegate functions within the agency. Dkt. 12-6, Monk Decl., Ex. 5 (citing 5 U.S.C. §§ 301, 302; 6 U.S.C. § 112). Whatever role these vesting and delegation statutes might play in assigning the role of first assistant before a vacancy occurs, the FVRA states that they cannot be used to provide the President options outside the FVRA to fill an existing vacancy. *See* 5 U.S.C. § 3347(b). That is because Congress enacted the FVRA in direct response to abuses of enabling and delegation statutes like these.

Indeed, the Cuccinelli episode reads like a sad retelling of the crises that finally motivated Congress to end appointment abuses and enact the FVRA. Things came to a head in 1997, when the Senate Judiciary Committee refused to refer Bill Lan Lee, President Clinton's nominee to head the Office of Civil Rights, to a floor vote. *See, e.g.*, Steven A. Holmes, *G.O.P Leader Says Nominee Will Be Halted*, N.Y. Times, Nov. 10, 1997, at A22, https://tinyurl.com/yyxtzmt2. The President responded by directing the Attorney General to appoint Lee as "Acting" Assistant Attorney General for Civil Rights by delegating those responsibilities to him, planning for him to serve beyond the Vacancies Act's time limits. That action produced public outcry and calls to amend the Vacancies Act to explicitly prohibit such presidential end-arounds.[5]

The parallels between the illegal appointments of Lee and Cuccinelli are striking. Both were hired from outside the government and would have been ineligible to displace a first assistant under the then-governing vacancies statutes. Both faced significant resistance from the

---

[5] *E.g.*, John M. Broder, *Clinton, Softening Slap at Senate, Names "Acting" Civil Rights Chief*, N.Y. Times, Dec. 16, 1997, at A1, https://tinyurl.com/yyssl4g3; Stewart M. Powell, *Lee Wins Civil Rights Job Despite GOP Block: President Dodges Senate Opposition and Names L.A. Lawyer to Post on an Acting Basis*, S.F. Examiner, Dec. 15, 1997, at A1.

Senate that would have prevented them from ever obtaining a permanent confirmation. And to bypass these barriers, both were hired by department heads to positions that did not previously exist, to positions termed a "Principal Deputy," and by use of general vesting and delegation statutes, including 5 U.S.C. §§ 301 and 302, in an effort to evade the FVRA.[6]

The only real difference is that, unlike Cuccinelli, Lee took office only after the Deputy resigned, meaning there was no "first assistant" or already acting deputy for him to displace. Cuccinelli, conversely, stepped into an acting office that was already occupied: Deputy Director Koumans was not removed and not resign. He remains able to serve, as he has resumed his position as Deputy. Cuccinelli's appointment—also displacing an existing office and displacing the acting official—is thus worse than the appointment that led Congress to overhaul the entire temporary appointment regime. And that is still another reason why Cuccinelli's appointment violates Congress's statutory appointments scheme and must be deemed unlawful.

## IV.   Vacatur of USCIS's directives and an injunction prohibiting future actions are the appropriate remedies for these numerous and serious legal infirmities.

The remedy for this unlawful appointment is clear: Cuccinelli must be enjoined from taking any further action as Acting USCIS Director. Plaintiffs have specifically sought this relief, and this Court has repeatedly remedied illegal appointments this way. *See Williams v. Phillips*, 360 F. Supp. 1363, 1371 (D.D.C. 1973) ("[T]he Court finds that the defendant Phillips was not

---

[6] *Compare* Dkt. 12-6, Monk Decl., Ex. 5 (Memorandum from Kevin McAleenan, Acting Secretary DHS, to Kenneth Cuccinelli, re: Appointment as Principal Deputy Director (June 10, 2019)), *with* DOJ Order No. 2134-97, "Designating Bill Lann Lee as Acting Assistant Attorney General for the Civil Rights Division" (Dec. 15, 1997), *reprinted in Oversight of the Implementation of the Vacancies Act: Hearing on S. 2176 Before the S. Comm. on Governmental Affairs*, 105th Cong. 102 (Mar. 18, 1998) (S. Hrg. 105-495).

appointed lawfully to his post as Acting Director of OEO. An injunction will issue to restrain him from taking any actions as Acting Director of OEO."); *see also Olympic Fed. Sav. & Loan Ass'n* v. *Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1202 (D.D.C.), *appeal dismissed and remanded*, 903 F.2d 837 (D.C. Cir. 1990). Cuccinelli's directives that are the subject of Plaintiffs complaint must also be vacated. This latter result flows from two separate statutes.

First, vacatur is required under the terms of the Act itself. The FVRA has its own enforcement mechanism; if an agency's functions or duties are being performed temporarily by someone whom the Act does not authorize to perform them, then actions taken by this person "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d). In other FVRA lawsuits, the government has argued that vacatur of *ultra vires* agency action is appropriate only when the purported official performed some statutory or regulatory duty that expressly specified itself to be non-delegable. But the FVRA's text reflects no such qualification.

Such a drastic limitation would also undermine the very purpose of the FVRA's statutory remedy. This enforcement mechanism was created to overturn a decision of the D.C. Circuit, *Doolin* v. *Office of Thrift Supervision*, 139 F.3d 203, 204, 211 (D.C. Cir. 1998), holding that actions by temporary officers acting *ultra vires* should be considered harmless when they are later ratified by a properly appointed official. *See* S. Rep. No. 105-250, at 8 (*Doolin*'s harmless error conclusion in light of a subsequent ratification action "demands legislative response"); *see also* Migala, *supra*, at 35 (discussing the anti-ratification provision). Congress's "legislative response" was to make vacatur the automatic, universal, and mandatory remedy for *all* violations of the FVRA's appointment provisions—going so far as to preclude allowing even subsequent ratification to cure an FVRA violation. In drafting a remedial provision so absolute, Congress did

not mean to have that remedy apply to only a smattering of applications in a few isolated statutory contexts; it certainly did not intend to so through legislative silence in *other* statutes. There is, in sum, no basis for the government's self-serving attempt to leave the Act toothless.

Application of the statutory remedy requires vacatur of all USCIS directives that Plaintiffs have challenged. Here, 6 U.S.C. § 271(a)(3)(A), (B), or (D) offer the only authorities under which a USCIS Director could issue those directives.[7] Because each authority in 6 U.S.C. § 271(a) is "required by statute to be performed by" the USCIS Director, and because that statute does not empower any other officer with that authority (the duty is assigned to "only that officer" in the subject statute), the directives issued by Mr. Cuccinelli qualify as "action[s]" that have "no force or effect" under the FVRA's enforcement mechanism. 5 U.S.C. § 3348.

Second and separately, vacatur is also required under the terms of the APA, and the D.C. Circuit's decision in *Southwest General* explains why. *See Sw. Gen., Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015). There, the D.C. Circuit noted that even without application of the FVRA's enforcement mechanism, relief is still available under two APA-based irregularity doctrines: (1) prejudicial error under 5 U.S.C. § 706; and (2) structural error. The "burden of demonstrating that the FVRA violation is non-harmless under the [APA] . . . is not a particularly onerous requirement." *Sw Gen.*, 796 F.3d at 80–81. In particular, if a court "cannot be confident that the [agency action] would have issued under an Acting [official] other than [the one in question]," then that "uncertainty is sufficient" for relief. *Id.*

---

[7] 6 U.S.C. § 271(a)(3)(A) is a cross reference, which includes § 271(b), that, in turn, authorizes the USCIS Director to set policies, like the directives at issue, for all adjudications, including asylum applications.

For the directives at issue here, such confidence is impossible. Plaintiffs have shown that the challenged directives are infused with Cuccinelli's anti-immigration views, which are more extreme than virtually anyone else who might have occupied the office. *E.g.*, Dkt. 1 (Complaint) at 24–30; Dkt. 12 (Motion for Preliminary Injunction), at 27–28. They have also demonstrated that the legal interpretations offered by Cuccinelli to justify those directives are similarly extreme, and no other USCIS Director has ever offered them. Dkt. 12 at 11–19.

But for Cuccinelli's input and prejudice, the rule would differ materially. And structural violations, such as those underlying an Appointment Clause claim—which naturally results from an FVRA violation—require even less direct impact and "will proceed even where any possible injury is radically attenuated." *Landry* v. *FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000). That burden is more than met here.

## CONCLUSION

Defendants should be enjoined from implementing the challenged directives, and Cuccinelli should be enjoined from performing any future duties or taking any future action as Acting USCIS Director.

Respectfully submitted,

/s/ Gregory M. Lipper

J. Carl Cecere (*pro hac vice* pending)      Gregory M. Lipper (Bar No. 494882)
CECERE PC                                    CLINTON & PEED
6035 McCommas Blvd.                           777 6th Street NW, 11th Floor
Dallas, TX 75206-5721                         Washington, DC 20001
(469) 600-9455                                (202) 996-0919
ccecere@cecerepc.com                          glipper@clintonpeed.com

                                             *Counsel for Amicus Curiae*
October 7, 2019                              *Morton Rosenberg*

21

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 7(o)(4) because it contains fewer than 25 pages, excluding the portions identified by Fed. R. App. P. 32(f).

<u>/s/ Gregory M. Lipper</u>
Gregory M. Lipper

## CERTIFICATE OF SERVICE

On October 7, 2019, I electronically filed and served this brief on all counsel through the

Court's CM/ECF system.

<u>/s/ Gregory M. Lipper</u>
Gregory M. Lipper