JOSEPH H. HUNT
*Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
ARCHITH RAMKUMAR
*Trial Attorney*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8060
Email: Archith.Ramkumar@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| L.M.-M., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-02676-RDM |
| | ) | |
| Kenneth T. Cuccinelli II, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.    Plaintiffs Cannot Show that USCIS's Guidance Is Inconsistent with Any Statutory or Regulatory Provisions. ...................................................................................................... 2

II.    To the Best of the Agency's Knowledge, the Only Reasons Underlying the Policies are the Reasons in the Record ...................................................................................................... 7

III.    Mr. Cuccinelli is Validly Serving As Acting Director. ...................................................... 7

IV.    This Court May Not Issue Nationwide Injunctive or Set Aside Relief. ........................... 13

CONCLUSION ...................................................................................................................... 20

## TABLE OF AUTHORITIES

### CASES

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ................................................................................................ 7

*Am. Immigration Lawyers Association v. Reno,*
    199 F.3d 1352 (D.C. Cir. 2000) ...................................................................................... 17, 18

*Arroyo v. DHS,*
    No. SACV 19-815 JGB (SHKx), 2019 WL 2912848 (C.D. Cal. June 20, 2019) ..................... 6

*Baptist Memorial Hosp.-Golden Triangle v. Sebelius,*
    566 F.3d 226 (D.C. Cir. 2009) ............................................................................................... 2

*Bowles v. Russell,*
    551 U.S. 205 (2007) .............................................................................................................. 19

*Capital Area Immigrants' Rights Coal. v. Trump,*
    No. 1:19-CV-02117-TJK, 2019 WL 3436501 (D.D.C. July 24, 2019) ................................... 20

*City and Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) .............................................................................................. 19

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018) ................................................................................................ 15

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision,*
    139 F.3d 203 (D.C. Cir. 1998) .............................................................................................. 10

*East Bay Sanctuary Covenant v. Barr,*
    934 F.3d 1026 (9th Cir. 2019) .............................................................................................. 19

*Fogo De Chao (Holdings) Inc. v. DHS,*
    769 F.3d 1127 (D.C. Cir. 2014) ......................................................................................... 4, 5

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .......................................................................................................... 13

*Gonzales v. Oregon,*
    546 U.S. 243, 257 (2006) ........................................................................................................ 5

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) .............................................................................................................. 14

*Guedes v. ATF,*
    920 F.3d 1 (D.C. Cir. 2019) ................................................................................. 12

*Hamama v. Adducci,*
    912 F.3d 869 (6th Cir. 2018) ............................................................................... 18

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ..................................................................................... 3, 4

*L.A. Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ..................................................................... 13, 14, 15

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) .......................................................................................... 13

*Mercy General Hosp. v. Azar,*
    No. 16-99 (RBW), 2019 WL 5269022 (D.D.C. Oct. 17, 2019) ................................. 4

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ..................................................................................... 13, 16

*Montes-Lopez v. Holder,*
    694 F.3d 1085 (9th Cir. 2012) ............................................................................. 6

*N. Air Cargo v. U.S. Postal Serv.,*
    674 F.3d 852 (D.C. Cir. 2012) ............................................................................. 6

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ......................................................................... 16

*O.A. v. Trump,*
    No. CV 18-2718 (RDM), 2019 WL 3536334 (D.D.C. Aug. 2, 2019) ...................... 16

*Perez v. Decker,*
    No. 18-CV-10683 (AJN), 2019 WL 4784950 (S.D.N.Y. Sept. 30, 2019) ................ 18

*Reid ex rel. Reid v. District of Columbia,*
    401 F.3d 516 (D.C. Cir. 2005) ............................................................................. 2

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ........................................................................................... 5

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) .......................................................................................... 13

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ................................................................................. 14, 15

*U.S. Telecom Ass'n v. FCC,*
    359 F.3d 554 (D.C. Cir. 2004) ................................................................ 12

*United States v. Mendoza,*
    464 U.S. 154 (1984) .............................................................................. 14

*Virginia Soc'y for Human Life, Inc. v. FEC,*
    263 F.3d 379 (4th Cir. 2001) ...................................................... 13, 14, 15

*Warth v. Seldin,*
    422 U.S.  490 (1975) .............................................................................. 13

*Wirtz v. Baldor Elec. Co.,*
    337 F.2d 518 (D.C. Cir. 1963) ............................................................... 15

**STATUTES**

5 U.S.C. § 3345 (1988) ............................................................................. 11

5 U.S.C. § 3345 (1994) ............................................................................... 9

5 U.S.C. § 3345(a)(1) .................................................................................. 7

5 U.S.C. § 3345(a)(2) .................................................................................. 7

5 U.S.C. § 3345(a)(3) .................................................................................. 7

5 U.S.C. § 3345(b) ..................................................................................... 11

5 U.S.C. § 3346 (1988) ............................................................................. 11

5 U.S.C. § 3347(a) (1998) ......................................................................... 10

5 U.S.C. § 3347(b) ..................................................................................... 10

5 U.S.C. § 3348 (1982) ............................................................................. 11

5 U.S.C. § 3348 (1994) ............................................................................... 9

5 U.S.C. § 3348(a)(2)(A) ........................................................................... 12

5 U.S.C. § 3348(a)(2)(B) ........................................................................... 12

5 U.S.C. § 3348(d) ..................................................................................... 12

5 U.S.C. § 3348(d)(1) ................................................................................ 12

5 U.S.C. § 3348(d)(2) ................................................................................ 12

5 U.S.C. § 3349a ........................................................................................................ 7

5 U.S.C. § 702 .......................................................................................................... 19

5 U.S.C. § 703 .......................................................................................................... 16

5 U.S.C. § 706(2) ...................................................................................................... 15

6 U.S.C. § 112(a)(3) ................................................................................................. 12

6 U.S.C. § 112(b)(1) ................................................................................................. 12

8 U.S.C. § 1225 .......................................................................................................... 2

8 U.S.C. § 1225(b) ................................................................................................... 17

8 U.S.C. § 1225(b)(1) ......................................................................................... 17, 18

8 U.S.C. § 1225(b)(1)(B)(iv) .................................................................................. 2, 6

8 U.S.C. § 1252 ........................................................................................................ 16

8 U.S.C. § 1252(a)(2)(A) ......................................................................................... 19

8 U.S.C. § 1252(e) ................................................................................................... 19

8 U.S.C. § 1252(e)(1) ............................................................................................... 17

8 U.S.C. § 1252(e)(1)(B) .......................................................................................... 17

8 U.S.C. § 1252(e)(3) ..................................................................................... 17, 18, 19

8 U.S.C. § 1252(f) ............................................................................................... 18, 19

8 U.S.C. § 1252(f)(1) ............................................................................................... 18

8 U.S.C. § 1362 ......................................................................................................... 5, 6

 28 U.S.C. 2342 ........................................................................................................ 17

## FEDERAL REGULATIONS

8 C.F.R. § 208.30(d)(1) .......................................................................................... 2, 4

8 C.F.R. § 208.30(d)(4) ............................................................................................. 5

8 C.F.R. § 235.3(b)(4)(ii) ....................................................................................... 2, 5

## LEGISLATIVE HISTORY

H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) ................................................ 16

*Oversight of the Implementation of the Vacancies Act: Second Session on S.1764 to Amend Sections 3345 through 3349 of the Vacancies Act, Before the S. Comm. on Governmental Affairs,*
105th Cong. 495 (1998) ........................................................................................... 8, 9

S. Rep. No. 105-250 (1998) ....................................................................................... 9, 10

S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945) ......................................................... 16

## OTHER AUTHORITIES

*Department of Energy—Vacancies (42 U.S.C. § 7342)—Vacancy Act (5 U.S.C. §§ 3345-3349)—De Facto Officers,*
2 Op. O.L.C. 113, 115 n.5 (1978) ............................................................................. 11

Letter from Leigh M. Shein, Office of Personnel Management, to Valerie Wills, DOJ
(Dec. 15, 1996) ......................................................................................................... 9

Order No. 2134-97 from the Office of Attorney General (Dec. 15, 1997) ............................... 9, 10

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction,*
131 HARV. L. REV. 417 (2017) ................................................................................. 15

The Federalist No. 78 (Clinton Rossiter ed., 1961) ....................................................... 14

*Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights*
(CRS General Distribution Memorandum, Jan. 14, 1998) .......................................... 9

Victor S. Rezendes, GAO to Sen. Joseph I. Lieberman, *et al.* (Dec. 7, 2001),
https://www.gao.gov/assets/80/75053.pdf ............................................................. 8

## INTRODUCTION

During the course of the preliminary injunction hearing, this Court asked both parties how to resolve Count I of the Complaint, which alleges that the Policies at issue, *see* PI Opp. (Dkt. 17) 8-9, violate the expedited removal statute and its implementing regulations. As demonstrated below, and in the opposition to the preliminary injunction motion, this question is a pure question of law not dependent on any assessment of facts. As a result, Count I must be resolved in favor of the Government, given the plain text of the statute and the regulations. And, in any event, this is a case where deference to the agency's interpretation of its regulations is appropriate.

With respect to Count II of the Complaint, meanwhile, which asserts that the Policies are arbitrary and capricious, the attached Declaration demonstrates that to the best of the agency's knowledge, the only reasons underpinning the Policies being challenged in this lawsuit are the stated reasons in the record. *See* Ex. A.

Moreover, for the reasons previously explained, Mr. Cuccinelli's service as Acting Director of USCIS is consistent with the strictures of the Federal Vacancies Reform Act ("FVRA"). Plaintiffs' proposed construction of the statute imposes an atextual tenure requirement on the service of the first assistant that draws no support from either the text of the FVRA or the historical circumstances surrounding the FVRA's enactment, including the designation of Bill Lann Lee as Acting Assistant Attorney General. Finally, even if the Court were to conclude that Mr. Cuccinelli was invalidly serving, the Directives could be ratified by another official because the authority to issue the Directives is delegable and thus does not meet the FVRA's narrow definition of a "function or duty" of the office of Director.

**ARGUMENT**

I.    **Plaintiffs Cannot Show that USCIS's Guidance Is Inconsistent with Any Statutory or Regulatory Provisions.**

In the midst of oral argument on Plaintiffs' preliminary injunction motion, this Court queried both parties as to how to resolve the issues raised by Count I of the Complaint, *see* Dkt. 1, ¶¶ 194-97, *i.e.*, whether the challenged Policies violate "8 U.S.C. § 1225, and its implementing regulations." *Id.* ¶ 197. The Government submits that this question of "statutory construction" is "a pure question of law" that does not depend on an evidentiary hearing or any factual development. *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005). Specifically, as noted in its opposition to the preliminary injunction motion, the sole question for this Court is whether USCIS interpreted the term "unreasonably delay" in section 1225(b)(1)(B)(iv) in a manner that transgressed the bounds of its statutory authority. PI Opp. 20-21. And, as the Government has demonstrated, the answer to that question is an unequivocal "no."

The single statutory provision at issue provides that "[a]n alien who is eligible" for a credible fear interview "may consult with a person or persons of the alien's choosing prior to the interview ... according to regulations prescribed by the [Secretary]. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); PI Mot. (Dkt. 12) 4. The challenged Policies do not preclude asylum seekers like Plaintiffs from "consult[ing]" "with a person or persons of [their] choosing," *id.*—a fact this case confirms, as multiple Plaintiffs consulted attorneys of their choice, *see* Dkt. 12-3, ¶ 8; Dkt. 12-4, ¶ 24; Dkt. 22-4, ¶¶ 4-5; Dkt. 22-5, ¶ 8—and it is undeniable that the Secretary has promulgated the "regulations" referenced by the statute, as said regulations form the predicate for Plaintiffs' assertions that 8 U.S.C. § 1225(b)(1)(B)(iv) and its implementing regulations were violated. *See, e.g.*, 8 C.F.R. § 208.30(d)(1), 2, (4); 8 C.F.R. § 235.3(b)(4)(ii); PI Mot. 16 ("[T]he

2

[Policy] also separately violates DHS's regulation concerning continuances."). Thus, resolution of Plaintiffs' claim rises and falls entirely with whether the agency's interpretation of the term "unreasonably delay" exceeds its statutory authority. That purely legal question can be resolved in the Government's favor, even if no deference is accorded to the agency's interpretation. *See Baptist Memorial Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 228 (D.C. Cir. 2009). As the Government demonstrated in its opposition to the preliminary injunction motion, neither the statute nor the regulations prescribe a minimum amount of time aliens must be afforded to consult prior to credible fear interviews, PI Opp. 20, neither the statute nor the regulations mandate that continuances be granted, *id.* at 25, and neither the statute nor the regulations require that information pertaining to the credible fear interview be conveyed in a particular manner. *Id.* at 26. There is accordingly no textual basis to conclude that any of the challenged Policies run afoul of either the statute or the implementing regulations, as Plaintiffs have not pointed to any part of the statutory or regulatory scheme evincing that the term "unreasonably delay" categorically compels a ruling setting aside the challenged Policies as unlawful.[1]

In any event, this is a case where *Auer* deference is appropriate, as such "deference retains an important role in construing agency regulations." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019); PI Opp. 21. The July 2, 2019 Memorandum checks all of the boxes necessary for *Auer* deference to apply, specifically: (1) the term "unreasonably delay" is "genuinely ambiguous," PI Opp. 21; (2) the "agency's reading" of the term is, as noted, "within the bounds of reasonable

---

[1] Tellingly, Plaintiffs cursorily address the operative statutory term—"unreasonably delay"—and when they do, they assert, without any support, that "[a] short period of a few hours is inadequate for virtually any asylum seeker." PI Mot. 17. Such an unsubstantiated assertion not only cannot be reconciled with the 24 hours asylum seekers are afforded to consult, which "in practice" amounts to more than 24 hours, AR114-15, but it also does not even attempt to engage with the relevant question: whether the text of the relevant statute or regulations have been violated.

interpretation," because the Policies provide at least 24 hours to consult prior to a credible fear interview and allow for the rescheduling of credible fear interviews if extraordinary circumstances are presented, consistent with the implementing regulations, *see* AR117; (3) the July 2, 2019 Memorandum constitutes "the agency's authoritative or official position,"; (4) the Memorandum likewise "implicate[s]" the agency's "substantive expertise," as "agencies have a nuanced understanding of the regulations they administer,"; and (5) there is no basis to conclude that the Memorandum is any sort of "post hoc rationalization" or "convenient litigating position." *Kisor*, 139 S. Ct. at 2415-18; *see also Mercy General Hosp. v. Azar*, No. 16-99 (RBW), 2019 WL 5269022, at *9-*10 (D.D.C. Oct. 17, 2019). Application of *Auer* deference in this case accordingly requires granting the Government summary judgment on Count I, should this Court decide that it needs to assess the level of deference necessary with respect to this claim.

In their reply brief, Plaintiffs assert that "*Chevron*-style deference" is not appropriate. PI Reply (Dkt. 19) 8. But the Government never took the position that *Chevron* deference was necessary, and instead laid out a methodology showing that *Auer* deference applies because neither "the statute nor the regulation defines the term 'unreasonably delay.'" PI Opp. 21. Thus, Plaintiffs' argument is nothing more than a non-sequitur. Plaintiffs also cursorily assert that *Auer* deference is inapplicable because "the regulation largely paraphrases the statutory language." PI Reply 8. Plaintiffs rely exclusively on *Fogo De Chao (Holdings) Inc. v. DHS*, 769 F.3d 1127, 1135 (D.C. Cir. 2014) for this proposition. *See* PI Reply 8. As that decision makes clear, however, "[n]o deference is due" only when the agency "instead of using its expertise and experience to formulate a regulation" has "elected merely to paraphrase the statutory language." 769 F.3d at 1135. The regulatory scheme at issue is a far cry from the limited set of circumstances addressed in *Fogo De Chao*, as the agency elucidated significant detail as to what the consultation right

4

entails, detail that is noticeably absent from the statute.  This includes: providing that officers have discretion to "reschedule" credible fear interviews if the officer "determines that the alien is unable to participate effectively in the interview because of illness, fatigue, or other impediments," 8 C.F.R. § 208.30(d)(1)—the predicate for Plaintiffs' challenge to the Policy governing the granting of continuances—allowing "asylum officer[s]" "discretion" to allow "person or persons with whom the alien chooses to consult" to "be present at the interview" and "to present a statement at the end of the interview," 8 C.F.R. § 208.30(d)(4), PI Mot. 4, and providing that consultation "shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained."  8 C.F.R. § 235.3(b)(4)(ii).  This is thus quite clearly not a case where "the underlying regulation does little more than restate the terms of the statute itself" because "the agency has left the statute as it found it," *Fogo De Chao*, 769 F.3d at 1135, or where the regulations are merely "parroting regulation[s]."  *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).  Plaintiffs' reply brief is bereft of any support for the proposition that the regulations here simply restate the statutory language without reflecting any of the agency's expertise, for good reason, as precisely the opposite is true.  Moreover, even if *Fogo de Chao* was apposite—which it is not—the D.C. Circuit in that case still found that "deference" was "due" pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  *Fogo de Chao*, 769 F.3d at 1137.  As demonstrated above, the agency's statutory and regulatory interpretation plainly has the "power to persuade," and thus should be sustained even assuming *Skidmore*, instead of *Auer*, applies.  *Id.*

Finally, it bears repeating that the only support Plaintiffs have offered in support of their argument that their statutory and regulatory consultation rights were violated are decisions analyzing an *entirely different* statute: 8 U.S.C. § 1362, which only applies in full, not expedited, removal proceedings.  PI Mot. 13-14; PI Reply 9-10.  The Government has already explained in

detail why 8 U.S.C. § 1362 is an inapt point of comparison and why no right to counsel exists in expedited removal proceedings, PI Opp. 22-23, and the plain text of 8 U.S.C. § 1362 only buttresses that conclusion.  8 U.S.C. § 1362, explicitly titled "Right to counsel" provides that any person in full removal proceedings "shall have the privilege of being represented (at no expense to the Government) by such counsel ... as he shall choose."  Unlike 8 U.S.C. § 1225(b)(1)(B)(iv), which, by its terms, only applies "prior" to a credible fear interview, *id.*, there are no temporal limitations in 8 U.S.C. § 1362, which is why the regulations implementing 8 U.S.C. § 1362 require immigration judges to "advise the respondent" "of his or her right to representation" and "of the availability of free legal services."  *Montes-Lopez v. Holder*, 694 F.3d 1085, 1088 (9th Cir. 2012); *Arroyo v. DHS*, No. SACV 19-815 JGB (SHKx), 2019 WL 2912848, at *17 (C.D. Cal. June 20, 2019) ("The Ninth Circuit characterizes this right [to counsel under 8 U.S.C. § 1362] as 'fundamental.'").  The crucial differences between 8 U.S.C. § 1362 and 8 U.S.C. § 1225(b)(1)(B)(iv), in conjunction with the equally important differences between full and expedited removal proceedings, PI Opp. 22-23, cement the conclusion that the right to counsel conferred by 8 U.S.C. § 1362 is wholly inapposite here.  Plaintiffs further misinterpret the Government's position with respect to the Due Process Clause, which is not that the relevant cases that Plaintiffs rely on arise "solely under the Due Process Clause," PI Reply 9, but rather that the cases Plaintiffs invoke each have a due process component and, accordingly, arose "in the context of claims asserted under the Due Process Clause."  PI Opp. 23.  Plaintiffs' reply brief only serves to underscore this point.  PI Reply 9 n.4.  Because there is no Constitutional component of Plaintiffs' claims, something Plaintiffs do not refute, Plaintiffs can only prevail in this case if they demonstrate that the statutory or regulatory text has been violated.  They have not done so.

If this Court were to disagree with the agency's interpretation, the appropriate remedy with respect to this claim is not, as the Plaintiffs suggest, that "the decisions of" USCIS "should be vacated." *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860 (D.C. Cir. 2012). Instead, this Court should "remand" to the agency to give it an opportunity to "advance reasonable interpretations of the provisions at issue" because "such an interpretation ... is probably achievable." *Id.* at 861; *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (declining to vacate because of the "serious possibility that the [agency] will be able to substantiate its decision on remand").

## II.     To the Best of the Agency's Knowledge, the Only Reasons Underlying the Policies are the Reasons in the Record.

In connection with Plaintiffs' assertions that the Policies are arbitrary and capricious, this Court inquired into whether there were other reasons for the Policies aside from the reasons in the record. As the attached Declaration makes clear, however, to the best of the agency's knowledge, the reasons in the administrative record are the reasons underlying the Policies, and the agency is not aware of any other reasons or justifications for the Policies that Plaintiffs challenge. *See* Ex. A.

## III.    Mr. Cuccinelli is Validly Serving As Acting Director.

Kenneth Cuccinelli is the Acting Director of USCIS. He was validly appointed to the position of Principal Deputy Director of USCIS. Acting Secretary of Homeland Security, Kevin McAleenan, exercised his authority under Department of Homeland Security ("DHS") Delegation No. 0106 to amend the line of succession for the office of Director to designate the Principal Deputy Director of USCIS as the first assistant to the office of Director. By operation of the default rule under the FVRA, 5 U.S.C. § 3345(a)(1), then, Mr. Cuccinelli is required to serve as Acting Director (absent a designation pursuant to subsections (a)(2) and (a)(3)). *See* PI Opp. 27-33.

As explained, that interpretation of the FVRA best accords with the text of the statute.  *See id.*; *see also* 5 U.S.C. § 3349a (resetting 210-day limit for acting service for vacancies that "exist[]" during the 60-day period after presidential transition, thereby permitting new administration to fill preexisting vacancy through post-vacancy appointment).  It also reflects the longstanding views of the Executive Branch, as the Office of Legal Counsel ("OLC"), since its first opportunity to opine on the issue in a formal opinion, has understood the FVRA to permit the acting service of a first assistant who was appointed to that position after the vacancy arose.  *See* PI Opp. 28 & n.5.  Indeed, the Legislative Branch has long been aware of and acquiesced to this understanding of the FVRA.  In particular, the Government Accountability Office—which Plaintiffs have described as "the Legislative Branch's chief watchdog agency," PI Mot. 24—expressly relied on OLC's interpretation of the FVRA when it adopted "the position that a person need not have been in the first assistant position before the vacancy occurs in order to serve as acting officer, unless that person is also nominated for the position."  *See* Letter from Victor S. Rezendes, GAO to Sen. Joseph I. Lieberman, *et al.* (Dec. 7, 2001), https://www.gao.gov/assets/80/75053.pdf; *see also id.* ("Agency heads can name an individual to the first assistant position (if it is not itself a PAS position) after a vacancy has occurred and that person could then act temporarily in the office up to the time limits allowed for acting officers under the [FVRA] . . . .").  Thus, there is nothing in the FVRA that requires a first assistant to be in place prior to the vacancy in order to serve as an acting officer under the FVRA's default rule.

The historical example of Bill Lann Lee's service as Acting Assistant Attorney General ("AAG") for the Department of Justice Civil Rights Division, and similar designations pre-dating the FVRA, does not suggest otherwise.  Mr. Lee's designation occurred under fundamentally distinct circumstances from and pursuant to different claimed authority than Mr. Cuccinelli's.  Mr.

Lee was designated the Acting AAG after the Senate had failed to act on his nomination to the position. *See Oversight of the Implementation of the Vacancies Act: Second Session on S.1764 to Amend Sections 3345 through 3349 of the Vacancies Act, Before the S. Comm. on Governmental Affairs*, 105th Cong. 495 (1998) ("Vacancies Hrg."). At the time, the then-Vacancies Act required acting officials to either be the first assistant to the vacant office or a Senate-confirmed officer, and it limited the term of acting service to the 120-day period following the vacancy. *See* 5 U.S.C. §§ 3345, 3348 (1994). When the Attorney General designated Mr. Lee as Acting AAG, the office had been vacant for nearly a year, with the Deputy AAG—the first assistant to the AAG—already serving as Acting AAG well in excess of the permissible 120 days. *See Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights* (CRS General Distribution Memorandum, Jan. 14, 1998), *reprinted in* Vacancies Hrg. at 68-115.[2]

Prior to the enactment of the FVRA, the Government took the position that the Department of Justice's ("DOJ") organic statute and the Attorney General's general delegation authority enabled the Attorney General to designate acting officers within the Department without complying with the requirements of the Vacancies Act. *See* S. Rep. No. 105-250 at 3 (1998). Consistent with that position, Mr. Lee was appointed as Principal Deputy AAG of the Civil Rights Division, *see* Letter from Leigh M. Shein, Office of Personnel Management, to Valerie Wills, DOJ (Dec. 15, 1996), *reprinted in* Vacancies Hrg. at 110, and then expressly designated by the Attorney General as AAG pursuant to her claimed authority under the Department's organic statute, and *not* the first assistant prong of the Vacancies Act. *See* Order No. 2134-97 from the Office of Attorney

---

[2] Mr. Lee ultimately served more than two years as Acting AAG, while his nomination (which was submitted three times) remained pending. The President would eventually appoint Mr. Lee pursuant to the Recess Appointment power, and he served as AAG for the remainder of the Administration.

General (Dec. 15, 1997), *reprinted in* Vacancies Hrg. at 115 ("By virtue of the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509, 510, 5 U.S.C. § 301, and 21 C.F.R. § 0.132(d), I hereby designate Bill Lann Lee to perform the functions and duties of and to act as Assistant Attorney General in charge of the Civil Rights Division."). Notably, Mr. Lee could not have been designated under the Vacancies Act because the office of AAG had already been vacant in excess of the 120-day limit for acting service. By contrast, resorting to the Department's organic statute allowed the Attorney General not only to avoid the Vacancies Act's time limitation but, indeed, to designate Mr. Lee as Acting AAG indefinitely.

Congress acted to replace the Vacancies Act with the FVRA in reaction to DOJ's position that the Attorney General and certain other Cabinet Secretaries could directly designate acting officials pursuant to their organic statutes to serve in excess of the 120-day limit under the Vacancies Act. *See, e.g.*, S. Rep. No. 105-250 at 5 ("By early in 1998, 64 of 320 advise and consent positions in the executive branch were held by acting officials, 43 of whom had served more than 120 days without a nominee").[3] Congress's response was to enact the FVRA's exclusivity provision to ensure that Departments would not use their organic statutes to designate acting officials instead of the FVRA. *See id*. at 3-5; 5 U.S.C. § 3347(a)-(b) (1998) (providing that,

---

[3] The legislative history confirms that agency use of organic statutes to fill acting positions despite the Vacancies Act time limitations was Congress's primary concern in enacting the FVRA. *See* S. Rep. 105-250 at 3 ("One vacancy had existed for twenty-one months, three were vacant for more than 120 days, and three positions were unfilled for less than 120 days. In at least four instances, positions were filled by an order of the Attorney General designating a person to act in the vacant position"). Notably, the Senate identified Walter Dellinger's year-long service as Acting Solicitor General as problematic, even though he already held the Senate-confirmed position of AAG for the Office of Legal Counsel, which would have otherwise qualified him for service under the Vacancies Act had he not exceeded the 120 day limit. *Id*.; *see also id*. at 6-9 (discussing the D.C. Circuit's decision in *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998), in which President invoked Vacancies Act to designate a Senate-confirmed official as acting officer nearly four years after the vacancy arose).

subject to two exceptions, the FVRA is the "exclusive means for temporarily authorizing an acting official"). The FVRA is thus typically the only basis for a person to become an "acting" official.

Mr. Cuccinelli's temporary designation is both readily distinguishable from Mr. Lee's indefinite designation and fully consistent with Congress's legislative response to that and similar designations. Mr. Cuccinelli is serving as Acting Director under the FVRA's first assistant provision, and, crucially, is subject to its statutory acting-service time limit. Unlike Mr. Lee, Mr. Cuccinelli was not designated as Acting Director after the FVRA's acting-service time limit had lapsed. Unlike Mr. Lee, the Government does not argue that DHS's organic statute gave the Secretary authority to designate Mr. Cuccinelli as Acting Director and thereby skirt the provisions of the FVRA for making someone an acting official. And unlike Mr. Lee—who continued to serve as Acting AAG while his nomination was pending—Mr. Cuccinelli has not been nominated to the office of Director on a permanent basis. *See* 5 U.S.C. § 3345(b) (limiting certain acting officers from continuing to serve as acting officer if his or her nomination is submitted to Senate). In other words, while Congress appears to have intended the FVRA to preclude designations like Mr. Lee's, there is no textual or historical basis to believe that Congress intended to adopt Plaintiffs' much more stringent atextual rule—*i.e.*, a categorical prohibition against first assistants appointed post-vacancy serving as acting officers.[4]

_____

[4] Although the historical record prior to the FVRA's enactment does not reveal a substantial practice of naming post-vacancy first assistants under the Vacancies Act, that outcome is neither surprising nor illuminating given that Act's historical narrowness. The pre-FVRA Vacancies Act applied to far fewer offices than the FVRA, *see* 5 U.S.C. § 3345 (1988) (applying only to "head of an Executive agency . . . or military department"), *id.* § 3346 (1988) (applying to "officer of a bureau . . . whose appointment is not vested in the head of the department"), and, at least until 1988, permitted acting service of only an extremely short duration, *see, e.g., id.* § 3348 (1982) (30 days). Moreover, at times, the Executive Branch took the position that under the Vacancies Act, the first assistant term "appl[ied] only to officials whose appointment has been specifically provided for by statute." *Department of Energy—Vacancies (42 U.S.C. § 7342)—Vacancy Act (5 U.S.C. §§ 3345-3349)—De Facto Officers*, 2 Op. O.L.C. 113, 115 n.5 (1978) (citing prior Attorney

Finally, although Mr. Cuccinelli is properly serving as the Acting Director of USCIS for the reasons discussed above, if the Court were to disagree, then, contrary to Plaintiffs' suggestion, *see* PI Mot. 25, the Directives could be ratified by another official.  Though the FVRA precludes ratification of certain actions by acting officers who were not designated in accordance with the FVRA's requirements, that prohibition applies only to actions "taken . . . in the performance of a[] function or duty of a vacant office."  5 U.S.C. § 3348(d).  For purposes of that prohibition, the FVRA narrowly defines "function or duty" as limited to non-delegable actions that are "required" by statute or regulation to be performed "by the applicable officer (*and only that officer*)."  *Id.* § 3348(a)(2)(A)-(B) (emphasis added); *see also Guedes v. ATF*, 920 F.3d 1, 12 (D.C. Cir. 2019) (describing 5 U.S.C. § 3348(d)(1)-(2) as "only prohibiting the ratification of nondelegable duties" and refusing to reach validity of designation under FVRA because of ratification).  Here, the authority to issue the Directives was plainly delegable and thus ratifiable.  *See* 6 U.S.C. § 112(b)(1) (authorizing Secretary of DHS to delegate "any" of his "functions to any officer" within the Department); *id.* § 112(a)(3) (vesting Secretary of DHS with "[a]ll functions of all officers, employees, and organizational units of the Department); *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.").  Nevertheless, unless and until the Directives are ratified, the Court need not resolve the issue.[5]

---

General opinions).  Finally, as discussed above, the Executive Branch frequently did not rely on the Vacancies Act because it believed that certain department heads had the authority under their respective organic statutes to name acting officers outside of the confines of the Vacancies Act.

[5] Upon further deliberation, the Government rests solely on its arguments on the validity of Mr. Cuccinelli's service under the FVRA and withdraws any other arguments raised at the hearing about other potential sources of authority for Mr. Cuccinelli to issue the Directives.

## IV.    This Court May Not Issue Nationwide Injunctive or Set Aside Relief.

In the event this Court grants summary judgment to Plaintiffs on any of their claims, this Court should not issue nationwide relief, and must limit any relief to the actual parties before this Court.  And even if the Court views relief that benefits non-parties as appropriate in this case, that relief should be limited to vacatur of the challenged Policies, and should not include injunctive relief.

*First*, Article III forecloses such relief. Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.").  Under Article III, where a party's "injury in fact … ha[s] been remedied," to allow the plaintiffs to challenge regulations "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). That rule is especially important here, where plaintiffs do "not represent a class, so they [can] not seek to enjoin [an agency regulation] on the ground that it might cause harm to other parties." *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010).

*Second*, even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity. The rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see, e.g.*, *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.")

(alteration in original; quotation marks omitted)); *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("Preventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]").

Longstanding historical practice confirms that injunctions are limited to what is necessary to remedy the plaintiff's injury.  It is well established that the scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999).  But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (Thomas, J., concurring) (quoting The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).  As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id*. at 2428.  It is thus unsurprising that universal injunctions "are a recent development emerging for the first time in the 1960s and dramatically increasing in popularity only very recently." *Id*. at 2426.

In contravention of these sound principles, universal injunctions create practical problems for the federal courts and federal litigants.  They "prevent[] legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Id.* at 2425; *see United States v. Mendoza*, 464 U.S. 154, 160 (1984) ("Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari.").  They also allow courts and parties to circumvent Federal Rule of Civil Procedure 23, which sets out the prerequisites for certifying a class and for granting relief to such a class.  *See L.A. Haven Hospice*, 638 F.3d at 664 (noting that considerations against

14

nationwide injunctions "appl[y] with special force where," as here, "there is no class certification").   And they create an inequitable "one-way ratchet" under which a loss by the government precludes enforcement of the challenged Policies everywhere, but a victory by the government does not preclude other plaintiffs from "run[ning] off to the 93 other districts for more bites at the apple."  *City of Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., concurring in the judgment in part and dissenting in part), *reh'g en banc granted* (No. 17-2991) (June 4, 2018), *reh'g en banc vacated as moot* (No. 17-2991) (Aug. 10, 2018).

*Third*, the APA does not affirmatively authorize nationwide relief in the form of universal vacatur of the challenged Policies. *Cf. Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). But nothing in section 706(2)'s text specifies whether the Policies, if found invalid, should be set aside on their *face* or *as applied* to the challenger.  In the absence of a clear statement in the APA that it displaces traditional rules of equity, the court should adopt the narrower reading of the "set aside" language. *See Va. Soc'y for Human Life*, 263 F.3d at 393 ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power.").  The historical backdrop to the APA's enactment lends further support to this reading.  The absence of nationwide injunctions prior to Congress's enactment of the APA in 1946 (and for over fifteen years thereafter) suggests that the APA was not originally understood to authorize courts to issue such broad relief.  *See* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 438 & n.121 (2017) (noting that the first nationwide injunction issued in the U.S. occurred in 1963 in *Wirtz v. Baldor Electric Company*, 337 F.2d 518 (D.C. Cir. 1963)).  Indeed, the APA further provides that in the absence of a special statutory review provision, the proper "form of

proceeding" under the APA is a traditional suit for declaratory or injunctive relief. *See* 5 U.S.C. § 703. But declaratory and injunctive remedies are equitable in nature, and, as discussed, equitable relief traditionally has been limited to determining the rights of the parties before the court.[6] *See supra* 14-15. And the APA's very reference to actions for "declaratory judgments" makes clear that no injunction—much less a nationwide injunction—is in any sense compelled by the APA when agency action is held unlawful. *See* H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) (referring to possibility of suits for declaratory relief to "determine the validity or application of a rule or order"); *see also* S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945).

*Fourth*, even assuming the APA might provide for universal relief, section 702 provides that "[n]othing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." As Defendants have explained, PI Opp. 45, 8 U.S.C. § 1252 "forbids" the universal relief Plaintiffs seek.

---

[6] Defendants acknowledge that *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998) holds that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual [plaintiffs] is proscribed." However, as explained *infra*, the specific INA provisions limiting the Court's authority to enter universal relief distinguish this case from *Nat'l Mining Ass'n*. Moreover, even on its own terms, *Nat'l Mining Ass'n* does not authorize *injunctive* relief, but is limited to *vacatur*. Indeed, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur," *Monsanto*, 561 U.S. at 165, a showing Plaintiffs cannot make here where they do "not represent a class," *id.* at 163, and where Plaintiffs present no evidence that the government would not comply with an order of vacatur. *Cf. O.A. v. Trump*, No. CV 18-2718 (RDM), 2019 WL 3536334, at *29 (D.D.C. Aug. 2, 2019) (concluding, even in a class action case not involving some of the jurisdictional provisions at issue in this case, that vacatur was sufficient, and no basis for injunctive relief existed).

To begin, section 1252 forecloses the Plaintiffs from seeking universal "set aside" relief as to the application of the Policies in expedited removal proceedings.  Section 1252(e)(1) provides that "no court may—(A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title *except as specifically authorized in a subsequent paragraph of this subsection*." (Emphasis added).  As to section 1252(e)(3), the sole remedy authorized is a "determination[]" on the merits of "whether [section 1225(b)], or any regulation issued to implement such section, is constitutional" or "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General [or Secretary] to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law."  Such a "determination" is the only form of "declaratory" relief specifically authorized by section 1252(e)(3).  But even if section 1252(e)(3) could be understood to authorize vacatur of a regulation a court found invalid as a form of "other equitable relief," the word "determination" would not ordinarily connote injunctive relief, and had Congress intended otherwise it would have used language like that in the Hobbs Act, explicitly empowering a court "to *enjoin* . . . the validity of" agency orders.  28 U.S.C. § 2342 (emphasis added).

Furthermore, section 1252(e)(1)(B) prohibits "certify[ing] a class under Rule 23."  As the D.C. Circuit has explained, that means Congress did not "intend[] to permit actions on behalf of a still wider group of aliens, actions in which no class representative appears as a party and the plaintiffs are unconstrained by the requirements of [Rule] 23."  *Am. Immigration Lawyers Association v. Reno ("AILA")*, 199 F.3d 1352, 1364 (D.C. Cir. 2000).  But universal injunctive or declaratory relief like that sought by Plaintiffs would produce the same result that Congress foreclosed, benefitting hundreds of thousands of aliens "none of whom are parties to the lawsuit,"

and "unconstrained by the requirements" of Rule 23.  *Id*. at 1364.  Such an order would also be

prohibited by 8 U.S.C. § 1252(f), which provides that "no court (other than the Supreme Court)

shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1231],

other than with respect to the application of such provisions to an individual alien against whom

proceedings ... have been initiated."  *See AILA*, 199 F.3d at 1359 (noting applicability of section

1252(f)(1) in suits under section 1252(e)(3)).  Universal set aside relief would do precisely what

section 1252(f)(1) forbids, by mandating or barring the use of requirements and standards for

future expedited removal proceedings found nowhere in 8 U.S.C. § 1225(b)(1)'s text on behalf of

"alien[s] against whom proceedings … have [not yet] been initiated," 8 U.S.C. § 1252(f)(1), and

therefore would enjoin or restrain operation of section 1225(b)(1) as written.  *See Hamama v.*

*Adducci*, 912 F.3d 869, 879-80 (6th Cir. 2018).  Here, the Plaintiffs ask this Court not only to

enjoin application of the Policies as to them in their ongoing expedited removal proceedings, but

to set aside the Policies as applied to all aliens, now, and in the future, who may be subject to it.

They thus seek to enjoin the Policies far beyond the statute's limitations on relief as limited "to

the application of [the INA] to an individual alien against whom proceedings . . . have been

initiated." 8 U.S.C. § 1252(f)(1).  But using an injunction or set aside relief to re-write the statute

to include additional statutory requirements limitations on the government's authority "that [do]

not exist in the statute" is precisely what section 1252(f) forecloses.  *Hamama*, 912 F.3d at 879–

80; *see Perez v. Decker*, No. 18-CV-10683 (AJN), 2019 WL 4784950, at *6 (S.D.N.Y. Sept. 30,

2019) ("Because Congress, in its judgment, chose not to mandate" the relief plaintiffs seek, "an

injunction imposing" such a statutory requirement "where the statute is silent would displace that

judgment in a way that would enjoin or restrain the method or manner of Section 1229[]'s functioning.").[7]

To the extent Plaintiffs might suggest that sections 1252(e)(3) and (f) do not apply because they do not override traditional understandings of what is supposed to happen when a federal court invalidates an agency rule under the APA, they are mistaken.   Section 1252(a)(2)(A) unambiguously provides that "[n]otwithstanding any other provision of law (statutory or nonstatutory), ... no court shall have jurisdiction" over matters "relating to section 1225(b)(1)" other than "as provided in subsection (e)."   And Section 1252(f) separately provides that "regardless of the nature of the action or claim," no court "other than the Supreme Court," may issue an injunction with respect to section 1225(b) other than with respect to individual aliens in actual removal proceedings.   The "notwithstanding any other provision of law" and "[r]egardless of the nature of action or claim" clauses encompass *any* statute or claim, including an APA claim. A contrary conclusion is also at odds with the settled rule that Congress can curtail the jurisdiction and equitable authority of the lower federal courts, and has done so here unambiguously by enacting sections 1252(e) and (f).   *See Bowles v. Russell*, 551 U.S. 205, 211 (2007) ("[o]nly Congress may determine a lower federal court's subject-matter jurisdiction").   And as noted, Congress preserved precisely that rule in the APA.  *See* 5 U.S.C. § 702.

*Fifth*, even assuming that the organizational plaintiff Refugee and Immigration Center for Education and Legal Services (RAICES) has a cause of action to challenge the Policies, which the

---

[7] To the extent Plaintiffs might suggest that a nationwide remedy is necessary in order to provide uniformity to immigration laws, the foregoing discussion of section 1252 makes clear Congress thought otherwise.  In any event, even without section 1252, the fact that a case arises in the "immigration context" does not, absent the requisite showing that nationwide relief is the only way to remedy Plaintiffs' harms, warrant such relief. *See East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019); *accord City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1243–45 (9th Cir. 2018).

Government contends it does not, *see* PI Opp. 12-14, as another Court in this District has recognized, it is unlikely that the diversion-of-resources injuries alleged by RAICES is the type of injury "that can warrant emergency [nationwide] relief." *Capital Area Immigrants' Rights Coal. v. Trump*, No. 1:19-CV-02117-TJK, 2019 WL 3436501, at *2 (D.D.C. July 24, 2019).  Those same concerns are no different on summary judgment: "the public interest is served by the government being able to conduct its administration of its immigration laws in the lawful ways it sees fit," *id.* at *4, and because "set aside" relief, like injunctive or declaratory relief, is equitable in nature, *see supra* at 15, any such relief with respect to RAICES should accordingly be limited.  Thus, should the Court believe that RAICES otherwise carries its burden of demonstrating entitlement to summary judgment, relief should be limited to the bona fide clients of RAICES that Plaintiffs affirmatively identify for the Court.

## CONCLUSION

For these reasons, the Court should deny the motion for a preliminary injunction and grant the Government partial summary judgment.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
ASSISTANT DIRECTOR

By: */s/ Archith Ramkumar*
ARCHITH RAMKUMAR
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Tel: (202) 598-8060
Email: Archith.Ramkumar@usdoj.gov

Dated: December 17, 2019                    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2019, I electronically filed the foregoing document with the Clerk of the Court for the United States Court District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Archith Ramkumar*
ARCHITH RAMKUMAR
Trial Attorney
United States Department of Justice
Civil Division