## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

L.M.-M., *et al.*,

        *Plaintiffs*,

    v.

KENNETH T. CUCCINELLI II, in his
purported official capacity as acting Director
of U.S. Citizenship and Immigration Services,
*et al.*,

      *Defendants.*

Civil Action No. 19-2676 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

Under the Appointments Clause of Article II of the Constitution, the President must

obtain "the Advice and Consent of the Senate" before appointing any principal officer of the

United States and, unless Congress vests the appointment power in the President, a court, or a

department head alone, before appointing any inferior officer as well.  U.S. Const., Art. II, § 2,

cl. 2.  This requirement is "more than a matter of 'etiquette or protocol'; it is among the

significant structural safeguards of the constitutional scheme."  *Edmond v. United States*, 520

U.S. 651, 659 (1997) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125 (1976) (per curiam)).  By

dividing authority between the President and the Senate, the Appointments Clause serves as a

check on both branches of government and a means of "promot[ing] . . . judicious choice[s] of

[persons] for filling the offices of the union."  The Federalist No. 76, at 454–59 (C. Rossiter ed.

1961) (A. Hamilton).  "The constitutional process of Presidential appointment and Senate

confirmation, however, can take time," raising the prospect that the duties and functions assigned

to an office requiring Presidential appointment and Senate confirmation (referred to as a "PAS"

office) can go unperformed if the President and Senate "cannot promptly agree on a replacement." *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 934–35 (2017).  Recognizing this reality, Congress has, since the early days of the Republic, authorized "the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation." *Id.* at 934.

The Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3345 *et seq.*, represents the "latest version of that authorization." *SW General, Inc.*, 137 S. Ct. at 934.  Subject to exceptions not relevant here, it sets forth the exclusive means of temporarily filling vacancies in PAS offices.  The default rule under the FVRA is that the "first assistant" to the vacant office automatically serves as the acting official when a vacancy arises.  5 U.S.C. § 3345(a)(1).  That default rule applies unless the President, and only the President, directs that (1) a person who has been confirmed by the Senate to serve in another PAS office or (2) an officer or employee of the agency in question, who has worked for that agency in a senior position for at least 90 of the 365 days preceding the vacancy, "perform the functions and duties of the vacant office temporarily in an acting capacity." *Id.* § 3345(a)(2) and (3).  The question presented in this case is whether the acting Director of the United States Citizenship and Immigration Services ("USCIS"), Kenneth Cuccinelli II, was appointed in conformity with the FVRA.

The relevant events began on June 1, 2019, when Lee Francis Cissna, the Senate-confirmed Director of USCIS, resigned, and, as the FVRA prescribes, his "first assistant," Deputy Director Mark Koumans, automatically assumed the post of acting Director.  *See* Dkt. 22-1 at 14 (Pls.' SUMF ¶¶ 81–84); Dkt. 17-2 at 5–7, 12 (USCIS order of succession); Dkt. 12-6 at 2 (Monk Decl. ¶ 6).  Koumans's tenure, however, was short-lived.  Nine days after Director Cissna's resignation, the then-serving acting Secretary of the Department of Homeland Security,

Kevin McAleenan, appointed Cuccinelli "to serve as the Principal Deputy Director of [USCIS]," Dkt. 17-4 at 5 (Blackwell Decl., Ex. 1), a position that did not exist prior to Cuccinelli's appointment, *see* Dkt. 17-2 at 12 (Johnson Decl., Ex. 1 at D-1).  That same day, acting Secretary McAleenan also revised USCIS's order of succession, designating the newly created position of Principal Deputy Director as "the First Assistant and most senior successor to the Director of USCIS."  Dkt. 17-4 at 7 (Blackwell Decl., Ex. 2).  These two changes—both of which occurred after the vacancy arose—allowed Cuccinelli to leapfrog Koumans to become USCIS's acting Director.

But neither of these changes was designed to endure.  Acting Secretary McAleenan specified that Cuccinelli's appointment as Principal Deputy Director "will remain in effect until the earlier to occur of (1) the appointment of a Director of USCIS by the President of the United States, or (2) the express revocation of this appointment."  *Id.* at 5 (Blackwell Decl., Ex. 1).  And acting Secretary McAleenan specified that the revised order of succession, which re-designated the Principal Deputy Director position as the "first assistant" to the Director, "will terminate automatically, without further action, upon the appointment of a new Director of USCIS by the President."  *Id.* at 7 (Blackwell Decl., Ex.2).  In other words, as soon as the vacant office is filled, the status quo will be restored.

On July 2, 2019, three weeks after assuming his new office, Cuccinelli issued a memorandum announcing a revised policy for scheduling credible-fear interviews in expedited removal proceedings.  AR 113.  Under the revised policy, USCIS (1) reduced the time allotted for asylum seekers to consult with others prior to their credible-fear interviews from 72 or 48 hours to "one full calendar day from the date of arrival at a detention facility," AR 113 ("reduced-time-to-consult directive"), and (2) prohibited asylum officers from granting asylum

seekers extensions of time to prepare for their credible-fear interviews, "except in the most extraordinary of circumstances," *id.*; *see also* AR 114 ("prohibition-on-extensions directive"). Although not reflected in the memorandum, Plaintiffs assert that Cuccinelli also cancelled "[t]he in-person [legal] orientation process that was" previously "in place" at the Dilley Detention Center in Dilley, Texas.  Dkt. 12-2 at 3–4 (Fluharty Decl. ¶¶ 6–7) ("in-person-orientation directive").  Before its cancellation, according to Plaintiffs, that policy "allowed asylum seekers to ask questions about their legal rights, provided the only means of transmitting information to asylum seekers who cannot read, and facilitated understanding for asylum seekers with special needs, including disabilities or competency issues."  Dkt. 12 at 18; *see also* Dkt. 12-2 at 3–4 (Fluharty Decl. ¶¶ 6–7).  Taken together, Plaintiffs refer to these revised policies as the "Asylum Directives."

Plaintiffs, five individual native Honduran asylum seekers (two adults and three of their minor children) and the Refugee and Immigrant Center for Education and Legal Services ("RAICES"), a nonprofit organization that provides legal services to refugees, challenge the lawfulness of the Asylum Directives on multiple grounds.  First, they allege that Cuccinelli was not lawfully appointed to serve as the acting Director of USCIS and that, as a result, the Asylum Directives must be set aside under the Appointments Clause, the FVRA, 5 U.S.C. § 3348(d)(1), the Administrative Procedure Act ("APA"), 5 U.S.C. §706(2)(A), and as *ultra vires*.  Dkt. 1 at 63–68 (Compl. ¶¶ 225–36).  Second, they allege that the Asylum Directives themselves are inconsistent with various statutory and regulatory requirements, including an asylum applicant's statutory right to "consult with a person or persons of the alien's choosing prior to the [credible-fear] interview," 8 U.S.C. § 1225(b)(1)(B)(iv), and the regulatory authority of asylum officers freely to reschedule credible-fear interviews whenever the asylum seeker "is unable to participate

4

effectively . . . because of illness, fatigue, or other impediments," 8 C.F.R. § 208.30(d)(1).  Dkt. 1 at 57–58 (Compl. ¶¶ 194–97).  Third, they contend that the Asylum Directives are arbitrary and capricious because USCIS failed to consider how the Directives harm asylum seekers, acted based on "animus toward immigrants" and failed to provide an adequate justification for the policy changes.  *Id.* at 58–59 (Compl. ¶¶ 198–204).  Fourth, they further allege that USCIS failed to comply with the APA's notice-and-comment and advanced-notice requirements.  *Id.* at 59–60 (Compl. ¶¶ 207–08).  Fifth, Plaintiffs maintain that the Asylum Directives discriminate against asylum seekers with "trauma-related and other mental impairments" in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.  Id.* at 60–62 (Compl. ¶¶ 209–18).  Finally, they allege that the Asylum Directives violate the First Amendment by interfering with the ability of the individual Plaintiffs and RAICES "to communicate and [to] associate" with one another regarding the individual Plaintiffs' legal rights.  *Id.* at 62–63 (Compl. ¶¶ 219–23).

As explained below, the Court is satisfied that at least one Plaintiff has Article III standing and that the Court has statutory jurisdiction over Plaintiffs' challenges to the reduced-time-to-consult and prohibition-on-extensions directives.  The Court is not persuaded, however, that it has statutory jurisdiction over Plaintiffs' challenge to the in-person-orientation directive.  On the merits, the Court concludes that Cuccinelli was not lawfully appointed to serve as acting Director and that, as a result, he lacked authority to issue the reduced-time-to-consult and prohibition-on-extensions directives.  The remedy for that deficiency, moreover, is compelled by the FVRA and the APA: the Asylum Directives must be set aside.  Finally, having reached that conclusion, the Court need not—and does not—reach Plaintiffs' alternative legal challenges.

# I. BACKGROUND

## A.     The Expedited Removal System

Congress first introduced the concept of expedited removal when it enacted the Illegal

Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996.  Pub. L. No. 104-

208, Div. C, 110 Stat. 3009–546, 3009 (1996) (codified as amended in scattered sections of 8

U.S.C.).  Expedited removal procedures allow the Department of Homeland Security ("the

Department") to remove a subset of aliens—those arriving at the border and those who recently

entered the United States without inspection—with considerably less process than the formal

proceedings required to remove other aliens.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).  IIRIRA, in

particular, authorizes the Department to remove aliens subject to expedited removal procedures

"without further hearing or review[.]"  *Id.*  If an alien subject to expedited removal "indicates

either an intention to apply for asylum . . . or a fear of persecution," however, then the

immigration officer is required to "refer the alien for an interview by an asylum officer," *id.*

§ 1225(b)(1)(A)(ii), who must determine whether the alien has a "credible fear of persecution,"

*id.* § 1225(b)(1)(B).

IIRIRA sets out procedures that are to be used when an alien is referred to an asylum

officer for a credible-fear interview.  The alien must be "provide[d] [with] information

concerning the asylum interview" and must be allowed to "consult with a person or persons of

the alien's choosing prior to the interview," although "[s]uch consultation shall be at no expense

to the Government and shall not unreasonably delay the process."  *Id.* § 1225(b)(1)(B)(iv).  If the

asylum officer determines that the alien has a credible fear of persecution, "the alien [is] detained

for further consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and is typically

placed in formal removal proceedings.  If the asylum officer determines that the alien does not

have a credible fear of persecution, "the officer shall order the alien removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

USCIS oversees credible-fear interviews. Although the now-defunct Immigration and Naturalization Service ("INS") once oversaw asylum applications, *see, e.g.*, U.S. Department of Justice, Immigration and Naturalization, Asylum, 39 Fed. Reg. 41,832 (Dec. 3, 1974), the "functions" of adjudicating "asylum and refugee applications" and of "establish[ing] the policies for performing [that] function" were transferred to the Director of USCIS by the Homeland Security Act of 2002, Pub. L. No. 107-296, Subtitle E, 116 Stat. 2195 (codified at 6 U.S.C. § 271 *et seq.*), 6 U.S.C. § 271(a)(3)(A) and (b)(3). Consistent with those authorities, the USCIS Director establishes policies for processing aliens that have been referred to USCIS for a credible-fear determination. *See, e.g.*, USCIS, Policy Memorandum, Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with *Matter of A-B-* (July 11, 2018), available at https://tinyurl.com/y6xt6j8l (last accessed March 1, 2020).

**B.     Cuccinelli's Appointment**

On June 1, 2019, Lee Francis Cissna resigned as Director of USCIS, creating a vacancy in that PAS position. Dkt. 22-1 at 14 (Pls.' SUMF ¶ 81); Dkt. 26 at 2 (Response to Pls.' SUMF). Under USCIS's order of succession at the time, Deputy Director Mark Koumans served as the Director's "first assistant" and thus, pursuant to the FVRA's default rule, automatically became the acting Director. Dkt. 12-6 at 13 (Monk Decl., Ex. 4). A few days later, on June 6, 2019, the Department's Office of Human Capital & Training sent Kenneth Cuccinelli II a letter "[c]ongratulat[ing] [him] on [his] noncareer Senior Executive Service (SES) appointment as Principal Deputy Director, ES-0301, U.S. Citizenship and Immigration Service," effective on June 10, 2019. Dkt. 17-3 at 5 (Monroe Decl., Ex. 1). Prior to his appointment to that position,

Cuccinelli had never been employed by the federal government.  Dkt. 12-6 at 9 (Monk Decl., Ex. 2).  Although not stated in the letter, it is undisputed that the Principal Deputy Director position did not exist prior to Cuccinelli's appointment.  Dkt. 22-1 at 14 (Pls.' SUMF ¶ 85); Dkt. 26 at 2 (Response to Pls.' SUMF).  Consistent with the Department's letter, on June 10, 2019, then-acting Secretary McAleenan appointed Cuccinelli "to serve as the Principal Deputy Director of [USCIS]."  Dkt. 17-4 at 5 (Blackwell Decl., Ex. 1).  The appointment will expire without further action upon "the appointment of a Director of USCIS by the President of the United States."  *Id.*

On the same day as Cuccinelli's appointment, acting Secretary McAleenan also issued a memorandum entitled "Amendment to the Order of Succession for [USCIS]."  *Id.* at 7 (Blackwell Decl. Ex. 2).  The memorandum consists of a single paragraph, which provides as follows:

> Pursuant to Paragraph II.K of Department of Homeland Security . . . Delegation No. 0106, *DHS Orders of Succession and Delegations of Authority for Named Positions* (last updated on April 10, 2019), I am exercising my reserved right to re-designate the order of succession for [USCIS] . . . .  I hereby designate the Principal Deputy Director of USCIS as the First Assistant and most senior successor to the Director of USCIS in such order of succession.  Annex D of DHS Delegation No. 0106 is hereby modified in accordance with this designation.  This designation, and the corresponding modification to Annex D of DHS Delegation No. 0106, will terminate automatically, without further action, upon the appointment of a new Director of USCIS by the President.  I reserve the right to amend or revoke this designation and such modification at any time.

*Id.* at 7 (Blackwell Decl. Ex. 2).  The acting Secretary thus designated the newly created position of Principal Deputy Director as the "first assistant" to the Director for purposes of the FVRA, *see* Dkt. 17-2 at 5–6, 12 (Johnson Decl., Ex. 1), but only until the appointment of a new Director of USCIS by the President, Dkt. 17-4 at 7 (Blackwell Decl., Ex. 2).  As a result, on the first day Cuccinelli reported to USCIS for work, he displaced Deputy Director Koumans as the acting Director.  *See* Dkt. 12-6 at 9 (Monk Decl., Ex. 2).  That appointment—and the parallel

designation—will expire when the vacant office is filled.  Dkt. 17-4 at 5 (Blackwell Decl., Ex. 1); *id.* at 7 (Blackwell Decl. Ex. 2).

## C.       The Asylum Directives

On July 2, 2019, Cuccinelli sent the acting Secretary of Homeland Security a memorandum notifying him that, "effective July 8, 2019, USCIS [1] is reducing the credible fear . . . consultation period to one full calendar day from the date of arrival at the detention facility . . . and [2] will deny requests for extensions, as unreasonably delaying the process, except in the most extraordinary circumstances."  AR 113.  The memorandum explained that the Immigration and National Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1101 *et seq.*), provides asylum seekers "in the credible fear process" the right "to consult with a person(s) of their choosing, as long as the consultation is at no expense to the government and does not unreasonably delay the process."  AR 113.  Under the pre-existing policy, those held at Family Residential Centers ("FRCs") were "given 72 hours after arrival at the facility and re-orientation by USCIS to seek and receive consultation," and at all other detention facilities, "single adults [were] generally not interviewed until at least 48 hours after arrival at the detention facility in order to [be able to] seek and receive consultation before the interview [took] place."  *Id.*

According to the memorandum, Cuccinelli decided to reduce the credible-fear consultation period, and to limit the availability of extensions to only "the most extraordinary circumstances," for two reasons.  *Id.*  First, he explained that USCIS had recently "completed revisions to [its] Form M-444, *Information About Credible Fear Interview*," AR 113–14.  USCIS gives that form to detainees upon their arrival at a detention facility to comply with its statutory and regulatory obligations to provide asylum seekers subject to expedited removal with

"information concerning the asylum interview."  8 U.S.C. § 1225(b)(1)(B)(iv); 8 CFR

§ 208.30(d)(2); 6 U.S.C. § 271(b)(3) (transferring to the Director responsibility for the function

of adjudicating asylum applications).  By "using plain language principles in order to provide

greater clarity to the alien during the consultation process," AR 113–14, Cuccinelli explained,

the revised M-444 form "makes the [credible-fear] process easier for aliens to understand," and

thus justifies a shortened consultation period, AR 114.  Second, the memorandum asserted,

without elaboration, that the policy shifts were also justified because "USCIS must do its part to

ensure the processing of aliens is not unduly delayed in light of the situation at the Southwest

Border."  AR 114.  The memorandum's concluding paragraph, repeated both rationales, stating:

> Given the critical need [at the Southwestern border], coupled with the
> improvements made to the M-444[,] which makes the [credible-fear] process
> easier for aliens to understand, [the acting USCIS Director has] decided to
> reduce the timeframe for consultation to one full calendar day at both the FRCs
> and all other facilities.  In practice, this means individuals will have longer than
> 24 hours to consult depending on when they arrive at the facility.  Reducing the
> time period for consultation could lead to longer delays at a later point in the
> process for some cases, as USCIS may receive more frequent requests to
> reschedule interviews.  However, USCIS is also establishing a new policy of
> requiring extraordinary circumstances warranting approval of a request to
> reschedule so that USCIS can ensure, consistent with the statute, that the
> consultation period does not unreasonably delay the overall process.

AR 114.

On July 8, 2019, USCIS updated its "Credible Fear Procedures Manual" to reflect the

policy changes announced in the memorandum.  AR 115–17.  The updated manual notes that it is

now the policy of "the Asylum Program to allow a minimum of one full calendar day to transpire

between the arrival of an alien at a detention site or receipt of initial M-444 (whichever is later)

and any credible[-]fear interview."  AR 117.  It further states that "[i]f USCIS is prepared to

proceed with the interview after the consultation period has passed, asylum offices normally will

deny requests for extensions of the consultation period, . . . except in extraordinary

circumstances."  *Id.*  Finally, the updated manual notes that "[e]xtraordinary circumstances may include, but are not limited to, serious illness or mental or physical disability of the alien, a member of the alien's immediate family, or the alien's consultant, and facility issues that prevent the alien from contacting a consultant."  AR 117.

Although not memorialized in the memorandum, or in any other written policy produced in this litigation, Plaintiffs offer evidence that Cuccinelli adopted a third, significant change in policy relating to the ability of asylum seekers to prepare for their credible-fear interviews.  Prior to issuance of the memorandum, "USCIS officials at [the Dilley Detention Center in South Texas] would provide an oral, in-person legal orientation, which allowed asylum seekers to ask questions about their legal rights."  Dkt. 12-2 at 3 (Fluharty Decl. ¶ 6).  As part of that process:

> [M]others and their minor children watched a video that explained the nature and purpose of the credible[-]fear interview . . . and sat down individually with an asylum officer who: (1) provided them with a written copy of Form M-444, (2) asked them if they had any questions regarding the interview process, (3) confirmed which language they speak and understand best, (4) confirmed whether the family prefers to speak with a male or female officer, and (5) provided the family with two copies of Form G-56, which indicated the day and time their interview would take place.

*Id.*  According to Plaintiffs, that process "has now been canceled."  *Id.* (Fluharty Decl. ¶ 7).

## D.    Plaintiffs

Plaintiff L.M.-M. is a Honduran national who, along with her two minor children, Plaintiffs B.M.-M. and V.M.-M, is "currently seeking asylum in the United States."  Dkt. 12-3 at 1 (L.M.-M. Decl. ¶ 1).  She attests that she fled Honduras because she has been "targeted by the Honduran government" due to her "political opinion" and "because [her] partner and the father of [her] youngest child beat [and] raped" her, "hit [her] daughters," "threatened to harm [her] if [she] ever left him, and when [she] did leave him, . . . continued to pursue and threaten [her]."  *Id.* at 1–2 (L.M.-M. Decl. ¶ 2).  On August 10, 2019, L.M.-M. and her daughters entered the

United States and soon thereafter were detained and placed in expedited removal proceedings. *Id.* at 2 (L.M.-M. Decl. ¶ 4).

L.M.-M. and her daughters were detained at two separate facilities before they were transferred to the USCIS "detention center in Dilley, Texas on August 13, 2019." *Id.*  The day after they arrived, L.M.-M. attended a "Know Your Rights presentation" and spoke with a legal assistant from the Dilley Pro Bono Project for less than an hour.  *Id.* at 3 (L.M.-M. Decl. ¶ 8). She continued to confer with the legal assistant for about forty-five minutes after dinner, but her appointment was cut short by the guards before she "finished discussing [her] case."  *Id.* at 3–4 (L.M.-M. Decl. ¶ 8).  That same evening, she was given a "piece of paper" that said she had a meeting scheduled "in the asylum building" at 10:00 a.m. the next morning.  *Id.* at 4 (L.M.-M. Decl. ¶ 9).  The paper "did not explain what [her] appointment would be about or any other information about the credible[-]fear process."  *Id.*

L.M.-M. attests that, at her credible-fear interview the next day, she "was unable to talk about [her] fear of [her] abusive partner."  *Id.* at 4 (L.M.-M. Decl. ¶ 10).  She also avers that she "was worn out and tired from the exhaustive intake process the day before as well as the many other appointments and meetings [she] had to attend."  *Id.*  The interviewer determined that L.M.-M. did not have a credible fear of persecution, and that determination was "subsequently affirmed by an Immigration Judge."  Dkt. 22-1 at 23 (Pls.' SUMF ¶ 151) (citing Dkt. 22-4 at 1 (Supp. L.M.-M. Decl. ¶ 2)).  L.M.-M. and her children are currently subject to orders of expedited removal.  *See id.*

Like L.M.-M., Plaintiff M.A.-H. is a Honduran national who, along with her minor daughter, Plaintiff I.M.-A., is seeking asylum in the United States.  Dkt. 12-4 at 1 (M.A.-H. Decl. ¶ 1).  Plaintiff M.A.-H. attests that she "suffered persecution in Honduras" because she supports

the "National Party in Honduras;" that she endured "sexual abuse, rape, and physical abuse" while in Honduras; and that she feared that her daughter, who "ha[d] been stalked by . . . MS-13 [gang] members,"[1] "would soon be kidnapped, drugged, and raped" in Honduras. *Id.* at 1–3 (M.A.-H. Decl. ¶¶ 3–9). Upon entering the United States, she and her daughter were detained by immigration officials, placed in expedited removal proceedings, and then transferred to the Dilley Detention Center. *Id.* at 5–6 (M.A.-H. Decl. ¶¶ 16, 22).

M.A.-H. and her daughter "arrived at Dilley on August 21 at 4:00 p.m." *Id.* at 6 (M.A.-H. Decl. ¶ 22). She received neither an M-444 form nor an in-person legal orientation. *Id.* USCIS officials did give her some "documents to sign," which they assured her "were not legal documents." *Id.* She signed the documents even though she was unable to read them, and, because the USCIS officials did not explain what the documents were, she did not understand what she was signing. *Id.* The next day she attended an orientation about the facility, received a medical examination, and sought a legal appointment—but there were no remaining appointments available that day. *Id.* at 6–7 (M.A.-H. Decl. ¶ 23). "[A]round 7:00 pm that night," M.A.-H received a notice informing her that her credible-fear interview would take place at "8:00 am the next morning." *Id.* at 7 (M.A.-H. Decl. ¶ 23). At 7:30 a.m., M.A.-H. went to look for a lawyer, but when she found one, the lawyer told her that there was insufficient "time to prepare [for her credible-fear interview] and that [she] should go and ask for more time in order to obtain legal orientation." *Id.* (M.A.-H. Decl. ¶ 24). M.A.-H. requested "additional time to prepare and "was given 30 minutes." *Id.* (M.A.-H. Decl. ¶ 25). She then returned to the lawyer, who advised her to request 24 hours to prepare, but the asylum officer denied that request and pressed forward with the interview. *Id.* In addition to being denied the opportunity

---

[1] MS-13 is a transnational criminal organization. *See* Dkt. 12 at 44.

to prepare or to substantively consult with counsel, the short turnaround time between arriving at Dilley and her credible-fear interview prevented M.A.-H. from "sp[eaking] with [her] brother[] or son," both of whom had "additional information that would have helped [her] explain the circumstances that caused [her] fear and . . . [her] need to leave" Honduras.  *Id.* (M.A.-H. Decl. ¶ 24).

Asylum officers determined that M.A.-H. and her minor daughter did not have a credible fear of persecution, and an Immigration Judge affirmed those determinations.  Dkt. 22-1 at 27 (Pls.' SUMF ¶ 188) (citing Dkt. 22-5 (Supp. M.A.-H. Decl. ¶ 13)).  As a result, like L.M.-M. and her children, M.A.-H. and her daughter are subject to orders of expedited removal.[2]  *See id.* M.A.-H. attests that, due to the Asylum Directives, she did not have an adequate opportunity to prepare for her credible-fear interview and that, with additional time to consult, she "would have understood the process better" and "would have been in a better position to describe the threats facing [her] daughter" and the abuse that she herself had suffered.  Dkt. 12-4 at 8 (M.A.-H. Decl. ¶ 26).

Plaintiff "RAICES is a . . . non-profit organization headquartered in San Antonio, Texas." Dkt. 12-5 at 2 (Meza Decl. ¶ 3).  Its stated "mission is to defend the rights of immigrants and refugees, empower individuals, families and communities, and advocate for liberty and justice." *Id.* (Meza Decl. ¶ 4).  Although RAICES accepts "cases of clients in detention centers throughout Texas," it serves as "the primary non-profit service provider at" the Karnes County Residential Center in Karnes City, Texas ("Karnes") and "strives to provide free, universal representation through all phases of the immigration process during detention at Karnes."  *Id.* at

---

[2]  Defendants have agreed not to remove any of the named Plaintiffs pending the adjudication of this motion.  *See* Dkt. 8.

2–3 (Meza Decl. ¶¶ 4–7).  RAICES serves "between 80–95% of the population at Karnes" by,

among other things, "conduct[ing] consultations and intakes, prepar[ing] detainees for their

credible[-]fear interviews and represent[ing] detainees at their credible[-]fear interviews," and

"appealing negative decisions from their credible[-]fear interviews."  *Id.* at 3 (Meza Decl. ¶ 6–7).

### E.    Procedural Background

The reduced-time-to-consult and prohibition-on-extensions directives took effect on July

8, 2019, *see* AR 113, and 60 days later, on September 6, 2019, the individual Plaintiffs and

RAICES brought this suit, Dkt. 1, alleging that (1) Cuccinelli's appointment to serve as acting

Director of USCIS was unlawful under both the FVRA and the Appointments Clause and that, as

a result, the Asylum Directives are invalid; (2) the Asylum Directives are, in any event, contrary

to law, including the statutory requirement that USCIS provide asylum applicants with a

meaningful opportunity to "consult with a person or persons of the alien's choosing prior to the

[credible-fear] interview," 8 U.S.C. § 1225(b)(1)(B)(iv), and the regulatory authority of asylum

officers freely to reschedule credible-fear interviews whenever the asylum seeker "is unable to

participate effectively . . . because of illness, fatigue, or other impediments," 8 C.F.R.

§ 208.30(d)(1); (3) the Asylum Directives are arbitrary and capricious; (4) USCIS failed to

comply with the APA's notice-and-comment and advanced-notice requirements; (5) the Asylum

Directives violate the  Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; and (6) the Asylum Directives

violate the First Amendment by interfering with the ability of the individual Plaintiffs and

RAICES to communicate and associate regarding the asylum process.

Three weeks after filing their complaint, Plaintiffs moved for a preliminary injunction.

Dkt. 12.  That motion relies on only four of the claims set forth in the complaint—Plaintiffs'

FVRA challenge to Cuccinelli's appointment; their contention that the Asylum Directives violate

various statutory and regulatory requirements; their claim that the directives are arbitrary and

capricious; and their Rehabilitation Act claim.  Dkt. 12 at 12.  On December 3, 2019, the Court

held a hearing on Plaintiffs' motion for a preliminary injunction.  Minute Entry (Dec. 3, 2019).

At the hearing, the Court raised the question whether that motion should be treated as an

expedited motion for summary judgment, and neither Plaintiffs nor Defendants opposed

proceeding in that fashion.  Dkt. 24 at 6 (Dec. 3, 2019 Hrg. Tr.).  The Court, accordingly,

directed that Plaintiffs' pending motion for a preliminary injunction be treated as a partial motion

for summary judgment on counts I, II, IV, and VI of the complaint, *see* Fed. R. Civ. P. 65(a)(2);

Minute Order (Jan. 9, 2020), and set a schedule for Plaintiffs' to supplement their submission

and for Defendants to respond to Plaintiffs' motion for partial summary judgment, Entry Order

(Dec. 3, 2019).  Defendants, in turn, cross-moved for partial summary judgment on Counts I and

II of the complaint.  Dkt. 25 at 8.

## II.  ANALYSIS

Before reaching the merits of Plaintiffs' claims, the Court must determine whether it has

jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

Defendants assert that the Court lacks jurisdiction for several reasons.  First, they argue

that neither the individual Plaintiffs nor RAICES has Article III standing.  Dkt. 17 at 26–30.

Second, they contend that RAICES lacks statutory standing to sue under the INA.  *Id.* at 24.

Third, they maintain that the Court's statutory jurisdiction is limited to challenges to "written

policy directive[s]" and thus does not include Plaintiffs' challenge to the discontinuance of the

in-person legal orientation program at the Dilley Detention Center.  *Id.* at 25–26.  As explained

below, the Court agrees with Defendants' final contention—that the Court lacks statutory

jurisdiction over Plaintiffs' challenge to the in-person-orientation directive.[3]  But with respect to the reduced-time-to-consult and prohibition-on-extensions directives, the Court concludes that the individual Plaintiffs have Article III standing and that those claims fall within the Court's statutory jurisdiction.  Finally, having reached that conclusion, the Court need not decide whether RAICES also has standing to pursue those same claims and to seek the same relief.  *See Town of Chester, N.Y. v. Laroe Estates, Inc*., 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested.").

Because Defendant's Article III standing argument turns in part on the scope of the Court's statutory jurisdiction, the Court begins by addressing Defendants' arguments concerning that issue.

### A.    Statutory Jurisdiction

Although their arguments are cast in terms of Article III redressability, Defendants posit that the Court lacks statutory jurisdiction under 8 U.S.C. § 1252(e)—or 28 U.S.C. § 1331—to review an order of expedited removal, except under limited circumstances not present here.  Dkt. 17 at 30.  That argument rests on the premise that IIRIRA "does not authorize review of a credible-fear determination once an order of expedited removal has issued."  *Id.*  Plaintiffs disagree and argue instead that asylum seekers subject to expedited removal orders may "challenge the policies by which [their expedited] orders [of removal] were issued."  Dkt. 19 at 11.  The plain text of the statute and instructive D.C. Circuit precedent confirm that Plaintiffs have the better argument.  That conclusion is not a total victory for Plaintiffs, however.  Rather,

---

[3]  Earlier in the proceeding, Defendants also argued that the claims brought by two additional plaintiffs, S.G.-C and B.O.-G, were moot because their negative credible-fear determinations were overturned.  Dkt. 17 at 22.  That point was well taken.  After oral argument on Plaintiffs' motion for a preliminary injunction, Plaintiffs voluntarily dismissed those Plaintiffs from the case pursuant Federal Rule of Civil Procedure 41(a)(1)(A)(i).  Dkt. 23.

as explained below, Defendants are correct that the Court lacks statutory jurisdiction over one of Plaintiffs' challenges.

IIRIRA expressly contemplates that its expedited removal provision, 8 U.S.C. § 1225(b), and the regulations and policies adopted to implement that provision, might be subject to judicial challenge. The statute thus permits "judicial review of the . . . [expedited removal] system" and its implementing regulations and policies, *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1354 (D.C. Cir. 2000) (hereinafter "*AILA*"), but (1) limits the scope of relief available in habeas corpus and (2) channels and sets time limits on systemic challenges to the expedited removal system and the regulations and written guidance that implement it, *see* 8 U.S.C. § 1252(e). Defendants contend that this provision precludes the Court from redressing the individual Plaintiffs' injuries because, "once an order of expedited removal has issued," an alien may obtain judicial review only in limited circumstances not applicable here. Dkt. 17 at 30. That contention fails for several reasons.

The Court's analysis of the meaning IIRIRA's channeling provision is guided by the "familiar principle of statutory construction: the presumption favoring judicial review of administrative action." *Kucana v. Holder*, 558 U.S. 233, 251 (2010). Under that principle, which the courts have "consistently applied to legislation regarding immigration, and particularly to questions concerning the preservation of federal-court jurisdiction," if "a statute is reasonably susceptible to divergent interpretation," courts must "adopt the reading that accords with the traditional understanding[]" that "executive determinations are generally subject to judicial review." *Id.* (internal quotations omitted). Here, far from unambiguously foreclosing judicial review, IIRIRA's channeling provision, § 1252(e), is best read to permit individual asylum seekers expeditiously to bring systemic challenges to IIRIRA's expedited removal provision and

its implementing regulations and policies, even if those individuals are subject to final orders of removal.

The Court begins with the text of the statute.  *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006).  Defendants are correct that IIRIRA divests courts of jurisdiction to review "any individual determination or to entertain any other cause of action or claim arising from or relating to the implementation or operation of an order" of expedited removal, except as provided in 8 U.S.C. § 1252(e).  *See* 8 U.S.C. § 1252(a)(2)(A)(i).  It is also true that "no court shall have jurisdiction to review" any "procedures and policies adopted" by USCIS "to implement the" expedited review provisions of the IIRIRA, except as provided in 8 U.S.C. § 1252(e).  *Id.* § 1252(a)(2)(A)(iv).  Defendants incorrectly assert, however, that § 1252(e) permits this Court to consider only "whether the petitioner is an alien, whether the petitioner was actually ordered removed, or whether the petitioner can provide that he or she was lawfully admitted as a permanent resident, refugees, or asylee."  Dkt. 17 at 30.  Implicit in Defendants' argument is the suggestion that § 1252(e)(2)—the provision governing "habeas corpus proceedings"—constitutes the exclusive avenue of judicial recourse once the affected person is subject to an order of expedited removal.  But that premise ignores the very next paragraph of § 1252(e)—entitled "challenges on validity of the system"—which provides for judicial review of systemic challenges to the expedited removal system and its implementing regulations or written policies.

Section 1252(e)(3) provides, in relevant part:

**(A) In general**

Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

> (i) whether such section, or any regulation issued to implement such section, is constitutional; or
>
> (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.
>
> **(B) Deadlines for bringing actions**
>
> Any action instituted under this paragraph must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is implemented.

8 U.S.C. § 1252(e)(3).[4]  Under § 1252(e)(3), a court has jurisdiction to review "determinations" made in the expedited removal context if three conditions are satisfied:  First, the plaintiff must challenge the constitutionality or lawfulness of § 1225(b)—IIRIRA's expedited removal provision—or the constitutionality or lawfulness of "a regulation, written policy directive, written policy guidance, or written procedure" adopted to implement that provision.  8 U.S.C. § 1252(e)(3)(A).  Second, the challenge must be "instituted in the United States District Court for the District of Columbia." *Id.*  Third, the action "must be filed no later than 60 days after the date the challenged section, regulation, directive, guidance, or procedure . . . is first implemented." *Id.* § 1252(e)(3)(B).

---

[4]  Although IIRIRA refers to actions taken "by or under the authority of the Attorney General," 8 U.S.C. § 1252(e)(3), those authorities were transferred to the Department of Homeland Security and USCIS following the creation of those agencies and the reassignment of responsibility for implementing the immigration laws from the INS to the Department of Homeland Security and USCIS. *See*, *e.g.*, Homeland Security Act of 2002, Public Law 107–296, § 451(b)(3), 116 Stat. 2135, 2196 (transferring "function" of "adjudications of asylum . . . applications" from the Commissioner of the INS to the Director of the Bureau of Citizenship and Immigration Services, which eventually became USCIS).

With one exception discussed below, the individual Plaintiffs' claims satisfy all three conditions.  Plaintiffs brought this action in the correct jurisdiction within 60 days of issuance of the Asylum Directives.  The directives set forth in the July 2 memorandum were implemented on July 8, 2019, *see* AR 113, and Plaintiffs filed suit in this Court 60 days later, on September 6, 2019.  Dkt. 1.  The suit also challenges the lawfulness of two "written policy directive[s]," "policy guideline[s]," or "procedure[s]," 8 U.S.C. § 1252(e)(3)(A)(ii)—the reduced-time-to-consult and prohibition-on-extensions directives are memorialized in the July 2 memorandum and are also reflected in USCIS's "Credible Fear Procedures Manual."  AR 113–17.  Thus, the individual Plaintiffs' claims fall squarely within the plain terms of § 1252(e)(3).

Had Congress intended to close the door to judicial review on aliens who are subject to final orders of expedited removal even when their challenges satisfy the requirements of § 1252(e)(3)—as Defendants contend—it knew how to say so.  Section 1252(a)(2)(C), for example, provides that, with an exception not relevant here, "no court shall have jurisdiction to review a final order of removal against an alien who is removable by reason of having committed" certain criminal offenses.  8 U.S.C. § 1252(a)(2)(C).  Although Congress provided that "no Court shall have jurisdiction to review . . . any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an [expedited] order of removal," it included an express carve out for claims brought "as provided in [§ 1252(e)]."  *Id.* § 1252(a)(2)(i); *see also id.* § 1252(a)(5) (reiterating the carve out for challenges pursuant to 8 U.S.C. § 1252(e)).  Thus, the statute expressly contemplates that aliens may seek judicial review of written directives implementing the expedited removal system if the aliens satisfy the conditions set out in § 1252(e).  *See AILA*, 199 F.3d at 1360 ("Congress meant to allow litigation challenging the [expedited removal] system by. . . aliens against whom the

[expedited removal] procedures had been applied").  The individual Plaintiffs' challenge is just

such an action.

Defendants' contention that § 1252(e) strips the Court of jurisdiction over the individual

Plaintiffs' challenge is also is at odds with the D.C. Circuit's decision in *American Immigration*

*Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000), a case that Defendants trumpet in

support of their contention that RAICES lacks statutory standing.  *See, e.g.*, Dkt. 17 at 23.  In

*AILA*, the D.C. Circuit addressed a challenge to the expedited removal provision and its

implementing regulations by immigrants' rights organizations and by individual aliens on the

ground that the statute and regulations violated the constitutional and statutory rights of the

individual plaintiffs and of unnamed aliens who might someday be subject to them.  199 F.3d at

1357.  The D.C. Circuit affirmed the district court's dismissal of the individual plaintiffs on the

ground that they filed suit after the 60-day period established by § 1252(e)(3) had expired.  *Id.*

That left, then, only the claims of the organizational plaintiffs.  As to those claims, the D.C.

Circuit rejected the contention that the organizational plaintiffs had standing to sue on behalf of

aliens—who, according to the plaintiffs in that case, could not protect their own rights—because

"nothing [would] prevent[]" "an alien returned to his native country" from bringing a systemic

challenge to IIRIRA and its implementing regulations, so long as suit was brought within 60

days.  *Id.* at 1362–63.  But, if Defendants were correct that an alien ordered removed under

§ 1225(b) may sue only under § 1252(e)(2), that pillar of *AILA* would fall.  Indeed, if Defendants

were right, it is difficult to imagine when, if ever, anyone could bring a systemic challenge under

§ 1252(e)(3).

Defendants do advance one persuasive argument, however.  That argument takes aim at

Plaintiffs' challenge to the portion of the Asylum Directives that, Plaintiffs say, discontinued

USCIS's policy of "providing an oral, in-person legal orientation to those detained at the Dilley

Detention Center." *See* Dkt. 1 at 47 (Compl. ¶ 155). As Defendants note, the problem with

Plaintiffs' challenge to the in-person-orientation directive is that § 1252(e)(3)(A)(ii) only

provides this Court with jurisdiction to review "*written* policy directive[s], *written* policy

guideline[s], or *written* procedure[s]," 8 U.S.C. § 1252(e)(3)(A)(ii) (emphasis added), and,

according to the declaration of USCIS's Deputy Chief of the Asylum Division, "USCIS has not

promulgated, authorized or implemented any *written* policy that there shall not be an in person

legal orientation for individuals seeking asylum at the Dilley Family Residential Center or any

other location." Dkt. 17-1 at 3 (Caudill-Mirillo Decl. ¶ 4) (emphasis added). The Court "must

give effect, if possible, to every . . . word of [the] statute," *Williams v. Taylor*, 529 U.S. 362, 404

(2002) (internal quotations and citations omitted), and, accordingly, cannot read § 1252(e)(3)(A)

to reach "unwritten actions" of USCIS, *see Khan v. Holder*, 608 F.3d 325, 331 (7th Cir. 2010)

(observing that § 1252(e)(3) bars review of "unwritten action" and expressing concerns about

Congress's decision to immunize unwritten action from judicial review); *American Immigration

Lawyers Association v. Reno*, 18 F. Supp. 2d 38, 57–58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352

(same). That conclusion forecloses Plaintiffs' challenges to the in-person-orientation directive.

**B.**     **Article III Standing**

"Because Article III limits federal judicial jurisdiction to cases and controversies, *see*

U.S. Const. art. III, § 2, federal courts are without authority" to decide disputes unless the

plaintiff has standing—that is, "a personal stake in the outcome of the controversy [sufficient] to

warrant [*her*] invocation of federal-court jurisdiction." *Chamber of Commerce v. EPA*, 642 F.3d

192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

"[T]he irreducible constitutional minimum of standing contains three elements"—injury in fact,

causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First,

injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotations and citation omitted). Second, causation requires a "causal connection between the injury and the conduct complained of." *Id.* That is, the injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (citation omitted) (internal quotes omitted). Finally, redressability requires a "likel[ihood], as opposed to mere speculati[on], that the injury will be redressed by a favorable decision." *Id.* at 561 (citation omitted) (internal quotes omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements," and the manner and degree of proof required varies based on the stage of the ligation. *Id.*

Defendants do not dispute that the Asylum Directives limited the time the individual Plaintiffs had to prepare and to consult before their credible-fear interviews took place. Instead, they argue that the individual Plaintiffs allege a violation of their "procedural" rights—their rights to have an opportunity meaningfully to consult with others and to prepare before their credible-fear interviews—but have failed to show that they have suffered any concrete injury as a result of that alleged procedural violation. *See* Dkt. 17 at 27. In other words, according to Defendants, the individual Plaintiffs "have not offered any tangible proof that the July 2 changes to the consultation period and the standard governing continuances would have had any impact on the outcome of their credible-fear interviews," *id.*, and have therefore failed to "satisfy the traceability [and] redressability" elements of *Lujan*, *id.*

Defendants' argument misunderstands how standing is analyzed in procedural-rights cases. Although every case brought in an Article III court must satisfy the three "irreducible" elements of standing, a "person who has been accorded a procedural right to protect his concrete

interests can assert that right without meeting all the normal standards for redressability and

immediacy." *Lujan*, 504 U.S. at 572 n.7.  Thus, for example, a person "living adjacent to the site

for proposed construction of a federally licensed dam has standing to challenge the licensing

agency's failure to prepare an environmental impact statement, even though he cannot establish

with any certainty that the statement will cause the license to be withheld or altered, and even

though the dam will not be completed for many years." *Id.*  That scenario, as the Supreme Court

has explained, is very different from a case in which the plaintiff does not live near—and has no

plans to live near—the hypothetical dam.  *Id.*

As a starting point, a party asserting a procedural right must—like any other plaintiff—

identify a "particularized injury" resulting from the government's contemplated action.  *See Fla.*

*Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc).  Here, because the

individual Plaintiffs sought and were denied asylum through allegedly unlawful procedures, they

have identified a "particularized" and "concrete" interest.  *See Hotel & Rest. Emps. Union, Local*

*25 v. Smith*, 846 F.2d 1499, 1502 (D.C. Cir. 1988) (en banc) (observing that individuals suffer an

injury in fact if their "asylum claims have been processed in [an] illegal manner"); *see generally*

*Judicial Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 363–66 (D.C. Cir. 2005) (Williams, J.,

concurring) (explaining that, as a general matter, a "judicially cognizable" interest satisfies

*Lujan*'s "injury in fact" requirement).  It is difficult to imagine an interest more "particularized"

than a person's interest in seeking asylum and avoiding the risk of deportation.  *Cf. INS v.*

*Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all

the more replete with danger when the alien makes a claim that he or she will be subject to death

or persecution if forced to return to his or her home country.").

The individual Plaintiffs have also satisfied the causation prong of *Lujan*. To establish causation in a procedural-rights case, the plaintiff must establish "two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'" *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668). "Importantly, with respect to the first link, the party . . . need not show that but for the alleged procedural deficiency the agency would have reached a different substantive result." *Id.* Rather, the plaintiff need establish only "that the procedural step was connected to the substantive result." *Id.* (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002)).

Here, uncontroverted declarations proffered by the individual Plaintiffs establish that the denial of their asserted right to consult and to prepare for their credible-fear interviews was "connected to the substantive result." *Ctr. for Biological Diversity*, 861 F.3d at 184 (citation omitted). As one Plaintiff explains, if she "had more time to prepare for the interview, [she] would have spoken with the Dilley Pro Bono Project and [she] would have understood the process better." Dkt. 12-4 at 8 (M.A.-H. Decl. ¶ 26). She "would have been in a better position to describe the threats facing [her] daughter, which include[d] being kidnapped and trafficked by transnational criminal organizations" and would have been able to speak with her brother or son, both of whom had "additional information that would have helped [her] explain the circumstances in Honduras that caused [her] fear and [her] need to leave" Honduras. *Id.* (M.A.-H. Decl. ¶¶ 24, 26–27). With respect to the second link, the party seeking to establish standing in a procedural-rights case must "demonstrate a causal connection between the agency action and

the alleged injury." *Ctr. for Biological Diversity*, 861 F.3d at 184 (quoting *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007)).  That requirement is also easily satisfied here.  But for the asylum officers' determinations that the individual Plaintiffs did not have a credible fear of persecution, they would have been "detained for further consideration of [their] application[s] for asylum."  8 U.S.C. § 1225(b)(1)(B)(ii).

The individual Plaintiffs' alleged injuries are also redressable under the "relaxed redressability requirement" that applies in procedural-rights cases.  *Ctr. for Biological Diversity*, 861 F.3d at 185 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013)).  Under that standard, the individual Plaintiffs "need not show that compliance with" the rules that preceded promulgation of the Asylum Directives "would alter the" results of the credible-fear interviews.  *Id.* (quoting *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005)).  Rather, they need establish only "that a revisitation of" the credible-fear inquiry "*could* reach a different conclusion." *Id.*  They have done so.  Both of the adult individual Plaintiffs have offered declarations detailing additional, pertinent information that they would like to present and have attested that they did not present this information because the Asylum Directives deprived them of adequate time to confer with others.  *See* Dkt. 12-3 at 5 (L.M.-M Decl. ¶ 13); Dkt. 12-4 at 8 (M.A.-H. Decl. ¶ 26).  It is possible that, if given another chance, the individual Plaintiffs will fare no better than they did the first time.  The Court, however, need decide only whether an asylum officer "could reach a different conclusion" with the additional information, and that undemanding test is satisfied on the present record.[5]

_____

[5]  Defendants may not rely on the contention that Plaintiffs' claims are not redressable because the individual Plaintiffs are subject to expedited orders of removal. Dkt. 17 at 30.  As explained above, Defendants are incorrect —at least with respect to the reduced-time-to-consult and prohibition-on-extensions directives—that § 1252(e) strips this Court of jurisdiction to review the individual Plaintiffs' claims.

Plaintiffs' FVRA challenge adds a twist to the Court's standing analysis.  If the Court were to hold that Cuccinelli was appointed in violation of the FVRA, USCIS might reinstate the Asylum Directives under the authority of a properly appointed official.  That concern, however, is answered by an array of decisions from the Supreme Court, the D.C. Circuit, and this Court reaching the merits of challenges to actions "taken by . . . government official[s] on the ground that the official invalidly [held] office," *Andrade v. Lauer*, 729 F.2d 1475, 1494 (D.C. Cir. 1984) (collecting cases), even when a properly appointed official might have reimposed the challenged action.  Notably, the Supreme Court and the D.C. Circuit reached the merits in *SW General, Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929, a case—like this one—involving a challenge to an appointment under the FVRA.  And although those decisions did not expressly address standing, other, similar decision have done so.  *See, e.g.*, *State Nat'l Bank of Big Spring v. Lew,* 795 F.3d 48, 53 (D.C. Cir. 2015) (holding that a bank had standing to challenge the recess appointment of the Director of the Consumer Financial Protection Bureau because the bank was regulated by that agency); *Olympic Fed. Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 732 F. Supp. 1183, 1188–89 (D.D.C. 1990) (holding that the plaintiff's challenge to the appointment of the agency director and acting director was redressable, even though the plaintiff faced a continuing "threat of government intervention" by other officials).

Even setting this precedent aside, however, any redressability question raised by the individual Plaintiffs' FVRA claim is put to rest by the principle that courts must assume, for purposes of assessing standing, that the Plaintiffs will prevail on the merits.  *See Cutler v. U.S. Dep't of Health & Human Servs.*, 797 F.3d 1173, 1179–80 (D.C. Cir. 2015) (observing that a court "must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim," including "that the requested relief would be granted" (internal quotation omitted)).

Plaintiffs' FVRA claim does not merely assert that Cuccinelli's appointment was improper.  It

also posits that, under the FVRA, the directives "shall have no force or effect," 5 U.S.C.

§ 3348(d)(1), and, that a properly appointment official may not ratify the directives, *id.*

§ 3348(d)(2), *see* Dkt. 28 at 17–21 (arguing that the FVRA requires vacatur of the Asylum

Directives and precludes ratification).  If Plaintiffs are right about the FVRA's meaning, as the

Court must assume for present purposes, the individual Plaintiffs will likely be entitled to new

credible-fear interviews and will be able to take advantage of the additional time to prepare that

they have now received.  As a result, the individual Plaintiffs' FVRA claims redressable.

*      *      *

The Court, accordingly, concludes that it has statutory jurisdiction over the individual

Plaintiffs' claims and that they have Article III standing.  Having reached that conclusion, the

Court need not decide whether RAICES also has standing to pursue those same claims and to

seek the same relief.  *See Town of Chester, N.Y.*, 137 S. Ct. at 1651 ("At least one plaintiff must

have standing to seek each form of relief requested in the complaint.").  Should subsequent

developments suggest that the scope of relief available to the individual Plaintiffs and RAICES

differs, the Court can return to the jurisdictional questions regarding RAICES's challenges.

## C.     Merits

Plaintiffs challenge the Asylum Directives on a variety of grounds, several of which carry

considerable force.[6]  The Court need reach only one of those grounds, though, because it is

sufficient to resolve the case.  That challenge asserts that the Asylum Directives were issued by

---

[6]  In light of the Court's conclusion that it lacks statutory jurisdiction to consider Plaintiffs'
challenge related to the in-person-orientation directive, the Court will use the phrase "Asylum
Directives" to refer only to the reduced-time-to-consult and prohibition-on-extensions directives
for the remainder of this opinion.

Cuccinelli in his capacity as acting Director of USCIS; that Cuccinelli was not lawfully appointed to that position under the FVRA and thus lacked the authority to issue the Directives; and that, accordingly, the Directives are invalid and without legal force or effect. As explained below, the Court agrees and will, accordingly, set aside the reduced-time-to-consult and prohibition-on-extensions directives.

      1.      *Constitutional and Statutory Framework*

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States," unless "the Congress . . . by Law vest[s] the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of the Departments." U.S. Const. art. II, § 2, cl. 2. Principal officers, in other words, must be appointed by the President, with the advice and consent of the Senate, and inferior officers must be appointed in that same manner, unless Congress supplants that default rule by vesting the appointment power in the President, a court, or a department head. *Edmond*, 520 U.S. at 660. Here, the parties do not dispute that the Director of USCIS is an "officer[]," and "not mere[ly] [an] employee[]" of the agency, *see Lucia v. SEC*, 138 S. Ct. 2044, 2052 (2018), and they do not contend that Congress specified an alternative appointment process. As a result, the default rule applies, and only the President, with the advice and consent of the Senate, may appoint someone to serve in that position.

The fact that an officer holds a PAS office does not mean, however, that one who performs the duties of that office in an acting capacity is also a PAS officer. The Supreme Court has long recognized that, when a "subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official." *United States v. Eaton*, 169 U.S. 331, 343 (1898). Consistent with this understanding, Congress has provided the Executive

Branch with the means of filling vacancies in PAS offices on a temporary basis since the earliest days of the Republic.  *See SW General, Inc.*, 137 S. Ct. at 935; Thomas A. Berry, S.W. General*: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 153 (hereinafter "Berry, *Unilateral Appointments*").

Although Congress enacted the first of these laws in 1792, *see* Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281; *see also SW General, Inc.*, 137 S. Ct. at 935 (quoting same), and enacted a series of related laws over the next seven decades, *see, e.g.*, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415; Act of Feb. 20, 1863, ch. 45, 12 Stat. 656, it did not enact the first comprehensive "Vacancies Act" until 1868, *SW General, Inc.*, 137 S. Ct. at 935 (citing Act of July 23, 1868, ch. 227, 15 Stat. 168).  The 1868 Act "expanded the number of PAS offices that the President could fill with acting officers," and, of particular relevance here, it adopted "a default rule that the 'first or sole assistant . . . shall' perform" the functions of the vacant office, "with an exception allowing the President to instead fill the post with a person already serving in a PAS office."  *SW General, Inc.*, 137 S. Ct. at 935.  Although the Vacancies Act has been "amended several times over the subsequent decades," it has retained the "core structure" established by the 1868 Act. *See* Berry, *Unilateral Appointments*, at 154.

The current iteration of the Vacancies Act, the FVRA, follows that structure.  It provides that a vacancy in a PAS office can be filled in one of three ways.  First, absent action by the President, "the first assistant to the office of such officer [who has died, resigned, or is otherwise unable to perform the functions and duties of the office] *shall* perform the functions and duties of the office temporarily in an acting capacity," subject to certain limitations.  5 U.S.C. § 3345(a)(1) (emphasis added).  Second, "the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with

the advice and consent of the Senate, to perform the functions and duties of the vacant office,"
again subject to certain limitations. *Id*. § 3345(a)(2). Third, "the President (and only the
President) may direct an officer or employee of" the agency experiencing the vacancy "to
perform the functions and duties of the vacant office," but only if that individual served in a
senior position in that agency for at least 90 days "during the 365-day period preceding" the
occurrence of the vacancy.[7] *Id*. § 3345(a)(3).

      2.     *Application of the FVRA to Cuccinelli's Appointment*

The parties agree that the question whether Cuccinelli was lawfully appointed to serve as
the acting Director of USCIS is answered, one way or another, by the FVRA. Within that
framework, the parties focus their arguments on the question whether, as Plaintiffs contend, *see*
Dkt. 12 at 34, the first-assistant default rule applies only to individuals serving as first assistants
at the time the vacancy arises or, as Defendants contend, *see* Dkt. 17 at 38, the default rule also
applies to individuals first appointed to the position of first assistant after the vacancy in the PAS
office arises. That dispute poses a difficult question that the Office of Legal Counsel has
answered differently at different times, *compare* 23 Op. O.L.C. 60, 63–64 (1999) ("the better
understanding is that you must be the first assistant when the vacancy occurs in order to be the
acting officer by virtue of being the first assistant"), *with* 25 Op. O.L.C. 177, 179–80 (2001)
(rejecting that view), and that the courts have not had the occasion to resolve, *see SW General,
Inc.*, 796 F.3d at 76 ("Although we do not decide its meaning today," the default rule "may refer
to the person who is serving as first assistant *when the vacancy occurs*"). Now is not the time to

---

[7] Specifically, the employee must be employed in a position for which the rate of pay "is equal
to or greater than the minimum rate of pay payable for a position at GS–15 of the General
Schedule." 5 U.S.C. § 3345(a)(3)(B).

resolve that question because Cuccinelli's appointment fails to comply with the FVRA for a more fundamental and clear-cut reason:  He never did and never will serve in a subordinate role—that is, as an "assistant"—to any other USCIS official.  For this reason alone, Defendants' contention that his appointment satisfies the FVRA cannot be squared with the text, structure, or purpose of the FVRA.

The Court starts, as it must, the with the statutory text.  *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).  The FVRA provides in relevant part:

> **(a)** If an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office—
>
> **(1)** the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;
>
> **(2)** notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or
>
> **(3)** notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if—
>
> **(A)** during the 365-day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and
>
> **(B)** the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule.

5 U.S.C. § 3345(a).  Here, because the acting Secretary—and not the President—directed that Cuccinelli serve as the acting Director, and because he did not hold another PAS position at the time of his designation and had not previously served as an officer or employee of the Department of Homeland Security or USCIS, §§ 3345(a)(2) and (a)(3) are plainly inapt. Plaintiffs' challenge to Cuccinelli's status as acting Director of USCIS, accordingly, rises or falls based on whether Cuccinelli was "the first assistant to the office of [the] officer" who resigned— that is, the office of former-USCIS Director Cissna.

Because the FVRA does not provide a statutory definition of the phrase "first assistant," *see* Federal Vacancies Reform Act of 1998, S. Rep. No. 105-250 at 12 (July 15, 1998) (hereinafter "Senate Report"), the Court must construe that phrase "in accordance with its ordinary or natural meaning," *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).  Defendants contend that Cuccinelli's service as acting USCIS Director is lawful "by dint of his appointment as Principal Deputy Director."  Dkt. 17 at 46.  That argument, however, fails to confront the essential meaning of the word "assistant," which under any plausible construction comprehends a role that is, in some manner and at some time, subordinate to the principal.  An "assistant" is "one who acts as a subordinate to another or as an official in a subordinate capacity."  *Assistant*, Webster's Third New International Dictionary at 132 (1993).  A "first assistant," in turn, is the senior or principal assistant to the official or office at issue—in other words, the assistant who is "foremost in rank" or the "chief" assistant.  *First*, Webster's Third New International Dictionary at 856 (1993).  Thus, although the "first assistant" holds a rank senior to other "assistants," he remains an "assistant" to the principal.  Under that commonsense understanding of the meaning of the default provision, Cuccinelli does not qualify as a "first assistant" because he was assigned

the role of principal on day-one and, by design, he never has served and never will serve "in a subordinate capacity" to any other official at USCIS.

Defendants fail to address this fundamental problem with Cuccinelli's designation. Instead, they argue that the default rule does not require that an individual have served as the assistant to the particular PAS *officeholder* who left, thereby creating the vacancy; it is enough, in their view, that the acting official hold an office that is subordinate to the PAS *office*, even if that office was vacant at the time of the acting official assumed the position of "first assistant." Dkt. 17 at 38–39. As noted above, the soundness of that contention is far from settled. But, for present purposes, the Court need not decide that question because, even under Defendants' reading of the statute, Cuccinelli does not hold an office that was or that ever will serve as the "first assistant" to the *office* of the USCIS Director. The office of Principal Deputy Director was created after the vacancy in the office of the Director arose; that office was nominally designated as the office of the "first assistant" to the Director after the vacancy arose; and it will cease to exist as the office of the "first assistant" as soon as the PAS vacancy is filled. *See* Dkt. 17-4 at 5, 7 (Blackwell Decl., Ex. 1, Ex. 2). Cuccinelli may have the title of Principal Deputy Director, and the Department of Homeland Security's order of succession may designate the office of the Principal Deputy Director as the "first assistant" to the Director. But labels—without *any* substance—cannot satisfy the FVRA's default rule under any plausible reading of the statute.[8]

Defendants make a second argument that fails for the same reason. That argument focuses on § 3345(b)(1), which provides as follows:

---

[8] To borrow from a long-running riff on the television show *The Office*, there may well be a difference between one who serves as "the assistant regional manager" and "the assistant to the regional manager." But either way, that person is, at best, second in command. Here, the acting Secretary created a position that is second in command in name only.

    **(1)**      Notwithstanding subsection (a)(1), a person may not serve as an acting officer under this section, if—

          **(A)**    during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person—

               (i)     did not serve in the position of first assistant to the office of such officer; or

               (ii)    served in the position of first assistant to the office of such office for less than 90 days; and

          **(B)**    the President submits a nomination of such person to the Senate for appointment to such office.

5 U.S.C. § 3345(b)(1).  Subject to an exception not relevant here, this provision prevents a person from serving "as an acting official while nominated to fill the [vacant] office if the person was not the first assistant to the office for at least 90 of the 365 days preceding the vacancy." *SW General, Inc.*, 137 S. Ct. at 950 (Sotomayor, J., dissenting).

        Defendants contend that § 3345(b)(1) makes sense only if it is possible for someone who is appointed to serve as the first assistant after the vacancy arose to serve in an acting capacity under § 3345(a)(1).  Otherwise, Defendants contend, there was no reason for Congress to declare that, "[n]otwithstanding subsection (a)(1)," a first assistant who is nominated by the President to fill the PAS position may not serve as the acting officer if he did not serve as the first assistant "during the 365-day period preceding the date of the" vacancy.  *See* Dkt. 17 at 42.  That contention reads too much into the "notwithstanding" clause, which is merely a clarifying clause that does not speak to the scope of § 3345(a)(1).  *See SW General, Inc.*, 137 S. Ct. at 941 ("The 'notwithstanding' clause simply shows that (b)(1) overrides (a)(1), and nothing more.").  But, more importantly, like the preceding argument, even if it were sound it would be unavailing on the facts of this case.  That is, even if Defendants were correct, and § 3345(b)(1)(A) implied that the first-assistant default rule found in § 3345(a)(1) includes those chosen to serve as first

assistants after the relevant vacancy arose, that would not solve Defendants' difficulty in this case because Cuccinelli was never and will never be the "assistant" to anyone or any office at USCIS—before or after the vacancy arose.

Historical practice can, at times, aid in defining phrases that Congress has used and reused in a series of statutory enactments.  Nothing in the historical record of the Vacancies Act, however, counsels in favor of construing the phrase "first assistant" to include those who hold the title of "first assistant" but occupy an office that, in actuality, was not, is not, and never will be subordinate to the principal office.  To the contrary, as recently as 1978, the Department of Justice "interpreted the term 'first assistant' as applying only to officials whose appointment has been specifically provided for by statute," 2 Op. O.L.C. 113, 115 n.5 (citing 19 Op. A.G. 503 (1890); 28 Op. A.G. 95 (1909)); *see also Doolin Sav. Bank*, 139 F.3d at 209 n.3—that is, those who hold an office that Congress created as subordinate to the principal office, *see, .e.g.*, 31 U.S.C. § 301 (establishing a Deputy Secretary of the Treasury and providing that the deputy shall carry out the duties and powers of the Secretary "when the office of Secretary is vacant").  To be sure, by the time Congress enacted the FVRA a practice had developed of designating some first assistants by regulation, and Congress was apparently aware of that practice.  *See* Senate Report at 12 ("Other departments and agencies have established first assistants by regulation"); *see also* 23 Op. O.L.C. 60, 63 (1999).  But those offices, like "first assistant" offices created by statute, existed before the principal office was vacated and continued to exist after that vacancy was filled.

At oral argument, the Court asked counsel for Defendants whether, prior to enactment of the FVRA, there was any example of a person that became the "first assistant" to a PAS office after it became vacant (*i.e.*, a "post-vacancy" first assistant) and thereby assumed the duties of

the vacant PAS office.  Dkt. 24 at 98–99 (Mot. Hr'g Tr. 98:19–99:4).  Defendants answered the

Court's question in their supplemental brief, asserting that "the historical record prior to the

FVRA's enactment does not reveal a substantial practice of naming post-vacancy first assistants

under the Vacancies Act."  Dkt. 25 at 18 n.4.  The absence of a "substantial practice" is putting it

mildly—in fact, Defendants failed to identify a single example of a post-vacancy first assistant

serving in an acting capacity prior to enactment of the FVRA.  That history casts some doubt on

whether Congress intended the phrase "first assistant" to encompass those appointed to the first-

assistant position after the vacancy arose.  But this case goes far beyond that scenario and pushes

doubt to disbelief.  There is no evidence that at any time prior to Cuccinelli's appointment did

Congress or the Executive Branch imagine that an agency could create a new position after a

vacancy arose; could then alter the agency's order of succession to treat that new position as the

"first assistant" to the vacant office; and could further specify that all would return to its original

state once the PAS vacancy was filled.

The structure and purpose of the FVRA further confirm that Cuccinelli was not lawfully

designated to serve as the acting Director of USCIS.  *See Food Mktg. Inst. v. Argus Leader*

*Media*, 139 S. Ct. 2356, 2364 (2019) (court must "careful[ly] examin[e]" the "structure of the

law itself").  The operative provisions of the FVRA take the following form: "The general rule is

that the first assistant to the vacant office shall [automatically] become the acting officer."  *SW*

*General, Inc.*, 137 S. Ct. at 934–35.  That default rule controls, except under two strictly defined

circumstances.  First, "the President (and only the President) may direct" that another PAS

official temporarily perform the functions of the vacant office.  5 U.S.C. § 3345(a)(2).  That is a

limited group of potential designees; it is a group that has already passed the tests of Senate

confirmation and presidential appointment; and the President must take personal responsibility

for the designation.[9]  Second, "the President (and only the President) may direct an officer or employee of" the agency to temporarily perform the functions of the vacant office but only if that "officer or employee" worked at the agency for at least 90 days in the year before the vacancy arose and did so in a senior capacity (payable at least at the GS-15 level).  5 U.S.C. § 3345(a)(3). That is also a limited group; it is a group that is likely to include officials with both experience and seniority; and, again, the President must take personal responsibility for the designation.

Defendants' reading of the FVRA would decimate this carefully crafted framework.  The President would be relieved of responsibility and accountability for selecting acting officials, and the universe of those eligible to serve in an acting capacity would be vastly expanded.  Except when the first assistant position is fixed by statute, the agency head—or, at times, even a subordinate agency official—could create a new office after the vacancy arose, designate that office as the "first assistant" to the vacant office, and fill the office with nearly anyone, regardless of whether that person had received prior Senate approval through the confirmation process and without regard to her seniority, experience, or tenure.  One is left to wonder, if Congress had intended—or even imagined—such a result, why would it have gone to the trouble of requiring that "the President (and only the President)" act in order to overcome the default rule and why would it have limited the pool of potential presidential designees to PAS officials and

---

[9]  *See* Senate Report at 12 ("Under this legislation, when an acting officer is to be designated, as opposed to automatically gaining acting status as a first assistant, only the President may designate an acting officer in a position that requires Senate confirmation."); *id.* at 13 ("This provision allows the President limited flexibility in appointing temporary officers, restricting the pool to persons who have already received Senate confirmation for their current position."); *see also* Administrative Conference of the United States, Acting Agency Officials and Delegations of Authority 1 (Dec. 1, 2019) (noting that there are over 1,200 PAS positions in the Executive Branch), available at https://www.acus.gov/sites/default/files/documents/final-report-acting-agency-officials-12012019.pdf.

senior officials who had served in the agency at issue for at least 90 days in the year before the vacancy arose?

It is not an answer to say, as Defendants posited at oral argument, *see* Dkt. 24 (Mot. Hr'g Tr. 88:9–17), that paragraphs (a)(2) and (a)(3) have meaning at least as applied to first assistant positions created by statute, thus avoiding the risk of Executive Branch overreaching.  Congress enacted the FVRA, in large part, to "recla[im]" its "Appointments Clause power," *SW General, Inc.*, 796 F.3d at 70, in the face of the long-standing Department of Justice "position that, in many instances, the head of an executive agency had independent authority apart from the Vacancies Act to temporarily fill vacant offices," *SW General, Inc.*, 137 S. Ct. at 935.  Congress was concerned, most notably, that the Attorney General and other department heads had made frequent use of organic vesting and delegation statutes to assign the duties of PAS offices to officers and employees, with little or no check from Congress.  *See* Senate Report at 3–4.  In one case, for example, the Attorney General designated someone "brought in from outside Government to serve as Acting Assistant Attorney General for the Civil Rights Division . . . , immediately after the Senate refused to confirm him to that very office." *SW General, Inc.*, 137 S. Ct. at 936.  That designation and many others like it prompted Congress to enact the FVRA. *See* Senate Report at 3–4.  But that position did not have a statutory first assistant, nor did other offices that Congress pointed to as examples of Executive Branch overreach motivating the FVRA's passage.[10]  *See, e.g.*, Senate Report at 3 (discussing the Solicitor General and other

---

[10]  *See, e.g.*, 28 U.S.C. § 504 ("The President shall appoint in the Department of Justice, by and with the advice and consent of the Senate, a Deputy Attorney General"); Reorganization Plan No. 5 of 1950, § 2 (renaming "The Assistant to the Attorney General" to "Deputy Attorney General"); 28 U.S.C. § 505 ("The President shall appoint in the Department of Justice, by and with the advice and consent of the Senate, a Solicitor General . . . ."); *id.* § 506 ("The President shall appoint, by and with the advice and consent of the Senate, 11 Assistant Attorneys

positions at the Department of Justice).  Simply put, overreaching in filling vacancies for positions that have statutorily designated first assistants was not the primary problem that Congress had in mind.  *See* 5 U.S.C. § 3347(a)(1) (authorizing persons to perform the functions and duties of a vacant office if a statute expressly provides for such temporary performance by a particular officer or employee); Senate Report at 15–16.

*     *     *

For all of these reasons, the Court concludes that Cuccinelli was designated to serve as the acting Director of USCIS in violation of the FVRA.

**C.     Remedy**

That leaves the question of remedy.

1.     *Asylum Directives*

The first form of relief that Plaintiffs seek is invalidation of the Asylum Directives, Dkt. 12 at 35—a form of relief that is necessarily circumscribed by the Court's conclusion that it lacks statutory jurisdiction to consider Plaintiffs' challenge to the in-person-orientation Directive, *see supra* Part II.A.  In support of this request, Plaintiffs press two arguments, which the Court will consider in turn.

a.     <u>FVRA</u>

Plaintiffs' first argument turns on whether Cuccinelli was performing a "function or duty" of the vacant office—that is, whether the Director's issuance of a written policy governing

---

General . . . ."); 28 C.F.R. § 0.137(b) (requiring by regulation that the principal deputy in each PAS office within the Department of Justice serve as first assistant and, "[w]here there is no position of [p]rincipal [d]eputy to the PAS office," providing that the Attorney General will designate a first assistant in writing).

how USCIS processes credible-fear determinations is a "function or duty" of the USCIS Director

office within the meaning of the FVRA.  Under the FVRA's vacant-office provision, if a person

is not lawfully serving in conformity with the FVRA, "[a]n action taken" by that person "in the

performance of any *function or duty* of [the] vacant office . . . shall have no force or effect" and

"may not be ratified."  5 U.S.C. § 3348(d)(1)–(2) (emphasis added); *but cf. id.* § 3348(e)

(exempting certain offices not at issue here).  The phrase "function or duty," in turn, is defined as

follows:

> **(2)**   the term "function or duty" means any function or duty of the applicable office that—
>
> **(A)**   (i) is established by statute; and
>
> (ii) is required by statute to be performed by the applicable officer (and only that officer); or
>
> **(B)**   (i)(I) is established by regulation; and (II) is required by such regulation to be performed by the applicable officer (and only that officer); and
>
> (ii) includes a function or duty to which clause (i)(I) and (II) applies, and the applicable regulation is in effect at any time during the 180-day period preceding the date on which the vacancy occurs.

5 U.S.C. § 3348(a)(2)(A).

Plaintiffs argue that, in issuing the Asylum Directives, Cuccinelli performed a "function"

of the USCIS Director office.  As Plaintiffs and amicus curiae explain, and as Defendants do not

dispute, Cuccinelli promulgated the Directives at issue pursuant to 6 U.S.C. § 271, *see* Dkt. 12 at

35; Dkt. 15 at 25; Dkt. 28 at 18, which assigns to the Director of USCIS the "[f]unctions" of (1)

"establish[ing] the policies for performing [the] functions . . . transferred to the Director" by the

Homeland Security Act "or otherwise vested in the Director by law," 6 U.S.C. § 271(a)(3)(A),

and (2) "establish[ing] national immigration services policies and priorities," *id.* § 271(a)(3)(D);

*see also id.* § 113(a)(1)(E) (establishing the PAS position of Director of the Bureau of Citizenship and Immigration Services, which was later renamed USCIS).  Those functions, accordingly, are assigned by statute to the office of the USCIS Director, and they are not assigned by statute to any other office.  In other words, according to Plaintiffs and amicus curiae, the function at issue is assigned by statute to the USCIS Director and only to the USCIS Director.

Although Defendants do not directly contest any of this, *see* Dkt. 25 at 1, 19 (arguing only that the Asylum Directives "could be ratified by another official"); *id.* at 20 (asserting that "relief should be limited to vacatur of the challenged Policies"), they do hint at a potential response in previewing a different argument that they might make at some point in the future.  In a single page of their supplemental brief, Defendants assert that, even if the Court concludes that the directives were promulgated without legal authority, they "could be ratified by another official."  Dkt. 25 at 19.  As Defendants acknowledge, no one has even attempted to ratify the directives and, accordingly, the question of ratification is hypothetical and not ripe for consideration.  *Id.*  Defendants' ratification argument does have some bearing on the question currently before the Court, however, because the same definition of "function or duty" applies both to the provision that renders actions taken by those serving in violation of the FVRA to have "no force or effect" and to the provision that precludes ratification of any such action.  *Compare* 5 U.S.C. § 3348(d)(1) *with id.* § 3348(d)(2).

Under Defendants' reading of the statute, the phrase "function or duty" includes only "non-delegable duties"—that is, only those duties that are assigned to a single official and that may not be reassigned.  *See* Dkt. 25 at 19.  From that premise, Defendants then argue, or at least suggest, that no function or duty assigned to *any* Department of Homeland Security official other

than the Secretary constitutes a "function or duty" within the meaning of the vacant-office

provision of the FVRA.  *Id.*  That follows, according to Defendants, because the Department's

organic statute vests "[a]ll functions of all officers, employees, and organizational units of the

Department" in the Secretary, 6 U.S.C. § 112(a)(3), and authorizes the Secretary to delegate any

of his "functions to any officer" within the Department," *id.* § 112(b)(1).  *See* Dkt. 25 at 19.  Put

differently, in Defendants' view, the functions assigned to the USCIS Director by the Homeland

Security Act are not functions "required . . . to be performed by [the USCIS Director] . . . *and*

*only that officer*" because the Department's organic statute vests the Secretary with *all* the

functions and duties of the Department.  Because similar vesting and delegation statutes can be

found throughout the Executive Branch, *see* Dkt. 28 at 19 n.6 (noting that "[e]very cabinet-level

department has some version of [the Department's] vesting and delegation statutes"),[11] the logic

of this position would cover all (or almost all) departments subject to the FVRA.

     In considering these arguments, the Court starts, once again, with the statutory text.  *See*

*Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  Here, the textual analysis turns on what Congress

meant by inserting "and only that office" in both the statutory and regulatory prongs of the

definition of "function or duty."  On the one hand, that clause could require that the statute or

regulation at issue provide that the function or duty at issue is assigned to one particular office,

---

[11]  Plaintiffs support that contention with the following examples: 10 U.S.C. § 113(d)
(Department of Defense); 20 U.S.C. §§ 3441, 3347, 3472 (Department of Education); 22 U.S.C.
§ 2651a(a) (Department of State); 28 U.S.C. § 510 (Department of Justice); 31 U.S.C. § 321(b),
(c) (Department of the Treasury); 38 U.S.C. §§ 303, 512 (Department of Veterans Affairs); 42
U.S.C. §§ 3534(a), 3535(d) (Department of Housing and Urban Development); 42 U.S.C.
§§ 7151, 7152, 7252 (Department of Energy); 43 U.S.C. § 1457c (Department of the Interior); 49
U.S.C. § 322(b) (Department of Transportation); Reorganization Plan No. 5 of 1950, § 2
(Department of Commerce); Reorganization Plan No. 6 of 1950, § 2 (Department of Labor);
Reorganization Plan No. 2 of 1953, § 4 (Department of Agriculture); Reorganization Plan No. 3
of 1966, § 2 (Department of Health and Human Services).  *See* Dkt. 28 at 19 n.6.

just as the function of establishing policies for performing the functions of USCIS and

establishing "national immigration services and polices" is assigned only to the office of the

USCIS Director, 6 U.S.C. § 271(a)(3).  Or, on the other hand, it could mean that the function

may not be reassigned and is not subject to the department head's general vesting-and-delegating

authority.  This latter reading is the one Defendants advocate.  In their view, the vacant office

provision of the FVRA applies only in those rare circumstances in which the function at issue is

not only assigned to a single office but also may not be reassigned.  *See* Dkt. 25 at 19.  The Court

is unpersuaded for two reasons.

First, the vacant-office provision specifies that, "[u]nless an officer or employee is

performing the functions and duties" of the vacant office in accordance with the FVRA's

appointment requirements, 5 U.S.C. § 3345, its time limitations, *id.* § 3346, and its exclusivity

provision, *id.* § 3347, "the office shall remain vacant" and, in the case of a subcabinet office,

"only the head of such Executive agency may perform any function or duty of such office."  *Id.*

§ 3348(b).  Significantly, this fallback provision presupposes that the head of the department will

have authority to discharge the functions and duties of the vacant, subcabinet office.  But, if

Defendants' understanding of the "functions or duties" of an office were accepted, the fallback

would be rendered meaningless.  It would apply only to cases, if any, where the relevant

subcabinet office is the sole office permitted to perform the "functions or duties" at issue *and*

where the department head's vesting-and-delegation authority is insufficient to overcome that

exclusive assignment of authority.  And, more importantly, unless the vacant-office provision is

implausibly read as an affirmative grant of authority otherwise denied to the department head,

the fallback provision would apply only in circumstances where the department head has no

authority to perform the functions of the vacant office.  In other words, the fallback provision,

which requires the department head to perform the functions of the vacant office, would apply only in those circumstances in which the department head lacks statutory authority to perform those functions.

This conundrum is avoided by reading the definition of "functions or duties" and fallback provisions in tandem. "[I]nterpretation of a phrase of uncertain reach" should not be "confined to a single sentence"—or here, two sentences, *see* 5 U.S.C. § 3348(a)(2)(A)(ii) & (B)(i)(II)—"when the text of the whole statute gives instruction as to its meaning," *Maracich v. Spears*, 570 U.S. 48, 65 (2013).  Here, any ambiguity in the meaning of "and only that officer" is resolved by reading that phrase in light of the fallback.  The inclusion of a fallback in the statutory scheme accords with the fact that agency organic statutes typically vest "[a]ll functions of all officers, employees, and organizational units of the [d]epartment" in the department head, *see, e.g.*, 6 U.S.C. § 112(a)(3); 28 U.S.C. § 509, and mandates that the department head exercise that authority with respect to the "functions and duties" of a vacant office, 5 U.S.C. § 3348(b).  It follows that, however narrowly defined, the functions or duties of a subcabinet office must include the duties *specifically* assigned by statute to that office, even if the department's organic statute *generally* vests the department head with *all* functions of the department.  That is, the mere fact that a department head is also vested with all functions specifically vested in other department officers and employees cannot, standing alone, defeat the enforcement mechanisms found in the FVRA's vacant-office provision.

A second textual clue supports this same conclusion and further clarifies what the statute allows and what it precludes.  In enacting the FVRA, Congress recognized the need for administrative flexibility, *see* Senate Report at 13, and did not withdraw the vesting-and-delegation authority of the Executive Branch departments and agencies.  But it also recognized

46

that few PAS positions have "any meaningful statutory duties" and that the duties of these offices are, instead, defined by "internal departmental regulations" that "can be changed at will without undergoing the notice and comment process."[12] *Id.* at 18. To avoid circumvention of the vacant-office provision, Congress, accordingly, added a 180-day lookback to the definition of regulatorily assigned functions or duties. *See* 5 U.S.C. § 3348(a)(2)(B)(ii). The lookback provision thus defines the functions or duties of a vacant office to include those that were established by regulation and are "in effect at any time during the 180-day period preceding the date on which the vacancy occurs." *Id.*

The 180-day regulatory lookback is at odds with Defendants' contention that the statutory definition of "functions or duties" reaches only those duties that the agency may not reassign— that is, those duties that are, in accordance with Defendants' lexicon, "non-delegable." Dkt. 25 at 19. Contrary to Defendants' reading of the statute, the lookback provision contemplates that agencies may and will use their organic authorities to issue rules reassigning duties and that duties subject to that authority may, at least at times, fall within the statutory definition of "functions or duties." What matters under the vacant-office provision is whether the rules—*i.e.*, the delegations and assignments—as they existed "at any time during the 180-day period preceding the date on which the vacancy occurs," 5 U.S.C. § 3348(a)(2)(B)(ii), assigned the functions or duties to the vacant office and "only [to] that office[,]" *id.* § 3348(a)(2). If so, then

---

[12]  A delegation of authority to perform defined agency duties may be exempt from the notice-and-comment process as a rule of "agency organization." *See* 5 U.S.C. § 553(b)(A); *Hogg v. United States,* 428 F.2d 274, 280 (6th Cir. 1970) ("We hold that the Administrative Procedure Act does not require that all internal delegations of authority . . . be published in order to be effective."); *see generally* Jennifer Nou, *Subdelegating Powers*, 117 Colum. L. Rev. 473, 518– 522, 521 (2017) (discussing the regulatory landscape of agency sub-delegations and observing that an agency head may, but need not, subject an internal sub-delegation to notice and comment).

the statutory definition of "function or duty" is satisfied, and actions taken by a person who is not serving in conformity with the FVRA "in the performance of [that] function or duty" have "no force or effect."  5 U.S.C. § 3348(d).

The only support Defendants offer for their more sweeping "non-delegable" argument is a citation to the D.C. Circuit's decision in *Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019).  Dkt. 25 at 19.  But the meaning of the vacant-office provision was neither disputed nor decided in *Guedes*.  Indeed, neither below nor on appeal did the parties dispute whether the official's appointment satisfied the FVRA, *see Guedes v. ATF*, 356 F. Supp. 3d 109, 138 (D.D.C. 2019), nor did the parties contest that, by the time the dispute reached the D.C. Circuit, the challenged rule had been validly ratified by a properly appointed official, *see Guedes*, 920 F.3d at 12; *see also Bump-Stock-Type Devices*, 84 Fed. Reg. 9,239, 9,240 (Mar. 14, 2019) (ratifying the final rule in dispute in *Guedes*).  In any event, the word "non-delegable" appears nowhere in the statute, and instead is found only in the legislative history.  *See* Senate Report at 18 ("The functions or duties of the office that can be performed only by the head of the executive agency are therefore defined as the non-delegable functions or duties of the officer as they existed at any point during the 180 days prior to the [vacancy][.]").  But even as used in the legislative history, the word does not have the meaning Defendants assign to it.  To the contrary, the Senate Report uses the term in the same breath in which it affirms that the "non-delegable" functions and duties include those assigned by regulation 180 days before the vacancy arose, even if later reassigned. *Id*.

Finally, Defendants' construction of the vacant-office provision is at odds with the statutory purpose of the FVRA.  As Plaintiffs note, "[e]very cabinet-level department has some version of [a] vesting and delegation statute[]."  Dkt. 28 at 19 n.6 (collecting statutory vesting

and delegation statutes).  It was the pervasive use of those vesting-and-delegation statutes, along with "the lack of an effective enforcement process," that convinced Congress of the need to enact the FVRA.  Senate Report at 7.  Yet, if Defendants were correct that the mere existence of these vesting-and-delegation statutes (and the absence of an express statutory bar on vesting and delegating a specific function or duty) were sufficient to negate the enforcement mechanisms Congress included in the FVRA, Congress would have done little "to restore [the] constitutionally mandated procedures that must be satisfied before acting officials may serve in positions that require Senate confirmation."  Senate Report at 8; *see also U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent.").

The Court recognizes that requiring department heads to perform the functions or duties of a vacant office could impose substantial burdens on those who already labor under enormous responsibilities.  That choice, however, is not the Court's, but Congress's.  Nor is the Executive Branch without tools to address this concern.  In most circumstances, departments and agencies can avoid this burden if the first assistant lawfully assumes the acting role pursuant to § 3345(a)(1), or if the President directs that a PAS officer or eligible senior agency official assume that role pursuant to §§ 3345(a)(2) or (a)(3), respectively.  When the 210-day clock on service of an acting official nears expiration, moreover, the President can extend the period by submitting a nomination for the vacant PAS office to the Senate.  5 U.S.C. § 3346(a).  If that nomination is rejected, withdrawn, or returned, the acting official may serve for another 210 days, and, if a second nomination is submitted, she may continue to serve until that nominee is confirmed or for 210 days after the nomination is rejected, withdrawn, or returned."  *Id*. at

§ 3346(b).  Department heads and other officials may also delegate duties to multiple officials,

so long as they do so 180 days before the vacancy arises.  *Id.* § 3348(a)(2)(B)(ii).  The Court's

holding, moreover, is a narrow one:  the Court merely concludes that where, as here, a statute

assigns a function to a single PAS office, and where, as here, the department head did not

reassign that function using his vesting-and-delegation authority or any other authority at least

180 days before the vacancy occurred, that function is a "function or duty" of the vacant PAS

office within the meaning of § 3348, and it must be performed either by a properly serving acting

official or by the department head.

    b.    <u>APA</u>

The Court, in any event, is also persuaded by Plaintiffs' alternative theory—that, because

Cuccinelli was exercising the authority of the USCIS Director in violation of the FVRA, the

directives were not issued "in accordance with law," and must, accordingly, be set aside under

the APA.  Dkt. 12 at 35 (quoting 5 U.S.C. § 706(2)(A)).  The D.C. Circuit's decision in *SW

General, Inc. v. NLRB*, 796 F.3d 67 (D.C. Cir. 2015), provides helpful guidance on this point.

That case involved a violation of the FVRA in the appointment of the acting general counsel of

the NLRB.  *Id.* at 69.  But because the NLRB is expressly exempted from the vacant-office

provision of the FVRA, the D.C. Circuit had to determine the consequences of the improper

appointment without the aid of that provision.  *Id.* at 78.  In addressing that question, the Court of

Appeals started with the premise that agency action taken without lawful authority is at least

voidable, if not void *ab initio*.[13]  *Id.* at 79.  It then considered whether one of two doctrines might

save the action at issue that case.

---

[13]  Because the NLRB "did not seek certiorari on this issue," the Supreme Court did "not
consider it."  *SW General, Inc.*, 137 S. Ct. at 938 n.2.

Under the first such rule, the APA's "rule of prejudicial error," 5 U.S.C. § 706, reviewing courts must consider whether the agency's error affected the outcome. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010). "The burden to demonstrate prejudicial error is on the party challenging agency action," but it "is 'not . . . a particularly onerous requirement.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009)). As in *SW General, Inc*., that rule does not pose a substantial hurdle to Plaintiffs' claim here. 796 F.3d at 80. The Court "cannot be confident that" the same Directives "would have issued under an" acting Director "other than" Cuccinelli. *Id.*

Under the second such rule, the *de facto* officer doctrine, a court may "confer[] validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Id.* at 81 (quoting *Ryder v. United States*, 515 U.S. 177, 180 (1995)). That doctrine, however, has seen substantial contraction over time and, under governing D.C. Circuit law, collateral attacks on an official's authority are permitted when two requirements are satisfied:

> First, the plaintiff must bring his action at or about the time that the challenged government action is taken. Second, the plaintiff must show that the agency or department involved has had reasonable notice under all of the circumstances of the claimed defect in the official's title to office.

*Id.* at 81–82 (quoting *Andrade v. Lauer*, 729 F.2d 1475, 1499 (D.C. Cir. 1984)). Here, Plaintiffs promptly brought suit within 60 days of the challenge action, and Defendants do not challenge the timeliness of the suit. Moreover, the Department had notice of the claimed defect in Cuccinelli's service as early as June 18, 2019—eight days after Cuccinelli took office and before he issued the Asylum Directives—when the House Committee on the Judiciary sent acting Secretary McAleenan a letter expressing "deep concern" that "Cuccinelli was appointed in a manner that circumvents the [FVRA]." *See* U.S. House of Representatives, Committee on the

Judiciary, Letter to Acting Secretary Kevin McAleenan (June. 18, 2019), available at https://tinyurl.com/s9xlzyy (last accessed Feb. 28, 2020).[14]  The *de facto* doctrine—which in any event was not raised as a defense, *see* Dkt. 25 at 19 n.5—would thus not pose a barrier to Plaintiffs' challenge.

*     *     *

Thus, under either theory—application of the FVRA vacant-office provision or general principles of administrative law—the reduced-time-to-consult and the prohibition-on-extensions directives "have no force or effect," 5 U.S.C. § 3348(d)(1), and must be "set aside" as action taken "in excess of statutory . . . authority," 5 U.S.C. § 706.   As Defendants acknowledge binding D.C. Circuit precedent requires that, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual [plaintiffs] is proscribed."  Dkt. 25 at 23 n.6 (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).  Although Defendants are correct that 8 U.S.C. § 1252(e)(1)(B) divests the Court of jurisdiction to certify a class, Plaintiffs have not asked the Court to do so, and the class action rule has no bearing on the nature of the relief that the Court must provide.  To the contrary, the structure of 8 U.S.C. § 1252(e)(3) itself contemplates that courts may issue declaratory judgments relating to the "implementation of" the expedited removal provisions of IIRIRA that affect the interests of those not before the Court; most notably, to expedite resolution of any legal challenges, Congress required all challenges to the validity of new implementing rules or polices be brought within 60 days of their adoption.  *Id.* § 1252(e)(3)(B).  Defendants are also correct that the Supreme Court

---

[14]   Although the June 18, 2019 letter is not in the record, the Court takes judicial notice of that public document pursuant to Federal Rule of Evidence 201(b)(2).

has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of [the policy's] vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also OA v. Trump*, 404 F. Supp. 3d 109, 153–54 (D.D.C. 2019). This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury. *Monsanto Co.*, 561 U.S. at 165. Thus, absent the need to take further action, the Court will decline Plaintiffs' request for an injunction and will set aside the two directives at issue.

2.   *Removal Orders*

Plaintiffs also request that the Court set aside their individual removal orders "as well as those of any asylum seekers who were processed under the Directives but have not yet been removed." Dkt. 28 at 26. Starting with the five remaining individual Plaintiffs, the Court must once again consider the "rule of prejudicial error." 5 U.S.C. § 706. At this point, the question is not simply whether the Directives would have issued in the same form even if Koumans had not been replaced by Cuccinelli as acting Director, but whether the five individual Plaintiffs were prejudiced by the resulting reduced time to consult and to prepare for their credible-fear interviews. Having reviewed Plaintiffs' extensive declarations, and given the minimal burden required to establish prejudicial error, *Jicarilla Apache Nation*, 613 F.3d at 1121 ("If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further."), the Court is convinced that the negative credible-fear determinations that each of the five individual Plaintiffs received must be set aside.

As a practical matter, this also means that their removal orders are deficient. If an alien indicates an intention to apply for asylum, expedited removal requires that an asylum officer

conduct a credible-fear interview of any alien seeking asylum, and that has yet to occur here. *See* 8 U.S.C. § 1225(b)(1)(A)(ii).  Until a legally sufficient interview occurs, the individual Plaintiffs are not subject to expedited removal.  The Court will, accordingly, vacate their negative credible-fear determinations (and any removal orders that are premised on those determinations) and will remand their cases to USCIS for further proceedings consistent with this decision.

The Court is unconvinced, however, that it should extend this relief to other asylum seekers who were processed under the defective directives.  Those individuals are not parties to this case, nor is this case a class action.  This Court's jurisdiction, moreover, is limited to claims brought challenging "determinations" made under the expedited removal provision of IIRIRA within 60 days of promulgation of the allegedly unlawful regulation or policy.  8 U.S.C. § 1252(e)(3).  To be sure, the Court has concluded that the two directives are invalid and must be set aside.  The consequences of that holding with respect to parties not before the Court, however, lies beyond this Court's jurisdiction.  *See id.* § 1252(a)(2) ("[N]o court shall have jurisdiction to review . . . any individual determination . . . except as provided in subsection (e)"); *see also id.* § 1252(e)(1) ("[N]o court may . . . certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized" under 8 U.S.C. § 1252(e)).  The Court will, accordingly, deny Plaintiffs' request to vacate the removal orders— or any negative credible-fear determinations—with respect to those who are not parties to this action.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Plaintiffs' partial motion for summary judgment, Dkt. 29, and **GRANTS** in part and **DENIES** in part

Defendants' partial motion for summary judgment, Dkt. 30.  The Court concludes that it has

jurisdiction over Plaintiffs' challenges to the reduced-time-to-consult and prohibition-on-

extensions directives and that it lacks jurisdiction over Plaintiffs' challenge relating to the in-

person-orientation directive.  The Court also concludes that Cuccinelli was not lawfully

appointed to serve as the acting Director of USCIS and that, accordingly, the reduced-time-to-

consult and prohibition-on-extensions directives must be set aside as *ultra vires* under both the

FVRA, 5 U.S.C. § 3348(d)(1), and the APA, 5 U.S.C. §706(2)(A).  Finally, the Court sets aside

the individual Plaintiffs' negative credible-fear determinations and expedited removal orders and

remands to USCIS for further proceedings consistent with this decision.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 1, 2020